1

IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

3

4

RODERICK GASTON,                    *
5          Plaintiff,          *Case No. 5:21-cv-00549-NAD
*April 12, 2023
6      vs.                         *Huntsville, Alabama
*9:33 a.m.
7      DUSTIN T. WARD,                 *
Defendant.          *
8      ******************************

9

10

TRANSCRIPT OF JURY TRIAL
11      BEFORE THE HONORABLE NICHOLAS A. DANELLA
UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23
Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
24  pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and
Procedures Vol. VI, Chapter III, D.2.  Transcript produced by
25                  computerized stenotype.

***LAUREN SHIRLEY, RPR, CRR***
Federal Official Court Reporter
1729 5th Ave N
Birmingham, AL 35203
256-390-9655/lauren_shirley@alnd.uscourts.gov

```
 1                        APPEARANCES

 2

                FOR THE PLAINTIFF:
 3              Johnny Lewis Banks, III, Esq.
                Balch & Bingham
 4              1901 Sixth Avenue North, Ste. 1500
                Birmingham, Alabama 35203
 5              205-279-2904

 6              Nicholas Elliot Brown, Esq.
                Balch & Bingham
 7              1901 Sixth Avenue North, Ste. 1500
                Birmingham, Alabama 35203
 8              205-266-3410

 9
                FOR THE DEFENDANT:
10              Elena L. Bauer, Esq.
                Burr & Forman
11              420 North 20th Street, Ste. 3400
                Birmingham, Alabama 35203
12              205-458-5386

13              Jackson Alexander Freese, Esq.
                Burr & Forman
14              420 North 20th Street, Ste. 3400
                Birmingham, Alabama 35203
15              205-458-5379

16

17              ALSO PRESENT:

18

19
                COURTROOM DEPUTY: STEPHANIE BUHLER
20

21

22              COURT REPORTER:  LAUREN SHIRLEY, RPR, CRR

23

24

25
```

1                                 I N D E X

2
   **RODERICK GASTON**                                              79
3        Direct Examination                                         79
         By Mr. Brown
4
         Cross-Examination                                         100
5        By Mr. Freese

6        Redirect Examination                                      111
         By Mr. Brown
7
   **DUSTIN TYLER WARD**                                           115
8        Direct Examination                                        116
         By Ms. Bauer
9
         Cross-Examination                                         127
10       By Mr. Banks

11       Redirect Examination                                      138
         By Ms. Bauer
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2          (In open court at 9:33 a.m. Defendant present.)

3          THE COURT:  On the record.  Getting warmed up in the

4     trial of Gaston v. Ward, 21-cv-549.  Counsel, please state your

5     appearances for the record.

6          MR. BANKS:  John Banks for plaintiff Roger Gaston.

7          MR. BROWN:  Nate Brown for the plaintiff Roger Gaston.

8          THE COURT:  Good morning.

9          MS. BAUER:  Elena Bauer for the defendant Dustin Ward.

10         MR. FREESE:  Jack Freese for the defendant Dustin

11    Ward.

12         THE COURT:  Good morning.  And Mr. Ward is in the

13    courtroom, and Mr. Gaston is here.

14         MR. BANKS:  Yes, Your Honor.

15         THE COURT:  Very good.  Subject to any thoughts or

16    questions that you all had, I only wanted to check on a few

17    things before the jury comes up for voir dire.

18         Any objections or other issues with, really, all the

19    documents that we circulated yesterday?  Let's start with the

20    court's voir dire.  Plaintiff?

21         MR. BANKS: No objections, Your Honor.

22         MS. BAUER:  No objections, Your Honor.

23         THE COURT:  How about jury instructions?

24         MR. BANKS:  No objections, Your Honor.

25         MS. BAUER:  No, Your Honor.

1          THE COURT:  Verdict form?

2          MR. BANKS:  No objections, Your Honor.

3          MS. BAUER:  No objections.

4          THE COURT:  Evidence.  We did our order on the motions

5  in limine.  Any follow-up on that?  We all know what's in,

6  what's out?

7          MS. BAUER:  Yes.

8          MR. BANKS:  Yes, Your Honor.  We're good, Your Honor.

9          MS. BAUER:  Yes, Your Honor.

10         THE COURT:  And how about exhibits, do we have an

11 exhibit notebook?

12         MR. BANKS:  Yes, Your Honor.

13         MS. BAUER:  Yes, yes, Your Honor.

14         THE COURT:  Do I have a copy of that?

15         MR. BANKS:  We can approach and give you one, Your

16 Honor.

17         THE COURT:  Yes, please.  Can we pre-admit these?  Are

18 these in by agreement, or do we have any issues as to any of

19 the documents?

20         MR. FREESE:  We have no issues, Your Honor.

21         MR. BANKS:  No objections, Your Honor.

22         MS. BAUER:  Our binder includes that the first three

23 exhibits are by agreement.  The other ones are impeachment

24 documents, so we don't intend to -- only if they become

25 appropriate.

1          THE COURT:  That's fair.  I think what I will propose

2     is that we receive each of these, but just tag what you're

3     using.  We won't need to go through what I'll call the

4     evidentiary rigmarole of authentication and admission and

5     objection and so forth.  Just if and when you go to any one of

6     these, just flag it, and then we'll admit it at that time.

7          MR. BANKS:  Yes, Your Honor.

8          THE COURT:  I just wanted to head down any issues as

9     to objections that we may have.  It sounds like there are none.

10         MR. BANKS:  And, Your Honor, we have a separate binder

11    of just impeachment documents -- impeachment documents we

12    anticipate needing.  Do you want a copy of that as well, just

13    to keep the two separate for our end?

14         THE COURT:  If you've got it, we'll take that now,

15    please.

16              (Off the record discussion.)

17         MR. BANKS:  Your Honor.

18         THE COURT:  Yes.

19         MR. BANKS:  I've been requested by my client to step

20    out.  Mr. Brown is more than capable of handling everything

21    else until I get back.

22         THE COURT:  Understood.  Thank you.  I think we only

23    have one or two more minutes as it is.  This was the best that

24    we could do with the skirt on the table.  And I think you all

25    have considered or discussed logistics of when the jury comes

1  in for voir dire, if you'll be on this side, and then how to

2  negotiate.  That's the best that we can do.  Any issue there?

3          MR. BROWN:  No, Your Honor.

4          THE COURT:  Thank you.  Any other issues, anything to

5  take up before we bring in the jury for selection and voir

6  dire?  Ms. Bauer?

7          MS. BAUER:  Yes.  We were wondering if the court would

8  like to advise our client of his Fifth Amendment rights before

9  the jury comes in since he's facing a criminal trial and

10 assault charge related to this incident.  We have discussed it

11 with him and discussed it with his criminal attorney, and he

12 will testify today and not plead the Fifth.  But I didn't know

13 if the court would like to advise him, again, of his right to

14 plead the Fifth and that he's waiving it.

15         THE COURT:  I'll just say, I mean, number one, I won't

16 ask as to what your lawyers have said.  That's all privileged.

17 What I will tell you is just what I tell all criminal

18 defendants.  Those proceedings are a bit different.  But you

19 have the right to remain silent.

20         Anything that you say can be used as evidence in court

21 against you.  If you begin to make a statement, you can stop at

22 any time.  You're not required to complete that statement.

23 That's about it.  Understood, sir?

24         THE DEFENDANT: Yes, Your Honor.

25         MS. BAUER:  That was it.  Thank you.

 1            THE COURT:  Thank you.  Anything else before we go
 2   back off the record?
 3            MR. BROWN:  Yes, Your Honor.  A couple of housekeeping
 4   issues.  For publishing evidence and documents to the jury,
 5   does the court prefer that we make a request to the court each
 6   time we publish a document, or can we make one request and have
 7   a standing permission throughout the course of the trial?
 8            THE COURT:  That's what I was getting at with the
 9   binders.  If everything is -- both sides know what it is, and
10   everyone is on board, and it's in by agreement, just tag it so
11   we know, and we can admit it at that time.  But you can go on
12   and publish it as though it's already admitted, and you have
13   permission to do so.
14            MR. BROWN:  Thank you, Your Honor.
15            THE COURT:  Again, we're shooting for efficiency and
16   speed today.
17            MR. BROWN:  Understood.  For approaching the jury box
18   or is there -- do we have any leeway during opening and closing
19   to move around the courtroom, or would you prefer that we stay
20   behind the podium?
21            THE COURT:  I think we talked about this at our
22   pretrial, and, Mr. Brown, you may not have been there.  You've
23   got leeway, but don't push it.
24            MR. BROWN:  Understood.
25            THE COURT:  I would think, within reason, I mean, if

1  you're crossing my face, you're probably going too far.

2        MR. BROWN:  Thank you, Your Honor.  And finally, Your

3  Honor, we anticipate, during the course of trial, we might hear

4  some testimony from Mr. Gaston that contains some rather

5  incendiary language.  We anticipate that we will need to use

6  that during our opening statement and, perhaps, our closing

7  statement as well.  I want to put the court on notice today.

8        THE COURT:  Thank you.

9        MR. BROWN:  Thank you, Your Honor.

10       COURTROOM DEPUTY:  Because of this heating and air

11  unit, this air unit and the air flow, if they start walking

12  around, it's very hard for the court reporter to hear during

13  opening because they don't have that microphone, the microphone

14  near them.  So, like, if they want to do that, we either need

15  to give them a handheld one, or just ask them if they'll stay

16  at the podium or their table, if you don't mind.

17       THE COURT:  Ms. Buhler has just said that when you

18  want to start performing -- and I'm not saying that

19  negatively -- there's not a microphone, and so it gets really

20  difficult for the court reporter to hear you given the air

21  conditioning.  So if you're willing to stay at the lectern, I

22  think that might be easiest.  It sounds like maybe we can get

23  you a handheld mic, if that's something that you want.  Do you

24  have any reaction hearing that?

25       MR. BANKS:  No, Your Honor.  We can stay by the

1  podium.

2          THE COURT:  Okay.  Thank you.  Ms. Bauer.

3          MS. BAUER:  Yes, sorry.  There was one issue regarding

4  the documents.  Both defendants and the plaintiffs have the

5  complaint as an exhibit.  There's an attachment to the

6  complaint, which is the disciplinary report.  It's the

7  defendant's position that that document is excluded per the

8  court's motion in limine order.

9          THE COURT:  Plaintiff.

10         MR. BANKS:  One moment.

11         THE COURT:  I'll say, I tend to agree with Ms. Bauer.

12         MR. BANKS:  Your Honor, to the extent that exhibit is

13  used, it will be used, frankly, for impeachment or for

14  inconsistent statements based on testimony listed during direct

15  or inconsistencies elicited during cross-examination.  And

16  further, to the extent that document is offered, based on some

17  other issues we discussed, we're more than willing to use it

18  verbally and not publish anything that has a true finding of

19  fact such that a legal conclusion or other type of inference

20  could be drawn from anything outside of the narrative in that

21  document.

22         THE COURT:  I think we're saying the same thing.

23  Document 1, including the appendix, which I have as Pages 5

24  through 8, are obviously in the court record.  But for today,

25  the appendix is out.

1    MR. BANKS:  Yes, Your Honor.

2    THE COURT:  Out for trial purposes.

3    MR. BANKS:  Yes, Your Honor.

4    THE COURT:  Understood?

5    MR. BANKS:  Yes, Your Honor.

6    MS. BAUER:  Yes, that was the only issue.

7    THE COURT:  Anything else from either side?

8    MR. BANKS:  No, Your Honor.

9    MR. BROWN:  No.

10   THE COURT:  Very good.  We'll go off the record, and

11   we'll get the jury.

12              (Recess at 9:45 a.m. to 10:08 a.m.)

13                   (Jury in at 10:08 a.m.)

14   THE COURT:  Good morning, again.  The jury venire is

15   in, parties are in, counsel is in.  At this time, I'll ask the

16   courtroom deputy to please administer the oath to the venire.

17   COURTROOM DEPUTY:  As I call your name, please stand.

18                   (Roll call.)

19                   (Jury sworn.)

20   COURTROOM DEPUTY:  Thank you.  Be seated.

21   THE COURT:  This is the case of Roderick Gaston versus

22   Dustin T. Ward.  We anticipate that the evidence in this case

23   will conclude today or tomorrow.  We are about to select a jury

24   for the trial of this case that has been announced ready for

25   trial.  And in order to assist the court and the attorneys in

1  that selection process, we're going to proceed with what is

2  called voir dire examination.  The purpose of voir dire

3  examination is to afford the lawyers full opportunity to inform

4  themselves so that they may responsibly exercise their duties

5  to their respective clients to select a fair and impartial jury

6  for the trial of this particular case.

7       No one wishes to probe unnecessarily into your private

8  affairs, but the lawyers need to know, and the parties are

9  legally entitled to know some information about you.

10 Therefore, please answer each question as fully and as

11 accurately as you can.  We need you to give your best, honest,

12 and sincere effort to answer each question.

13      If you are not sure whether you have information called

14 for by the question, tell us what you know or think.  That is,

15 tell us more rather than less.  The information you give in

16 response to the court's and the lawyers' questions will be used

17 only by the court and the lawyers to select a qualified jury

18 for the trial of this case.  If any of the information

19 requested is particularly personal to you, let me know, and you

20 can tell us about it here at the bench and not in front of

21 everyone else.

22      I am now going to request the courtroom deputy to call the

23 roll of jurors who have been summoned to this courthouse for a

24 term of jury service through a random selection process and

25 have been selected through a similar-type random selection

1  process to come into this courtroom as possible jury venire,

2  who are now seated in the order in which that random selection

3  process put you.

4      As the courtroom deputy calls your name, please stand and

5  tell us in a loud voice the information requested on the card

6  each of you have been given.

7      COURTROOM DEPUTY:  Cameron Holland.  The sheets of

8  paper -- they were supposed to bring those.  I apologize.

9      PROSPECTIVE JUROR:  My name is Cameron Holland.  I

10 live in Huntsville, Alabama.  I work for Dynetics.  I do

11 government contracting.  I've been working there for three

12 years.  I have a high school diploma from -- or yeah, high

13 school diploma from Madison County High School.  I got

14 machining certificates from Calhoun.

15     I am not married or divorced.  My primary hobbies or

16 interests, I mainly just hang out with my friends, hunt, fish.

17 That's pretty much about it.  I don't have any bumper stickers

18 on my car.  I have a -- for religion, I go to Huntsville

19 Holiness Church.  Everything else -- I don't -- I have a

20 Facebook, Instagram.  My main source of news information is the

21 local news.  And I don't really do much reading.

22     THE COURT:  Thank you.

23     PROSPECTIVE JUROR:  My name is Casey Campbell.  I live

24 in Laceys Spring, Alabama, which is in Morgan County.  I work

25 for Sanmina.  I've worked there the last seven years.  My

1 duties, just basically, stock room, warehouse work.  Education,

2 I have my high school diploma from Brewer High School.  And I

3 attend Calhoun, where I'm working on my associates in business.

4     I'm not married or divorced.  My hobbies are racing,

5 football, hunting.  I do not have a bumper sticker on my car.

6 I'm not -- I don't have a membership in any organizations.  I

7 have Facebook.  My main source of news is Facebook or through

8 the news.  And I don't really read either.

9     COURTROOM DEPUTY:  Anita Bankhead.

10     THE COURT:  Thank you.

11     PROSPECTIVE JUROR:  My name is Anita Bankhead.  I live

12 in Madison City, Madison County.  I work for Limestone County

13 Schools at Clements High School.  I'm a special education

14 teacher.  I've been employed with them for three years.

15 College, undergrad from Hampton University in Virginia.

16 Master's degree from University of Phoenix in Phoenix, Arizona.

17 And currently, working on the doctoral in educational

18 technology.

19     Spouse's name is Donald Bankhead, and he works for Iron

20 Mountain as a contractor.  Primary hobbies and interests, I

21 guess, I do like to color.  It's a stress reliever.  And

22 traveling with my family.  Bumper sticker on my car would be

23 the Maryland flag because that's where I'm from.

24 Organizations, member of Delta Sigma Theta sorority, and I

25 attend church at Restoration Church in Madison.  Social

1  networks, Facebook, Instagram, and Twitter.  Main source of

2  news or information, from the local news and cable news

3  networks.  Magazine I'm currently reading would be Time

4  Magazine, and the last book was Obama's book -- I can't

5  remember the name, Audacity of Hope.

6  THE COURT:  Thank you.

7  COURTROOM DEPUTY:  Kimberly Schmidt.

8  PROSPECTIVE JUROR:  I'm Kimberly Schmidt.  I live in

9  Harvest, Alabama.  I work at Lockheed Martin as an analyst.  I

10  graduated from UAH with a degree in accounting.

11  I am married to Paul.  My primary hobbies are landscaping

12  and playing with my dogs.  I have no bumper stickers on my car.

13  I'm not a member of any organization, other than through work,

14  like, Women's Network and things like that.  I have no

15  social --

16  THE COURT:  I'm sorry.  Please, just speak clearly

17  into the microphone.

18  PROSPECTIVE JUROR:  Sorry.  I have no social

19  networking accounts or anything.  I watch, mostly, Fox News.

20  And the last book was Aztec Gold, Clive Cussler novels.

21  THE COURT:  Thank you.

22  COURTROOM DEPUTY:  Tina Whiteside.

23  PROSPECTIVE JUROR:  Good morning, my name is Tina

24  Whiteside.  I'm from Muscle Shoals, Colbert County.  I work at

25  Wal-Mart as an assistant manager.  I graduated from Muscle

1  Shoals High School.

2      I am divorced.  My ex-husband's name is James, and I have

3  no idea where he is or where he works.  My primary hobbies are

4  hiking and kayaking.  I have dragon flies on the back window of

5  my car.  I am not a member -- I don't have memberships of any

6  organization.  I have a Facebook account.  I don't really watch

7  the news at all.  And the last book I read was A Proposal of a

8  Billionaire.

9          THE COURT:  Thank you.

10         COURTROOM DEPUTY:  Freda Vandiver.

11         PROSPECTIVE JUROR:  Hello, I'm Freda Vandiver.  I work

12 with the U.S. Postal Service.  I'm a rural letter carrier.

13 I've been there for 30 years.  I went to UNA, but I dropped out

14 when I got married.  My husband is Joseph W. Vandiver.  He is

15 retired from the Colbert County Road Department.  He was the

16 road superintendent.  My hobbies is I love to go thrift store

17 shopping.  And my bumper sticker, of course, is U.S. Mail Watch

18 For Stop.

19     I'm in the Alabama Rural Letter Carriers Association.  I

20 have a Facebook account.  And source of news, I usually watch

21 Channel 19 or Fox News.  And when I can, I do read, but I'm

22 tired of reading when I get through delivering mail.  Who gets

23 it next?

24         THE COURT:  Thank you.

25         COURTROOM DEPUTY:  Lauren Fearns.

1          PROSPECTIVE JUROR:  My name is Lauren Fearns.  I live
2    in Madison in Madison County.  I'm self-employed as a
3    housekeeper for the past year.  I have an associate degree from
4    the University of Fairbanks Alaska.  My husband is Allen
5    Fearns.  He works at Ascend Performance Materials.
6          My hobbies is gardening and home improvement.  I do not
7    have a bumper sticker.  I am not in any memberships or
8    organizations.  I have Facebook and Instagram.  My main source
9    of news comes from my husband.  And the book I'm reading is
10   Shoe Dog.
11          THE COURT:  Thank you.
12          COURTROOM DEPUTY:  Patty Kirby.
13          PROSPECTIVE JUROR:  Hello, I'm Patty Kirby.  I live in
14   Decatur, Alabama.
15          THE COURT:  Can you speak into the microphone, please?
16          PROSPECTIVE JUROR:  Hello, I'm Patty Kirby.  I live in
17   Decatur, Alabama, Morgan County.  Name of the employer is 3M.
18   I am a designer developer.  I've been there for 17 years.  I
19   had UNA, and then I went to get an associate degree at Wallace
20   State.
21          Spouse's name is Joey Corbin, but I've divorced and been
22   divorced 12 years.  I don't know what he's doing now.  Primary
23   hobbies is just traveling and playing with my dogs.  Do you
24   have bumper stickers?  I do have bumper stickers from
25   vacations, the beach, and Inglis Foundation.  I'm not involved

1   in any civic social union organizations.  I do have Facebook,

2   but I do not even go on Facebook.  Main source of news is

3   WHNT-TV 19.  I haven't read a book or magazine in a long time.

4          THE COURT:  Thank you.

5          COURTROOM DEPUTY:  Leslie Sexton.

6          PROSPECTIVE JUROR:  Hi, I'm Leslie Sexton.  I work in

7   Decatur for Decatur Morgan Hospital.  My duties is a

8   pharmacist.  I've been there since 2007.  My education, I have

9   a bachelor's degree from Barry College in Georgia, a master's

10  from NC State, went back to pharmacy school at the University

11  of Georgia.

12         My spouse's name is Michael Sexton.  He works for American

13  Forest Management.  He's a forester.  My hobbies are hiking

14  with the family, yard work, landscaping, gardening.  We have no

15  bumper stickers on the car.  My membership, we belong to

16  Decatur Presbyterian Church.  I don't have any social

17  networking accounts, Facebook or Twitter.  My main news source

18  is probably television news and the radio.  And as far as books

19  and magazines, I've read, like, Better Homes and Gardens and

20  Southern Living, as well as, I can't remember -- the book by

21  the vets right now.  I can't remember the name of it.  Anyway,

22  it's on a television show right now.  I'm sorry.

23         THE COURT:  Thank you.

24         COURTROOM DEPUTY:  Becky Aldridge.

25         PROSPECTIVE JUROR:  My name is Becky Aldridge.  I live

1  in Trinity, Alabama, Morgan County.  I work for Parsons

2  Government Services.  I'm a senior systems analyst.  I've been

3  there 13 years.  I went -- I graduated from Decatur High

4  School.  I have a bachelor's degree from Faulkner University.

5       My husband's name is Glen Sandlin.  He works at Jack

6  Daniels Cooperage in Trinity.  My primary hobbies or interests

7  are farming.  We have a small little farm with horses and a pig

8  and other animals.  No bumper stickers on my vehicle.  No

9  memberships or organizations.  I do have Facebook and

10  Instagram.  My main source of news is British news, actually.

11  I read about the United States news from foreign news outlets.

12  And my current book that I'm reading is Imagine Heaven.

13          THE COURT:  Thank you.

14          COURTROOM DEPUTY:  Russell Delay.

15          PROSPECTIVE JUROR:  My name is Russell Delay.  I live

16  outside Killen in Lauderdale County.  I am retired from TBA.

17  My education is I have a BS degree in civil engineering.

18       Spouse's name is Beverly Sue Delay, and she's a retired

19  teacher.  Primary hobbies would be sports, golf, gardening, and

20  investing.  No bumper stickers on our cars.  Member of the

21  Lions.  I'm also a member of Killen United Methodist Church,

22  but we're in the process of probably going to transfer to the

23  episcopal church.  I do not have any social networking

24  accounts.  Main source of news, of course, locally, it's the

25  TV, newspapers, and the biggest source is probably the iPhone.

1  I read a lot of magazines.  I like to read magazines, and I

2  always read Better Investing every month.  I read the

3  Smithsonian and the National Geo.

4          THE COURT:  Thank you.

5          COURTROOM DEPUTY:  Jada Goree.

6          PROSPECTIVE JUROR:  My name is Jada Goree.  I'm from

7  Athens, Alabama, Limestone County.  I work for McCurry Motor

8  Company.  I've been there for 11 years.  I do bookkeeping,

9  fleet management.  I have an associate's degree in business

10 management.  I am currently seeking my accounting degree.  I

11 have certifications in computer information systems.

12         I'm not married or divorced.  Hobbies, kayaking, running,

13 hanging out with my family.  I do not have any bumper stickers

14 on my car.  I'm not a member of any organizations.  I do have

15 Facebook and Instagram, Snapchat.  I get my news from social

16 media networks and local television stations.  And I am

17 currently not reading any books or magazines.

18         THE COURT:  Thank you.

19         COURTROOM DEPUTY:  Jacob Bolin.

20         PROSPECTIVE JUROR:  My name is Jacob Bolin.  I am a

21 machinist at Toyota Motor Manufacturing of Alabama.  I have

22 been there for two years.  Before then, I was an early

23 childhood development teacher.  I have a high school diploma

24 from Hazel Green High School and certifications through the

25 Childcare Institute.

1     I am married to my wife, Justice Bolin.  She is currently

2  unemployed.  My primary hobbies, when I'm not working, would

3  just be landscaping and general maintenance of my home.  I do

4  not have any bumper stickers.  I do not belong to an

5  organization at this time.  I do have a Facebook.  I get most

6  news from the local news.  And I read various fiction books for

7  entertainment.

8           THE COURT:  Thank you.

9           COURTROOM DEPUTY:  Melissa Glover.

10          PROSPECTIVE JUROR:  My name is Melissa Glover.  I work

11  for St. Bernard Preparatory School as the director of

12  admissions.  Also, in the last five years, I've worked in the

13  nonprofit sector for Curt's Closet and in marketing at Marshall

14  Medical Centers.  I graduated with a bachelor's degree from

15  Auburn University in communication.

16     I am not married or divorced.  Primary hobbies, hiking,

17  kayaking, and I sing in a women's choir.  I do have one bumper

18  sticker on my car, it's an Auburn University Aubie sticker.

19  And I volunteered for a nonprofit organization.  I don't know

20  if that counts in organizations.  But also a member at

21  Northbrook Baptist Church, where I also serve in their

22  preschool department.

23     I do have social media, Facebook, Instagram, Facebook,

24  Twitter and Snapchat.  I get a lot of my news from social media

25  and podcasts.  And I am currently reading the Lost December by

1   Richard Paul Evans.

2            THE COURT:  Thank you.

3            COURTROOM DEPUTY:  Nathaniel Floyd.

4            PROSPECTIVE JUROR:  I'm Nathan Floyd.  I live in

5   Madison in Madison County.  The last few years I have been

6   working at a store called War Hammer.  It's all models that you

7   build and paint and play games with.  I manage that store by

8   myself.  Before that, I worked in printing for Allegra Printing

9   in Auburn.  I went to Auburn High School and then went to

10  community college at Southern Union.  And then I almost

11  finished at UAB.

12       My spouse's name is Daphne Ellis Floyd.  I have been

13  divorced, and we are married.  She works for T-Mobile as an

14  area manager.  My primary hobbies and interests are spending

15  time with my kids, video games, and the models that we sell.  I

16  don't have any bumper stickers on my car.  I'm not any member

17  of any organizations.  I have Facebook.  I only use it for

18  messenger.

19       And then, news information is primarily from Fox News, I

20  do get some stuff from Daily Wire, Google, and I try to check

21  in on CNN to get a balance.  Books and magazines, I'm currently

22  reading War Games Illustrated, which is tied to my job.  And

23  that is it.

24            THE COURT:  Thank you.

25            COURTROOM DEPUTY:  Jay Staton.

1          PROSPECTIVE JUROR:  My name is Jay Staton.  I live in

2    Scottsboro, Jackson County.  Work with O'Neal Computing and

3    Consulting for the past five years.  Education, I graduated

4    from North Jackson High School.

5         Not married or divorced.  Play video games.  No bumper

6    stickers.  No membership in organizations.  Don't have any

7    social networking accounts.  I get news from cable and haven't

8    really been reading anything.

9          THE COURT:  Thank you.

10          COURTROOM DEPUTY:  Maxwell Burgess.

11          PROSPECTIVE JUROR:  I am Maxwell Sean Burgess.  I live

12    in Hanceville, which is Cullman County.  I work for Wal-Mart

13    distribution as a forklift driver.  I've been there almost

14    30 years.  I have a high school diploma.  My wife's name is

15    Tracy Lane Burgess.  My hobbies are music.  I'm a bass player.

16    My bumper sticker says my doberman pinscher can eat your honor

17    student.  No organizations or anything.  I'm on Facebook.

18    Channel 6 News is my news source.  And I think the last book I

19    read was a Led Zeppelin biography.

20          THE COURT:  Thank you.

21          COURTROOM DEPUTY:  Anna Bacon.

22          PROSPECTIVE JUROR:  My name is Anna Bacon.  I live in

23    Huntsville, Alabama.  I was working as a teller for Red Stone

24    Federal Credit Union for about a year, but I recently quit so I

25    could do my new job at UAH as an admissions counselor.  I have

1    a Bachelor of Fine Arts from UAH.

2        I'm not married or divorced.  Mainly, I like to do

3    anything art related, animation, art, play video games, hang

4    out with friends, play D&D, that kind of stuff.  I don't have

5    any bumper stickers on my car.  I'm not part of any

6    organization.  I do have some social media accounts, but I

7    don't really use them.  Mainly get my news from the internet.

8    And I think the last book I read was Persepolis.

9        COURTROOM DEPUTY:  Bruce Graves.

10       THE COURT:  Thank you.

11       PROSPECTIVE JUROR:  Good morning, I'm Bruce Graves --

12   good morning, I'm Bruce Graves.  I live in Huntsville, Madison

13   County.  For the last two and a half years, I've been a senior

14   aviation engineer for Intrepid, Incorporated.  Prior to that, I

15   retired from the U.S. government at the Aviation & Missile

16   Center.  And my last assignment was the principal director for

17   technology development director for the technology development

18   director.  That was for 38 years.

19       I went to the University of Tennessee.  I have an

20   electrical engineering degree.  My wife's name is Cheryl

21   Graves, and she's a homemaker.  Primary interests are golf,

22   music, travel, and our grandkids.  I do have a couple of bumper

23   stickers.  Two of them are University of Tennessee football

24   stuff and Chicago Cubs sticker.

25       I'm not in any kind of civic organizations.  We do go to

1 Grace Lutheran Church here in Huntsville. No social networking

2 accounts. Main source of news or information is either on

3 television or on the internet. The last book or magazine, I

4 just finish reading the Quad A magazine, which is the Army

5 aviation magazine. And then, my last book I read was a

6 biography on Tom Petty.

7        THE COURT: Thank you.

8        COURTROOM DEPUTY: Charles Kilpatrick.

9        PROSPECTIVE JUROR: My name is Charles Kilpatrick. I

10 live in Cullman Alabama, Cullman County. I am retired. I

11 formerly worked for Cullman Parks and Recreation for about four

12 years as park maintenance. I have some college. Graduated

13 from Cullman High School.

14     Spouse's name is Kathy Kilpatrick, and she works at

15 Pilgrim's Pantry in Cullman. Main hobbies are I like fishing

16 and gardening. No bumper stickers. No membership in

17 organizations. I have no social networking. Main source of

18 news is either local news or Fox News. And haven't read a book

19 in a day or two.

20        THE COURT: Thank you.

21        COURTROOM DEPUTY: Carter Horn.

22        PROSPECTIVE JUROR: I'm Carter Horn. I split my time

23 between Ardmore and Madison, in terms of residence. Currently,

24 I'm a residential HVAC contractor or technician. I work for a

25 small company, Residential Air, in Madison. I've got some

1  college, attended UAH for a short time, and I graduated high

2  school from Ardmore.

3      Currently, I'm not married or divorced.  I played guitar

4  for ten years.  I love music.  And I'm a car guy.  Despite

5  that, I have no bumper stickers on my car.  Currently, I'm not

6  a member of any civic, social, et cetera, organization.  I've

7  got an Instagram and a Facebook and all of that.  I'm not

8  extremely active, but I do have them.  My main source of news

9  information is just friends and family, various things I read

10 on the internet.  And currently I'm reading East of Eden by

11 John Steinbeck.

12      THE COURT:  Thank you.

13      COURTROOM DEPUTY:  David Plunk.

14      PROSPECTIVE JUROR:  Good morning, my name is David

15 Plunk.  I live in Madison in Madison County.

16      THE COURT:  Can you speak into the microphone, sir?

17      PROSPECTIVE JUROR:  Yes, I live in Madison, Madison

18 County.  I work at SEIC as a computer programmer.  And I've

19 worked as a computer programmer since I graduated from college,

20 MTSU, in the major of computer science.

21      My wife's name is Carrie, and she's a homemaker.  And I

22 have been divorced before, but I'm married now.  My primary

23 hobbies, I guess, you'd say, would be drumming and bike riding.

24 And I have a bumper sticker with a baby yoda and Breckenridge,

25 Colorado.  I attend church at Church of the Highlands and Grace

1  United Methodist Church.  I have a Facebook and a Twitter

2  account.  And my main source of news is Youtube, local news,

3  and Fox News.  And the book I'm reading is an autobiography of

4  Helen Keller.

5          THE COURT:  Thank you.

6          COURTROOM DEPUTY:  Tiffany James.

7          PROSPECTIVE JUROR:  Hi, I'm Tiffany James.  I live in

8  Anderson, Alabama, which is in Lauderdale County.  I work at

9  Brooks High School in the lunchroom.  I've been there four

10 years.  I do have a high school diploma, some college.  I am

11 married.

12     My husband is Lance James.  And he works at Magneti (sic)

13 as a technician.  And I don't have any bumper stickers on my

14 car.  I attend Bethel Baptist Church, and I help with our youth

15 group.  And I do have Facebook and Twitter.  And I watch the

16 local news and get information from Facebook also.  And I'm not

17 reading any magazines or books at the time.

18         THE COURT:  Thank you.

19         COURTROOM DEPUTY:  Eric Horton.

20         PROSPECTIVE JUROR:  I'm Eric Horton.  I'm from Cullman

21 County.  I've got a high school diploma from Holly Pond,

22 Alabama.  My wife's name is Angela Horton.  She runs a business

23 with my mom cleaning houses.  I like hiking, kayaking.  I don't

24 have any bumper stickers.  I'm not a part of any memberships or

25 organizations.  I have a Facebook account.  Just local news.  I

1 don't really watch TV that much. And I don't read anything

2 either.

3 THE COURT: Thank you. As I indicated a few minutes

4 ago, we are commencing the trial of the case of Gaston versus

5 Ward. In this case, Plaintiff Gaston alleges an Eighth

6 Amendment excessive force claim against Defendant Ward and

7 seeks money damages. Plaintiff Gaston alleges that Defendant

8 Ward used excessive force when he struck Gaston in the face

9 after Gaston refused to abide by a direct order to lock down.

10 The incident that gave rise to this suit took place on March

11 12th, 2021 at the Limestone Correctional Facility.

12 Now, ladies and gentlemen, as I indicated earlier, I'm

13 going to ask you some questions, after which the attorneys will

14 be allowed to ask you some additional questions if they so

15 desire. Please answer these questions completely and

16 truthfully. If your answer is yes, raise your hand and give

17 your name in a loud, clear voice when called upon to respond.

18 Is any juror familiar with the facts that may be involved

19 in this particular case? I see no hands.

20 Does any member of the jury panel know of any reason why

21 you may be prejudiced for or against the plaintiff or for or

22 against the defendant because of the nature of this particular

23 case or otherwise? In other words, is there any one of you

24 that could not be fair to both sides in this case due to the

25 fact that this case involves an excessive force claim? I see

1    no hands.

2        This is the plaintiff, Mr. Roderick Gaston.  Would you

3    please raise your hand, sir?  Are any of you related by blood

4    or marriage to Plaintiff Gaston?  Are any of you friends, or do

5    you know him?  I see no hands.

6        This is the defendant, Dustin Ward.  Would you please

7    raise your hand, sir?  Are any of you related by blood or

8    marriage to Defendant Ward?  Are any of you friends, or do you

9    know him?  I see no hands.

10        Have any of you or any person related to any of you, by

11    blood or marriage, or any close friend, ever been employed by

12    the Alabama Department of Corrections?  I see no hands.

13        The attorneys in this case are John Banks and Nick Brown,

14    of the law firm of Balch & Bingham in Birmingham, representing

15    the plaintiff, Mr. Gaston.  I'd ask you both to please raise

16    your hand.  And representing the defendant is Elena Bauer and

17    Jack Freese of the Burr & Forman law firm in Birmingham.  Would

18    you two please raise your hand?  Are any of you members of the

19    jury panel related, by blood or marriage, to any of the

20    attorneys in this case?  I see no hands.

21        Do any of you know, personally, any of the attorneys or

22    anyone who works at one of their law firms?  I see no hands.

23        Have any of you or any members of your immediate family

24    ever been represented by any of the attorneys in the case or by

25    any attorney at Balch & Bingham or Burr & Forman, or to your

1  knowledge, been involved in any matter in which any of these

2  attorneys or their law firms were involved?  I see no hands.

3      Do you know or are you related, by blood or marriage, to

4  any of the other members of the jury panel?  I see no hands.

5      Do you know me, Nicholas Danella, or any members of my

6  courtroom staff, Stephanie Buhler or Beth Graham?  I see no

7  hands.

8      The following people may be called as witnesses in this

9  case.  If you are related to or know any of these people,

10  please raise your hand.  Counsel for the plaintiff, would you

11  please read your witness list?

12          MR. BANKS:  Roderick Gaston.

13          THE COURT:  Thank you.  Counsel for defendant.

14          MS. BAUER:  Dustin Ward.

15          THE COURT:  Any other witnesses today?

16          MR. BANKS:  No, Your Honor.

17          MS. BAUER:  No, Your Honor.

18          THE COURT:  I see no hands.  Has anyone talked with

19  you about this case or discussed it in your presence prior to

20  your coming into this courtroom today?  I see no hands.

21      Would any of you be the least bit hesitant promptly to

22  report to me or the courtroom deputy should someone approach

23  you about this case or talk to you about it while you are

24  serving as a juror?  I see no hands.

25      Have you or any person related to you, by blood or

1 marriage, or any close friend, ever been a party to a

2 witness -- excuse me -- a party to or a witness in a lawsuit?

3          PROSPECTIVE JUROR:  Does arbitration count?

4          COURTROOM DEPUTY:  Can you please stand?

5          PROSPECTIVE JUROR:  Does arbitration count?  Russell

6 Delay.  Does arbitration count?

7          THE COURT:  Why don't you tell us about that, sir,

8 please.

9          PROSPECTIVE JUROR:  Okay.  We had a case, our --

10 Killen Methodist Church, we had a failure of our roof trusses.

11 And we entered into litigation against the contractor.  And by

12 the contract, it was through arbitration that we settled, and

13 then we had mediation after that.

14          THE COURT:  And it ultimately was resolved in

15 mediation?

16          PROSPECTIVE JUROR:  Right.

17          THE COURT:  Thank you, sir.  Have you ever served as a

18 juror in a criminal or civil case or as a member of the grand

19 jury either in federal or state court?

20          PROSPECTIVE JUROR:  Patty Kirby.  In, probably, about

21 16 years ago, grand jury, Birmingham, for six months, one week

22 out of the month.

23          THE COURT:  Do you remember was it federal court or

24 state court?

25          PROSPECTIVE JUROR:  It was federal.

1          THE COURT:  You said 16 years ago?

2          PROSPECTIVE JUROR:  Probably, yeah.

3          THE COURT:  Thank you.

4          PROSPECTIVE JUROR:  Bruce Graves, served as a juror

5   twice -- or once, summoned twice, served once, state court here

6   in Huntsville in 2010.

7          THE COURT:  What kind of case did you sit on, sir?

8          PROSPECTIVE JUROR:  It was a -- it was a female

9   accused another person of sexually harassing her at work.  That

10  was it.

11         THE COURT:  What was the result of the case?

12         PROSPECTIVE JUROR:  Before we -- it never finished.

13  We sat, they settled out during our break, and then we went

14  home.

15         THE COURT:  Did you get into the evidence?

16         PROSPECTIVE JUROR:  No, actually, we did not.

17         THE COURT:  Thank you.  Have you, anyone in your

18  family, or a close friend ever served as a correctional

19  officer, prison warden, police officer, sheriff, or other law

20  enforcement officer?

21         PROSPECTIVE JUROR:  Becky Aldridge, my nephew is a

22  sergeant on Decatur police force.

23         THE COURT:  Thank you.

24         PROSPECTIVE JUROR:  Russell Delay, my nephew is a

25  deputy sheriff in the State of Missouri, Cape Girardeau County.

1          THE COURT:  Thank you.

2          PROSPECTIVE JUROR:  Jada Goree, my brother is a police

3    officer in Union City, Tennessee.

4          THE COURT:  Thank you.

5          PROSPECTIVE JUROR:  I'm Nathan Plunk.  I have a close

6    friend who works as a correctional officer, sheriff's

7    department, in Savannah, Tennessee.

8          PROSPECTIVE JUROR:  My cousin's name is Brad Morgan.

9    He works for Hanceville Police Department.  And my brother is a

10   part of the fire department in Holly Pond.  My name is Eric

11   Horton.

12         PROSPECTIVE JUROR:  Kimberly Schmidt, my nephew is an

13   officer with the Huntsville police, and he used to work in the

14   jail.

15         THE COURT:  Anyone else?  Ms. Aldridge, you said your

16   nephew is with the Decatur police force?

17         PROSPECTIVE JUROR:  Yes, sir.

18         THE COURT:  Would that keep you from being fair and

19   impartial in deciding the case on the evidence and the law?

20         PROSPECTIVE JUROR:  No, I'm very fair minded.

21         THE COURT:  Mr. Delay, you mentioned your nephew, same

22   question.  Would that keep you from deciding this case based on

23   the evidence and the law?

24         PROSPECTIVE JUROR:  No, sir.

25         THE COURT:  Ms. Goree, you said your brother is a

1 police officer in Tennessee.

2         PROSPECTIVE JUROR:  Yes, sir.

3         THE COURT:  Would that keep you from deciding this

4 case based on the evidence and the law?

5         PROSPECTIVE JUROR:  No, sir.

6         THE COURT:  Mr. Plunk, you mentioned a friend.  Would

7 that keep you from deciding this case based on the evidence and

8 the law?

9         PROSPECTIVE JUROR:  No, sir.

10         THE COURT:  And, Mr. Horton, would you be able to

11 decide this case based on the facts and the law?

12         PROSPECTIVE JUROR:  Say that one more time, please.

13         THE COURT:  Would you be able to decide this case

14 based on the facts you hear in the courtroom and the law as I

15 instruct you?

16         PROSPECTIVE JUROR:  Yes, sir.

17         THE COURT:  Thank you.  Have you, anyone in your

18 family --

19         COURTROOM DEPUTY:  Judge, you didn't ask Ms. Schmidt

20 the same.

21         THE COURT:  I apologize.  Thank you, Ms. Buhler.  Ms.

22 Schmidt, I forgot to follow up with you.  Thank you.  You

23 mentioned your nephew.  Would that prevent you from deciding

24 this case based on the facts and the law?

25         PROSPECTIVE JUROR:  No, sir.

1              THE COURT:  Thank you.  Thank you, again, Ms. Buhler.

2         Have any of you or any person related to any of you, by

3    blood or marriage, or a close friend ever served any time in

4    jail or prison?  I see a number of hands.

5              PROSPECTIVE JUROR:  I'm Eric Horton.  My uncle has

6    been in prison my entire life, off and on.

7              THE COURT:  And would that keep you from deciding this

8    case on the facts and the law?

9              PROSPECTIVE JUROR:  No, sir.

10             THE COURT:  Thank you.

11             PROSPECTIVE JUROR:  Becky Aldridge, I have a friend

12   that has a drinking issue and has had multiple DUIs and ended

13   up having to do some jail time.

14             THE COURT:  Would that keep you from deciding this

15   case based on the facts and the law?

16             PROSPECTIVE JUROR:  No, sir.

17             PROSPECTIVE JUROR:  Russell Delay, I have a nephew

18   that served time for drugs in Missouri State Penitentiary.  And

19   this is going out a little ways, but I have a second cousin who

20   is serving life for murder in Missouri.

21             THE COURT:  Would that keep you from deciding this

22   case based on the facts and the law?

23             PROSPECTIVE JUROR:  No, sir.

24             THE COURT:  Thank you.

25             PROSPECTIVE JUROR:  My name is Jada Goree.  My fiancee

1 did time in prison, probably, 20 years ago.

2          THE COURT:  Would that keep --

3          PROSPECTIVE JUROR:  Oh, and my daughter's, my middle

4 child's father, has been in and out of prison, which I have no

5 contact with him.

6          THE COURT:  Would that keep you from deciding this

7 case based on the facts and the law?

8          PROSPECTIVE JUROR:  No.

9          PROSPECTIVE JUROR:  Freda Vandiver.  My niece's

10 ex-husband served time in prison for arson.

11          THE COURT:  Would that keep you from deciding this

12 case based on the facts and the law?

13          PROSPECTIVE JUROR:  No, sir.

14          PROSPECTIVE JUROR:  Kimberly Schmidt, I had a

15 different nephew who served in the Alabama State Prison for

16 armed robbery.

17          THE COURT:  Would that keep you from deciding this

18 case based on the facts and the law?

19          PROSPECTIVE JUROR:  No, sir.

20          PROSPECTIVE JUROR:  Anita Bankhead, my nephew served

21 three years in Limestone Correctional Facility.

22          THE COURT:  Do you know what the charge was?

23          PROSPECTIVE JUROR:  Assault.

24          THE COURT:  Would that keep you from deciding this

25 case based on the facts and the law?

 1          PROSPECTIVE JUROR:  No, sir.

 2          PROSPECTIVE JUROR:  My name is Casey Campbell.  I did

 3   jail time for felony drug possession charges, but I did drug

 4   court.

 5          THE COURT:  And would that keep you from deciding this

 6   case based on the facts and the law?

 7          PROSPECTIVE JUROR:  No.

 8          THE COURT:  Anyone else?  Does anyone else or anyone

 9   in your family or close friend ever served any time at

10   Limestone Correctional Facility, other than Ms. Bankhead?  I

11   see no hands.

12       Have you, anyone in your family, or a close friend ever

13   been charged with a crime that was later dropped or dismissed?

14          PROSPECTIVE JUROR:  I'm Maxwell Burgess.  I was

15   charged with obstructing governmental operations, which was

16   basically, being a smart alec to a cop.

17          THE COURT:  And it was dropped, dismissed?

18          PROSPECTIVE JUROR:  It was dropped.

19          THE COURT:  When was that, sir?

20          PROSPECTIVE JUROR:  It's been, probably, 15 years ago,

21   back when I was young and dumb.

22          THE COURT:  Was that here or --

23          PROSPECTIVE JUROR:  It was in Cullman County.

24          THE COURT:  Would that keep you from deciding this

25   case based on the facts and the law?

```
 1              PROSPECTIVE JUROR:  No, sir.

 2              THE COURT:  Thank you.

 3              PROSPECTIVE JUROR:  Becky Aldridge, I'm very

 4    embarrassed.  It was assault.  But I -- it was dropped.

 5              THE COURT:  And when was that?

 6              PROSPECTIVE JUROR:  Maybe 2001, something like that.

 7              THE COURT:  Was that in Alabama?

 8              PROSPECTIVE JUROR:  Yes.

 9              THE COURT:  Would that keep you from deciding this

10    case based on the facts and the law?

11              PROSPECTIVE JUROR:  No.

12              THE COURT:  Thank you.  Any other hands?  Do you work

13    for or with any police officers, sheriffs, security guards,

14    state troopers, or correctional officers?

15              PROSPECTIVE JUROR:  Tiffany James, our SRO officer at

16    school.

17              THE COURT:  Would that keep you from deciding this

18    case based on the facts and the law?

19              PROSPECTIVE JUROR:  No, sir.

20              THE COURT:  Thank you.

21              PROSPECTIVE JUROR:  Bruce Graves, just security

22    personnel on the arsenal.

23              THE COURT:  Would that keep you from deciding this

24    case based on the facts and the law?

25              PROSPECTIVE JUROR:  No, sir.
```

1          PROSPECTIVE JUROR:  Anita Bankhead, the resource

2     officer at Clements High School.

3          THE COURT:  Would that keep you from deciding this

4     case based on the facts and the law?

5          PROSPECTIVE JUROR:  No, sir.

6          PROSPECTIVE JUROR:  Melissa Glover, and we have an SRO

7     officer at St. Bernard Prep School.

8          THE COURT:  Would that keep you from deciding this

9     case based on the facts and the law?

10          PROSPECTIVE JUROR:  No, sir.

11          PROSPECTIVE JUROR:  Becky Aldridge, security personnel

12     on the arsenal.

13          THE COURT:  Would that keep you from deciding this

14     case based on the facts and the law?

15          PROSPECTIVE JUROR:  No, sir.

16          THE COURT:  Thank you.  Anyone else?  Do you have or

17     display any stickers or flags on your car or any property that

18     shows support for any law enforcement support groups or

19     movements?  I see no hands.

20          Is there anyone who believes, for whatever reason, that

21     they would be unable, if chosen to serve on the jury in this

22     case, to be fair and impartial to both sides and to return a

23     verdict based solely on the facts as you determine them to be

24     from the evidence and the law as I give it to you to be applied

25     to those facts?  I see no hands.

1     Can any of you think of any other matter that you should

2     call to the court's attention that may have some bearing on

3     your qualifications as a juror or that may prevent you from

4     rendering a fair and impartial verdict based solely on the

5     evidence and my instructions as to the law?  I see no hands.

6     I have now asked the questions I intended to ask.  Now,

7     the attorneys may ask you some questions.  Please answer them

8     fully and truthfully.  Mr. Banks.

9     MR. BANKS:  Yes, Your Honor.  Good morning.  First, we

10    want to thank you for your transparency so far.  One thing I

11    want to ask from everyone, before we get too much further, is

12    if, by a show of hands, all of you can commit that anything

13    that is said in this room stays in this room.  Show of hands.

14    Okay.  Cool.  Everybody got a little bit of movement in real

15    quick.

16    We asked where you currently stay, but is anybody here a

17    Birmingham transplant, at one point stayed or lived in

18    Birmingham?

19    PROSPECTIVE JUROR:  Nathan Floyd.  Let's see.  My son

20    is 13.  So I lived in Hoover 11 years ago and the four years

21    previous to that.

22    MR. BANKS:  Okay.  So starting from today, about 15 to

23    11 years ago you were in Hoover?

24    PROSPECTIVE JUROR:  (Nods head.)

25    MR. BANKS:  Being in, kind of, that Birmingham metro

1   area, are you familiar with Roebuck?

2          PROSPECTIVE JUROR:  I remember the name, but I don't

3   remember the location.

4          MR. BANKS:  Okay.  Thank you, sir.  Anybody else?

5   Okay.  Does anyone here think that any person who has been

6   convicted of a crime deserves anything that happens to them

7   while they're in jail?  Anybody disagree with that?  Okay.

8   Good chunk of hands.  I'll save everybody the expense for sake

9   of the court's time.

10         Does anyone here think that any person who's been

11  convicted of a crime cannot or should not complain about any

12  fights or scuffles they have while incarcerated?

13         And one thing I want to say before I get too much further,

14  if I ask a bad question that you do not understand, please

15  throw your hand up, and I'll try my best to fix it.  Okay?

16  Does anyone here believe that a police officer, correctional

17  officer, anybody in law enforcement, in a situation, can use

18  whatever force they feel is appropriate?  Anybody disagree with

19  that?  Okay.  I haven't heard from you, ma'am.  If you -- right

20  there.

21         PROSPECTIVE JUROR:  Tina Whiteside.

22         MR. BANKS:  Could you tell us why you might disagree

23  on that?

24         PROSPECTIVE JUROR:  I feel like what you do on the

25  outside should not affect how you feel in jail.  When you're in

1  jail, you should feel like you're safe.

2  MR. BANKS:  Does anybody here agree with what Ms.

3  Whiteside said, by a show of hands?  Anybody disagree with

4  that?  Show of hands.  Thank you, Ms. Whiteside.

5  Taking that just a step further, does anyone here believe

6  that somebody who was in jail or prison gets to be treated any

7  type of way by any correctional officer, guard, anything like

8  that?  Show of hands.

9  Anybody disagree with that one?  Okay.  I won't pick

10  anybody this time.

11  Do you think anybody who pleads guilty to a crime loses

12  rights while in prison?  If you'll stand up, sir.

13  PROSPECTIVE JUROR:  Bruce Graves.

14  MR. BANKS:  What was that?

15  PROSPECTIVE JUROR:  I was going to say they don't have

16  the right to vote anymore, right?

17  MR. BANKS:  Right.  I'm saying, more so, while they're

18  in a facility.

19  PROSPECTIVE JUROR:  Oh.

20  MR. BANKS:  Do you think they lose any rights by being

21  in state custody as a correctional -- no?  Okay.  Thank you,

22  sir.

23  Does that change anybody's mind if the person is convicted

24  as opposed to pled guilty?

25  For those of you who raised your hands earlier and said

1  you have had a run-in with law enforcement or family member

2  has, could you raise your hand if you had a -- you or that

3  person had a generally positive experience with law

4  enforcement?

5          PROSPECTIVE JUROR:  Pleasant.

6          MR. BANKS:  Pleasant, positive, somewhat okay.

7          PROSPECTIVE JUROR:  It was fair.

8          MR. BANKS:  Yeah.

9          PROSPECTIVE JUROR:  Becky Aldridge, it was a fair

10 experience.

11         MR. BANKS:  And what makes you say it was fair?

12         PROSPECTIVE JUROR:  They listened.  It was --

13 everything was explained in detail.  It was a false charge.  So

14 I was able to explain the experience, and there was witnesses

15 and everything there, so it was fine.

16         MR. BANKS:  And do you think that, say, whoever was

17 involved didn't listen or explain everything as well, do you

18 think that would have changed your experience or your outlook

19 on that?

20         PROSPECTIVE JUROR:  Possibly, yes.

21         MR. BANKS:  Okay.  Anybody agree with Ms. Aldridge?

22 Show of hands.  If we've got a whole bunch of folks, I won't

23 pick on anybody.  So help folks out.

24     Anybody disagree with Ms. Aldridge?  Or anybody who's had

25 a similar experience have something opposite of what Ms.

 1  Aldridge had?  Anybody have a negative experience?  Okay.

 2       Let's widen it.  Instead of just if you were charged or

 3  convicted, if you've ever been pulled over, might not have had

 4  the best time with that officer when they pulled you over.

 5  Anybody?  Show of hands.  Okay.  We got two.  I'll pick on both

 6  of y'all.

 7            PROSPECTIVE JUROR:  My name is Jay Staton.

 8            MR. BANKS:  Yes, sir.  And what was your experience?

 9            PROSPECTIVE JUROR:  Usually, harassment.  I had one

10  police officer sit down at the end of my road and, knowing that

11  I didn't have a license at the time but I had to go to work to

12  pay the ticket, would pull me over again to give me another

13  ticket.  And it just continued like that for awhile.

14            MR. BANKS:  Anybody had a similar experience?  Know of

15  anybody that's had a similar experience?  Thank you, sir.  Mr.

16  Floyd.

17            PROSPECTIVE JUROR:  Nathan Floyd, when I was 22, I was

18  driving down the street in Auburn, where I lived at the time --

19  well, where I lived most of my life.  And I had an incident

20  where an officer put on lights.  I pulled over into a parking

21  deck near downtown.  And I was surrounded by cop cars

22  immediately.  They all drew or were prepared to, and I was

23  instructed to put my hands on the ceiling.

24       And when they approached the car, they said they were

25  looking for somebody driving a car that they had stolen that

1   matched the description of my car.  I provided them all of my

2   information, and they said, Okay, it's not you.  And they

3   walked off.

4          MR. BANKS:  Besides, kind of, the obvious shock and

5   awe of getting pulled over and surrounded, what else, if

6   anything, of that experience made it less than positive?

7          PROSPECTIVE JUROR:  The hands on the guns when I

8   thought I was coming to a traffic stop, and the fact that they

9   didn't disarm when they left.  They just said, It's not you.

10  And all walked away, and said, It's not him, on radios.

11         MR. BANKS:  Got you.  Thank you, sir.  I believe Judge

12  Danella asked this, but does anybody know anyone who is

13  currently in Alabama state custody for some crime?  Just one.

14  Yes, ma'am.

15         PROSPECTIVE JUROR:  Freda Vandiver.  My husband had an

16  employee, from the Colbert County Road Department, he and his

17  wife was in a domestic one.  Of the sheriff's deputies pulled

18  up and a state trooper, and he had a gun.  And he shot it at

19  the officer, but it jammed.  And so he's still in prison, in

20  like 15 years, still in there.

21         MR. BANKS:  Okay.  Thank you, ma'am.  Has anyone had

22  any interactions with someone as they are serving time or after

23  they have been released?  Quick show of hands.  Do I need to

24  clear up the question?  Okay.  Thank you for that.

25         Has anyone here had any interaction with someone who is

1  currently in a correctional facility or someone who has been

2  released from a correctional facility?  So a current inmate or

3  a former inmate?  Not that many hands.  I'll get all of y'all.

4  We'll start over here.

5          PROSPECTIVE JUROR:  Anita Bankhead, and I'm in

6  communication with my nephew since he's been released.

7          MR. BANKS:  Anyone else besides your nephew?

8          PROSPECTIVE JUROR:  No.

9          MR. BANKS:  Okay.  Has your nephew being in custody

10  changed your opinion of him at all?

11          PROSPECTIVE JUROR:  Of him?

12          MR. BANKS:  Yeah.

13          PROSPECTIVE JUROR:  No.  He deserved it.

14          MR. BANKS:  Said like a good auntie.  I saw some other

15  hands over here.  Thank you, ma'am.

16          PROSPECTIVE JUROR:  Russell Delay.  My nephew served

17  about three years in Missouri State Pen for, I think, it was

18  drug possession.

19          MR. BANKS:  Have you had any interaction with him

20  since he's been released?

21          PROSPECTIVE JUROR:  Yes.  I haven't seen him for a

22  couple of years because we live here.  But I've seen him since

23  he got out, definitely.

24          MR. BANKS:  Kind of the same question, has your

25  opinion changed, or did him serving time change your opinion of

1   him?

2          PROSPECTIVE JUROR:  No, I don't think it changed my

3   opinion of him, but I blame somebody else.

4          MR. BANKS:  Was it some other person, or was it law

5   enforcement?

6          PROSPECTIVE JUROR:  No.  It was my brother, his

7   father.

8          MR. BANKS:  Okay.  I understand that.  Thank you, sir.

9          PROSPECTIVE JUROR:  Jada Goree.

10         MR. BANKS:  Yes, ma'am.

11         PROSPECTIVE JUROR:  My fiancee did time before we

12  were -- before I knew him.  And I didn't mention earlier -- I

13  thought about it while I was sitting here -- my sister did time

14  in jail for child endangerment.  I currently have custody of

15  her children.

16         MR. BANKS:  I think I know the answer to the question

17  I've asked the other two, but just to be clear, has your

18  opinion changed of her since her incarceration?

19         PROSPECTIVE JUROR:  No.

20         MR. BANKS:  I think I saw one hand in the back, yes.

21  Thank you, ma'am.

22         PROSPECTIVE JUROR:  Eric Horton, when my uncle gets

23  out, every once in awhile, he'll come around the family for a

24  little bit, and we treat him like he's family.

25         MR. BANKS:  Thank you, sir.  Does anyone here think

1 that law enforcement, whether it's a regular police officer,

2 sheriff, state trooper, correctional officer, just more

3 trustworthy than the average bear?

4     Does anyone think anyone in law enforcement, police

5 officer, sheriff, state trooper, anywhere on the spectrum, do

6 you think, by nature of them being in law enforcement, they are

7 more trustworthy than average folks?  No hands.

8     PROSPECTIVE JUROR:  If I'm going to go to a police

9 officer or a random Joe?  Because I'd probably go to the police

10 officer over the random Joe.

11     MR. BANKS:  Completely understandable.  No, I mean,

12 more so, if like, like if a police officer tells you something,

13 are you going to automatically give what they say more weight

14 than somebody else?

15     PROSPECTIVE JUROR:  No.

16     MR. BANKS:  Okay.  Thank you, ma'am.  Can everyone

17 here commit that they will listen to all of the facts and

18 evidence and return the appropriate verdict as instructed by

19 Judge Danella?  Show of hands.

20     Would anybody have a problem returning a verdict, based on

21 the facts and the evidence, if it doesn't line up with your

22 experience or your prior thoughts?

23     Does anyone here believe that, no matter what comes up

24 during trial, that they can't give Mr. Gaston a fair shake in

25 today's case?

1     So I'm going to flip it, can everyone here give Mr. Gaston

2     a fair shake despite anything he has done prior to what we're

3     here about today in court?  Show of hands.

4         Does anyone place such a high value on folks in law

5     enforcement and having such high trust in law enforcement you

6     don't think you could be fair to Mr. Gaston?

7         Last thing, can everyone here commit to me that they will

8     return a verdict for Mr. Gaston, when the facts and evidence

9     support a verdict for him, even if you do not like him?  Show

10    of hands.  Thank y'all.

11        THE COURT:  Thank you.  Ms. Bauer.

12        MS. BAUER:  Hi, good morning.  Thank you for your

13    time.  I just have a couple more questions, and then we should

14    be done.  The first question, who on the jury panel works or

15    has worked in management?  Please raise your hands.  All right.

16    If we could -- yeah, go ahead and start right here.

17        PROSPECTIVE JUROR:  Bruce Graves.

18        MS. BAUER:  Okay.  Go ahead.

19        PROSPECTIVE JUROR:  Just a description of what -- I

20    currently manage seven people in the job I'm in now.  Before I

21    retired my last -- my last organization, I had 970 people

22    working for me.  And then of course, prior to that, I was in

23    another division that we had about 300 people that were in my

24    group.

25        MS. BAUER:  Okay.  Thank you.

1          PROSPECTIVE JUROR:  Tiffany James, my previous job at

2    Kohl's, I was the area supervisor, and I was over the stock

3    room.

4          MR. BANKS:  Thank you.

5          PROSPECTIVE JUROR:  Russell Delay.  I was a manager

6    for TBA for 27 years, various groups.

7          PROSPECTIVE JUROR:  Tina Whiteside.  I am currently a

8    manager at Wal-Mart, and I have been in management for the last

9    25 years.

10          MS. BAUER:  Thank you.

11          PROSPECTIVE JUROR:  Nathan Floyd.  I have worked for

12    several different theater chains, managing between 25 and 60

13    people at a time.  And I was human resources for Toys "R" Us in

14    Birmingham, at my time in Hoover, where we would seasonally

15    manage up to 130 people.  Currently, I only manage myself.

16    But, again, I've had several retail jobs where I manage people.

17          MS. BAUER:  Okay.  Thank you.  Is there anyone else?

18    All right.

19          Next question, who on the jury panel has a hard time

20    delegating?  Whether that's tasks at home, tasks at work, just

21    in general, in school, had a hard time when you had to do a

22    group project, and you had to actually let everybody else get

23    involved?  No?  That's just me.  All right.  Let's see.

24          Who on the jury panel believes that the safety of people

25    inside a prison facility, that means the correctional officers,

1 the prisoners, and the employees in the correctional facility,

2 are in danger if all the inmates refuse to comply with the

3 orders given by corrections officers?  Please, show your hands.

4          PROSPECTIVE JUROR:  Can you repeat that?

5          MS. BAUER:  Yeah, sorry.  Who on the jury panel

6 believes that the safety of people inside the prison facility,

7 so that means the correction officers, the inmates, and other

8 employees that are in the correctional facility, are in danger

9 if all of the inmates refuse to comply with the orders given by

10 the correction officers?  Okay.

11          Does anybody disagree with that statement?  Okay.

12          Who on the jury panel believes that, in order to maintain

13 discipline and security in a prison facility, the correctional

14 officer may have to use force against the prisoner who refuses

15 to obey a direct command?  I'll repeat it, sorry.  Who on the

16 jury panel believes that, in order to maintain discipline and

17 security in a prison facility, the correctional officer may

18 have to exercise force against the prisoner who refuses to obey

19 a direct command by a corrections officer?

20          Does anybody disagree with that?  Okay.

21          Have you or a family member or a close friend ever been

22 seriously injured?  Okay.

23          PROSPECTIVE JUROR:  Nathan Floyd, I was just looking

24 for clarification on that.  In what context?

25          MS. BAUER:  In any context, whether that's from a

1 product malfunctioning, they were struck in a car accident,

2 they were assaulted by someone --

3          PROSPECTIVE JUROR:  Car accident.  I broke my leg

4 slipping in the rain one time, but my other injuries were from

5 a car wreck from years ago.

6          MS. BAUER:  Okay.  And that was you who was injured or

7 a friend or a family member?

8          PROSPECTIVE JUROR:  I and my wife, my ex-wife, were

9 traveling home from Christmas at the time.  She sustained only

10 bruises, and I had an untreated fracture in my neck.

11          MS. BAUER:  Okay.  Thank you.

12          PROSPECTIVE JUROR:  Russell Delay, I rolled a pickup

13 when I was 17.

14          MS. BAUER:  Excuse me?

15          PROSPECTIVE JUROR:  I rolled a pickup over when I was

16 17.

17          MS. BAUER:  Okay.  Were you injured as a result of

18 that?

19          PROSPECTIVE JUROR:  Yes.  It's the only time I've ever

20 been in the hospital.

21          MS. BAUER:  Okay.  Thank you.

22          PROSPECTIVE JUROR:  Jada Goree, my best friend was

23 killed by a drunk driver.

24          MS. BAUER:  Thank you.  Juror Number 18, okay.

25          PROSPECTIVE JUROR:  Anna Bacon, my mother and father

1  were assaulted by my brother.

2  MS. BAUER:  Do you feel comfortable sharing what
3  injuries they suffered as a result?

4  PROSPECTIVE JUROR:  My dad has a black eye, and my mom
5  got, like, punched in the back of the head.

6  MS. BAUER:  Okay.

7  PROSPECTIVE JUROR:  David Plunk, my sister was rear
8  ended by a car in an accident.

9  MS. BAUER:  Okay.  Thank you.

10  PROSPECTIVE JUROR:  I was bucked off a horse and had
11  to have neck surgery.

12  MS. BAUER:  Okay.  Anybody else?  All right.  Have
13  you, a family member, or a close friend ever had a busted lip
14  before?  A busted lip?  I'm sorry.  Okay.  Could we just
15  quickly go through, and you can describe whether it's you, the
16  friend, or family member?

17  PROSPECTIVE JUROR:  Jada Goree.  I used to do boxing
18  and MMA.

19  PROSPECTIVE JUROR:  Several through the years, just
20  roughhousing, that sort of thing.

21  MS. BAUER:  Okay.

22  PROSPECTIVE JUROR:  I had a couple of them, but I
23  can't tell you when, when we were kids.

24  PROSPECTIVE JUROR:  Busted lip from a tea handle at
25  work.  I hit myself in the face.

1          MS. BAUER:  Okay.

2          PROSPECTIVE JUROR:  Eric Horton, I've had stitches in

3    my mouth three times.  Just growing up, sometimes there were

4    fights.  Sometimes, it was just an accident, like throwing

5    rocks.

6          MS. BAUER:  Anybody on this side?  Yeah.

7          PROSPECTIVE JUROR:  Growing up, just fights, and most

8    recently, the Doberman I mentioned earlier head butted me and

9    busted my lip.

10          MS. BAUER:  Thank you.

11          PROSPECTIVE JUROR:  I had three older brothers.

12          MS. BAUER:  Enough said, thank you.  Anybody else?

13    No.  All right.  Well, that's all I have.  Thank you.

14          THE COURT:  Thank you.  Thank you all.  Ms. Buhler

15    will direct you as to what comes next, but I think you're all

16    going back downstairs.

17          COURTROOM DEPUTY:  Yes, sir.

18          THE COURT:  You'll all be going back downstairs, and

19    then you'll be directed as to what's next.  Thank you all for

20    your responses.

21                    (Jury out at 11:29 a.m.)

22          THE COURT:  You can be seated.  The jury is out.  If

23    you all want to take a minute to rearrange.  We're off the

24    record.

25                    (Recess at 11:31 a.m. to 11:38 a.m.)

1          (Sidebar conference on the record, as follows:)

2          THE COURT:  Ms. Campbell, I want to follow up on a

3   question from organization when we were down this morning

4   before you came upstairs.  When you came upstairs, you

5   mentioned a drug court, drug issue.  And one of the questions I

6   asked this morning was -- I'll give you the wordy question, and

7   then I'll tell you what it means practically.  But convicted in

8   state or federal court of record of a crime punishable by

9   imprisonment for more than one year and your civil rights have

10  not been restored.

11         PROSPECTIVE JUROR:  So I wasn't convicted.  I did drug

12  court, and my civil rights were restored.

13         THE COURT:  Okay.  That's what we were thinking, but

14  we just wanted to clear it up.

15         PROSPECTIVE JUROR:  It's cleared off my record.

16         THE COURT:  Very good.  Thank you.

17         PROSPECTIVE JUROR:  You're welcome.

18              (Sidebar conference concluded.)

19         THE COURT:  Back on the record.  The parties are here.

20  The lawyers are here.  The jury is not here.  Any objections

21  from either side to voir dire?

22         MR. BANKS:  No, Your Honor.

23         MS. BAUER:  No, Your Honor.

24         THE COURT:  Any for cause challenges for the

25  plaintiff?

```
 1              MR. BANKS:  No, Your Honor.

 2              THE COURT:  For the defendant?

 3              MS. BAUER:  No, Your Honor.

 4              THE COURT:  Thank you.  I'm going to give you about

 5    15 minutes to work on your strike sheet.  If you have any

 6    questions, Ms. Buhler is the expert.  But I will say, just

 7    practically speaking, now that you have the seating chart, it

 8    will be the first eight who are not struck.  Any questions on

 9    that?

10              MR. BANKS:  Yes, Your Honor.  Is it a full panel of

11    eight with no alternates, or will we actually have an alternate

12    even though this trial is short?

13              THE COURT:  That's a good question.  It's eight, no

14    alternates.  And my goodness, I hope we don't lose anyone just

15    today, but eight will take the case.  If we happen to lose

16    someone or we go to tomorrow and we lose someone or lose some

17    two, that just gives us a little breathing room such that we

18    don't lose the jury.

19              MR. BANKS:  Yes, Your Honor.

20              THE COURT:  Other questions?

21              MR. BANKS:  No, Your Honor.

22              MS. BAUER:  No, Your Honor.

23              THE COURT:  Thank you.  We'll go off the record and

24    give you 15 minutes to work on your strikes.

25              (Recess at 11:40 a.m. to 11:57 a.m.)
```

1          THE COURT:  The parties are in.  The lawyers are in.

2    The jury is out.  We have our jury.  Before we go get the jury

3    and seat them, any Batson challenge or other objection or issue

4    as to strikes for plaintiff?

5          MR. BANKS:  No, Your Honor.

6          THE COURT:  Defendant?

7          MS. BAUER:  No, Your Honor.

8          THE COURT:  All right.  We'll be off the record until

9    the jury is in.

10              (Recess at 11:58 a.m. to 12:04 p.m.)

11                  (Jury in at 12:04 p.m.)

12          THE COURT:  Back on the record.  The parties are here.

13   Counsel are here.  The venire are here.  At this time, I'd ask

14   the CRD, courtroom deputy, to please call the jury to the box.

15          COURTROOM DEPUTY:  As I call your name, please proceed

16   to the jury box.

17      Casey Campbell, Tina Whiteside, Freda Vandiver, Patty

18   Kirby, Becky Aldridge, Russell Delay, Jacob Bolin, Melissa

19   Glover.

20          THE COURT:  For those of you not on the jury, again, I

21   want to thank you.  As I said this morning, this is important,

22   and we appreciate your time.  Your term of service is over.  If

23   you need a work excuse, you can talk to court staff about that.

24      Otherwise, you're free to go.  Thank you all.

25              (Prospective jurors are excused.)

1          THE COURT:  The jury is in the box.  Is the plaintiff

2    satisfied with the jury?

3          MR. BANKS:  Yes, Your Honor.

4          THE COURT:  Any objection to the jury selection

5    process?

6          MR. BANKS:  No, Your Honor.

7          THE COURT:  Is the defendant satisfied with the jury?

8          MS. BAUER:  Yes, Your Honor.

9          THE COURT:  Any objection to the jury selection

10   process?

11         MS. BAUER:  No, Your Honor.

12         THE COURT:  Ms. Bulher, would you please swear in the

13   jury?

14         COURTROOM DEPUTY:  As I call your name, will you

15   please stand and raise your right hand.  Casey Campbell, Tina

16   Whiteside, Freda Vandiver, Jacob Bolin, Melissa Glover, Patty

17   Kirby, Becky Aldridge, Russell Delay.

18                         (Jury sworn.)

19         COURTROOM DEPUTY:  Thank you.  Be seated, please.

20         THE COURT:  Members of the jury, it's my duty to

21   instruct you on the rules of law that you must use in deciding

22   this case.  A jury trial has, in effect, two judges.  I am one

23   of the judges.  The other judge is the jury.  My duty is to

24   preside over the trial and to decide what evidence is proper

25   for your consideration.  My duty at the end of the trial is to

1 explain to you the rules of law that you must follow and apply

2 in arriving at your verdict.

3     First, I'll give you some general instructions that apply

4 in every case.  For example, instructions about burden of proof

5 and how to judge the believability of witnesses.  Then I will

6 give you some specific rules of law about this particular case.

7 Finally, I will explain to you the procedures you should

8 follow.  I apologize.  Let me back up.  We'll get to that.

9 Don't worry.

10     Now that you've been sworn, I need to explain some basic

11 principles about a civil trial and your duty as jurors.  These

12 are preliminary instructions.  I'll give you more detailed

13 instructions at the end of the trial.  It's your duty to listen

14 to the evidence, decide what happened, and apply the law to the

15 facts.  It's my job to provide you with the law you must apply.

16 You must follow the law, even if you disagree with it.

17     You must decide the case on only the evidence presented in

18 the courtroom.  Evidence comes in many forms.  It can be

19 testimony about what someone saw, heard, or smelled.  It can be

20 an exhibit or a photograph.  It can be someone's opinion.  Some

21 evidence may prove a fact indirectly.

22     Let's say a witness saw wet grass outside and people

23 walking into the courthouse carrying wet umbrellas.  This may

24 be indirect evidence that it rained, even though the witness

25 didn't personally see it rain.  Indirect evidence like this is

1   also called circumstantial evidence, simply a chain of

2   circumstances that likely proves a fact.

3        As far as the law is concerned, it makes no difference

4   whether evidence is direct or indirect.  You may choose to

5   believe or disbelieve either kind.  Your job is to give each

6   piece of evidence whatever weight you think it deserves.

7        During the trial, you'll hear certain things that are not

8   evidence, and you must not consider them.  First, the lawyers'

9   statements and arguments are not evidence.  In their opening

10  statements and closing arguments, the lawyers will discuss the

11  case.  Their remarks may help you follow each sides' arguments

12  and presentation of the evidence, but the remarks themselves

13  aren't evidence and shouldn't play a role in your

14  deliberations.

15       Second, the lawyers' questions and objections aren't

16  evidence.  Only the witness's answers are evidence.  Don't

17  decide that something is true just because a lawyer's question

18  suggests that it is.  For example, a lawyer may ask a witness,

19  you saw Mr. Jones hit his sister, didn't you?  That question is

20  not evidence of what the witness saw or what Mr. Jones did

21  unless the witness agrees with it.

22       There are rules of evidence that control what the court

23  can receive into evidence.  When a lawyer asks a witness a

24  question or presents an exhibit, the opposing lawyer may object

25  if he or she thinks the rules of evidence don't permit it.  If

1 I overrule the objection, then the witness may answer the

2 question or the court may receive the exhibit.  If I sustain

3 the objection, then the witness cannot answer the question and

4 the court cannot receive the exhibit.  When I sustain an

5 objection to a question, you must ignore the question and not

6 guess what the answer might have been.

7     Sometimes, I may disallow evidence -- this is called

8 striking evidence -- and order you to disregard or ignore it.

9 That means you must not consider that evidence when you're

10 deciding the case.  I may allow some evidence only for a

11 limited purpose.  When I instruct you that I have admitted an

12 item of evidence for a limited purpose, you must consider it

13 for only that purpose and no other.

14     To reach a verdict, you may have to decide which testimony

15 to believe and which testimony not to believe.  You may believe

16 everything a witness says, part of it, or none of it.  When

17 considering a witness's testimony, you may take into account

18 the witness's opportunity and ability to see, hear, or know the

19 things the witness is testifying about; the witness's memory;

20 the witness's manner while testifying; any interest the witness

21 has in the outcome of the case; any bias or prejudice the

22 witness may have; any other evidence that contradicts the

23 witness's testimony; the reasonableness of the witness's

24 testimony in light of all the evidence; and any other factors

25 affecting believability.

1       At the end of the trial, I'll give you additional

2   guidelines for determining a witness's credibility.  This is a

3   civil case.  To help you follow the evidence, I'll summarize

4   the party's positions.  The plaintiff, Mr. Gaston, claims the

5   defendant, Mr. Ward, took an opportunity to use his power and

6   position to inflict excessive force upon Mr. Gaston.  Mr. Ward

7   denies those claims and contends that Ward reasonably believed

8   that striking Gaston once in the face was appropriate and

9   necessary to restore discipline and protect himself in light of

10  Gaston's refusal to comply with a direct order.

11      Mr. Gaston has the burden of proving his case by what the

12  law calls a preponderance of the evidence.  That means Mr.

13  Gaston must prove that, in light of all the evidence, what he

14  claims is more likely true than not.  So if you can put the

15  evidence favoring Mr. Gaston and the evidence favoring Mr. Ward

16  on opposite sides of balancing scales, Mr. Gaston needs to make

17  the scales tip to his side.  If Mr. Gaston fails to meet this

18  burden, you must find in favor of Mr. Ward.

19      To decide whether any fact has been proved by a

20  preponderance of the evidence, you may, unless I instruct you

21  otherwise, consider the testimony of all witnesses, regardless

22  of who called them, and all exhibits that the court allowed,

23  regardless of who produced them.  After considering all the

24  evidence, if you decide a claim or fact is more likely true

25  than not, then the claim or fact has been proved by a

1  preponderance of the evidence.

2      Serving on the jury, you may not talk with anyone about

3  anything related to the case.  You may tell people that you're

4  a juror and give them information about when you must be in

5  court.  But you must not discuss anything about the case itself

6  with anyone.  You shouldn't even talk about the case with each

7  other until you begin your deliberations.  You want to make

8  sure you've heard everything, all the evidence, the lawyers'

9  closing arguments, and my instructions on the law before you

10  begin deliberating.

11      You should keep an open mind until the end of the trial.

12  Premature discussions may lead to a premature decision.  In

13  this age of technology, I want to emphasize that, in addition

14  to not talking face to face with anyone about the case, you

15  must not communicate with anyone about the case by any other

16  means.  This includes e-mails, text messages, and the internet,

17  including social networking websites, such as, Facebook,

18  Instagram, and Twitter.  You also shouldn't Google or search

19  online or offline for any information about the case, the

20  parties, or the law.

21      Don't read or listen to the news about this case, visit

22  any places related to this case, or research any fact, issue,

23  or law related to this case.  The law forbids the jurors to

24  talk with anyone else about the case and forbids anyone else to

25  talk to the jurors about it.  It's very important that you

1  understand why these rules exist and why they're so important.

2  You must base your decision only on the testimony and other

3  evidence presented in the courtroom.

4      It's not fair to the parties if you base your decision, in

5  any way, on information you acquire outside the courtroom.  For

6  example, the law often uses words and phrases in special ways,

7  so it's important that any definitions you hear come only from

8  me and not from any other source.  Only you jurors can decide a

9  verdict in this case.  The law sees only you as fair and only

10  you have promised to be fair.  No one else is so qualified.

11      Reports about this trial, about this incident, or about

12  the parties may appear in the media.  The reporters may not

13  have heard all the testimony as you have, may be getting

14  information from people who are not under oath and subject to

15  the cross-examination, may emphasize an unimportant point, or

16  may simply be wrong.  You must not read, listen to, or watch

17  anything about this trial or about Mr. Gaston or Mr. Ward.  It

18  would violate your oath as a juror to decide this case on

19  anything other than the evidence presented at trial and on your

20  own common sense.

21      You must decide this case exclusively on the evidence you

22  receive here in court.  If you wish, you may take notes to help

23  you remember what the witnesses said.  If you do take notes,

24  please don't share them with anyone until you go to the jury

25  room to decide the case.  Don't let note taking distract you

1 from carefully listening to and observing the witnesses.  When

2 you leave the courtroom, you should leave your notes hidden

3 from view in the jury room.

4       Whether or not you take notes, you should rely on your

5 memory of the testimony.  Your notes are there only to help

6 your memory.  They're not entitled to greater weight than your

7 memory or impression about the testimony.  You should pay close

8 attention to the testimony because it will be necessary for you

9 to rely upon your memory concerning what the testimony was.

10       Although the court reporter is making stenographic notes,

11 recording everything that is said, typewritten transcripts will

12 not be prepared in time for your use during your deliberations,

13 and you should not expect to receive them.

14       On the other hand, any exhibits admitted in evidence

15 during the trial will be available to you for detailed study,

16 if you wish, during your deliberations.  So if an exhibit is

17 received in evidence but is not fully read or shown to you at

18 that time, don't be concerned because you will get to see and

19 study it later during your deliberations.

20       If you are having any problems with your employer about

21 your jury service or expect a problem, please advise the court.

22 Someone on the court staff will advise your employer that you

23 must appear as part of your civil duty, and your service cannot

24 be held against you in any way.  They can also send a letter

25 explaining this duty to your employer.

1    From time to time, during the trial, I may be called upon

2  to make legal rulings on objections or motions made by the

3  lawyers.  You should not infer or conclude, from any ruling or

4  other comment I may make, that I have any opinions on the

5  merits of the case favoring one side or the other.  And if I

6  should sustain an objection to a question that goes unanswered

7  by a witness, you should not guess or speculate what the answer

8  might have been, nor should you draw any inferences or

9  conclusions from the questions itself.  Nothing I may say or

10  do, during the course of the trial, is intended to indicate,

11  nor should it be taken by you as indicating, what your verdict

12  should be.

13    During the trial, I may need to confer with the lawyers

14  out of your hearing regarding questions of law, evidence, or

15  procedure that require consideration by the judge alone.  On

16  some occasions, you may be excused from the courtroom for the

17  same reason.  I'll try to limit these interruptions as much as

18  possible, but you should remember the importance of the matter

19  you are here to determine and should be patient, even though

20  the case may seem to go slowly.  Also, if during the course of

21  the trial you need a recess for personal reasons, just raise

22  your hand.

23    Let's walk through the trial.  First, each side may make

24  an opening statement, but they don't have to.  Remember, an

25  opening statement isn't evidence, and it's not supposed to be

1 argumentive.  It's just an outline of what that party intends
2 to prove.

3      Next, Mr. Gaston will present his witnesses and ask them
4 questions.  After Mr. Gaston questions the witness, Mr. Ward
5 may ask the witness questions.  This is called cross-examining
6 the witness.  Then Mr. Ward will present his witnesses and
7 Mr. Gaston may cross-examine them.  You should base your
8 decision on all the evidence regardless of which party
9 presented it.

10      After all the evidence is in, the parties' lawyers will
11 present their closing arguments to summarize and interpret the
12 evidence for you.  And I'll give you instructions on the law.
13 You'll then go to the jury room to deliberate.

14      Now, we will begin by giving the lawyers for each side an
15 opportunity to make their opening statements, in which they may
16 explain the issues in the case and summarize the facts they
17 expect the evidence will show.  Again, the opening statements,
18 like all other statements by lawyers, are not evidence.  Each
19 side will be given 15 minutes for opening statements.
20 Mr. Banks.

21      MR. BANKS:  Yes, Your Honor.  May it please the court.
22 When someone understands the power they have over us, it not
23 only becomes scary, it becomes dangerous when that person
24 ignores the responsibility that comes with that power.

25      On March 12, 2021, Roger Gaston was punched in his face by

a correctional officer that had the power over him, after that
officer took off his radio and mace.  That officer is this
defendant, Dustin Ward.

As you've heard, my name is John Banks, and I, along with
my co-counsel Mr. Nate Brown, we represent Mr. Gaston in
today's case.  Today's case, as the judge has kind of
explained, is a little different than what you might see on TV,
Law & Order or CSI.  You'll learn, during the course of today's
trial, that this case is revolved around Mr. Gaston at an
Alabama state correctional facility.

Back in 2016, Mr. Gaston pled guilty to four counts of
robbery in the third.  He's currently serving a 20-year
sentence for all four of those counts.  This defendant is a
correctional officer and was, at the time, at Limestone County
Correctional Facility, where Mr. Ward -- or Mr. Gaston was
serving his sentence.

Friday, March 12th, 2021, Mr. Gaston is outside of his
dorm building, L-dorm, about 7:00 at night, when he sees this
defendant and another officer come around the corner.  You'll
learn today that the defendant mentions a lockdown order.  What
you will also hear is that order did not come over a loud
speaker.  That order had not been given by any other
correctional officer.  First time Mr. Gaston heard that order
was from Mr. Ward.

What you will also learn is that, a couple of days before

1  this, either on that Wednesday or Thursday, Mr. Gaston and the

2  defendant had a little back and forth with words.  See,

3  Mr. Gaston was in a different dorm building.  At that point,

4  the defendant tried to lockdown, get everybody back to where

5  they were supposed to be.  As Mr. Gaston tries to leave, the

6  defendant's blocking his way.

7       We're not going to lie to you.  Mr. Gaston cussed at him.

8  And after that, there was a mention of something called "the

9  one".  You will learn, through testimony, that "the one" is,

10  essentially, one-on-one fight, schoolyard brawl or fight, well

11  back before my time.  Both folks go at it, fight it out, and

12  both are able to walk away.  No retribution, no come backs, no

13  disciplinaries.  You handle your beef, and you walk away.

14      So on that Friday, March 12th of 2021, as Mr. Gaston's

15  sitting there, "the one" comes back up again.  And this time,

16  the defendant takes off his radio, takes off his mace, and

17  hands them to that other officer.  And as soon as he turns back

18  around pops Mr. Gaston in his face.

19      Now, we anticipate that the defense is going to try to get

20  up here and tell you that that was appropriate or reasonable

21  based on the defendant's job as a correctional officer.  I want

22  to keep one thing -- two things in your mind.  The evidence

23  will show that the defendant took off his mace, took off his

24  radio, before sucker punching Mr. Gaston.  And after punching

25  Mr. Gaston in the face, you will learn that this defendant

1 decided to say something.  Got down to Mr. Gaston and said, I

2 ain't no bitch ass nigga.

3     After leaving Limestone, based on the ADOC, the Alabama

4 Department of Corrections' decisions, Mr. Gaston went to some

5 other facilities, and when he got to those other facilities, he

6 was greeted by threats.  But not by other inmates, by guards

7 who had heard about what happened.  Heard about him,

8 Mr. Gaston, deciding to exercise his constitutional right for

9 the actions this defendant took and was told it might get him

10 touched, jumped, beat, stabbed by other inmates.  Other

11 individuals who had the power and responsibility to look over

12 Mr. Gaston.

13     We, as the plaintiff, brought this case.  We have the

14 burden, as Judge Danella explained, and that's a legal term

15 called a preponderance of the evidence.  Regular folks' talk,

16 it's more likely than not.  It's enough to tip the scales one

17 way or the other.  This case has some specific language.

18     This case is based on a constitutional right under the

19 Eighth Amendment.  One of those first ten that, when the

20 drafters of the constitution declared was an essential right, a

21 Bill Of Rights that everyone in this country is entitled to,

22 black, white, purple, brown, male, female, straight, gay,

23 bisexual, inmate, or free.  Courts just like this one has

24 consistently held that the Eighth Amendment says that we are

25 free -- everyone is free from the use of excessive force

1 against them.  That is why we are here.  Mr. Gaston has decided

2 to assert his constitutional right that everyone in this

3 country has against this defendant.

4       And in order to prove, what I'm going to call, this

5 excessive force claim today, Judge Danella will tell you that

6 we have to prove four things:  One, that this defendant

7 intentionally struck Mr. Gaston; the force was excessive; the

8 defendant caused Mr. Gaston's injuries; and the defendant was

9 acting under color of law.

10      But really, this case boils down to two of those.  You

11 see, there's no dispute that this defendant intentionally

12 punched Mr. Gaston in the face.  There's no dispute that this

13 defendant was acting under color of law.  In fact, Judge

14 Danella will instruct you to take those two elements as proven

15 facts.  What this case boils down to is whether the force used

16 was excessive and whether or not this defendant caused

17 Mr. Gaston's injuries.

18      In order to prove our claim, we're calling Mr. Gaston.

19 He's going to tell you about what happened the week leading up

20 to March 12th, what happened on March 12th, and what happened

21 and what he experienced after March 12th.  We anticipate the

22 defense will call Mr. Ward.  And Mr. Ward will have the

23 opportunity to tell us his side of this story, try to tell us

24 that the force he used was reasonable under the circumstances.

25 That his hit did not cause injury to Mr. Gaston.

1     Judge will instruct you that you can weigh the credibility

2 of each witness in today's case.  That boils down to Mr. Gaston

3 and this defendant.  And what I want to remind you of is that

4 commitment you made in front of everyone this morning.  That,

5 despite what Mr. Gaston might have done before, what the matter

6 of focus is today is what happened on March 12th, 2021, nothing

7 else.

8     When someone understands the power they have over us, it

9 not only becomes scary, it becomes dangerous when that person

10 ignores the responsibility that comes with that power.  And on

11 March 12th, 2021, the evidence will show that's exactly what

12 happened.  Because of that, at the end of this trial, when all

13 of the testimony is out and all the evidence has been

14 presented, Mr. Brown is going to stand before you and ask that

15 you return the only verdict and the only award that the

16 evidence supports and that justice demands, and that's a

17 verdict finding this defendant liable of violating Mr. Gaston's

18 constitutional rights.  Find this defendant liable.

19     THE COURT:  Thank you.  Ms. Bauer.  Mr. Freese.

20     MR. FREESE:  May it please the court.  Thank you all

21 for being here today.  This case is about one punch.  One

22 single punch in response to plaintiff Gaston's refusal to

23 adhere to a direct order, to hurl -- he hurled complaints.  He

24 hurled derogatory statements at Mr. Ward.  And he squared up to

25 fight him.  One single punch is what this case is about.

1    Mr. Ward, in this situation.  On March 12th, he perceived

2    the situation.  And he did what was necessary to maintain order

3    and discipline at Limestone Correctional Facility.  The

4    plaintiff did not adhere to his direct order to lock down.  He

5    did the opposite.

6        My name is Jack Freese, and this is Elena Bauer, and we

7    represent Dustin Ward, the defendant in this case.  You've

8    heard Mr. Banks say that this case is about constitutional

9    rights.  That is not what this case is about.  This case is

10   about not allowing an inmate to defy a direct order, and then

11   when he receives the response for that, to receive money

12   damages.  That's what this case is about.  A single punch in

13   response to his refusal to adhere to a direct order.

14       I'd like to introduce you to my client, Dustin Ward.

15   Dustin Ward, he turned 28 last month.  In a few months, he's

16   going to become a father.  He's a good man.  He has committed

17   his career to serving the State of Alabama, serving his

18   community, and serving the inmates in the prison where he

19   works.  He cares about the inmates.  He does.

20       You'll hear from Mr. Ward.  He doesn't read their records.

21   Other correctional officers read the records of the inmates.

22   He doesn't care what they have done.  He doesn't care why they

23   are there.  All he cares about is maintaining the safety and

24   helping the prisoners, rehabbing the prisoners.

25       But he understands it's a dangerous place.  This is

1  Limestone Correctional Facility, the largest prison in the
2  State of Alabama.  On any point, there are over 2,000 inmates
3  in this facility, over 2,000.  At the same time, there are 14
4  to 22 correctional officers working.  That's a ratio of 100
5  inmates to one correctional officer.

6      Opposing counsel has introduced you to his client,
7  Roderick Gaston, who is serving four concurrent terms for
8  robbery in the third degree, 20 years.  You'll hear from
9  Mr. Ward.  You'll hear his side of the story.  You'll hear from
10 Mr. Gaston.  You'll hear their side of the story.  It's your
11 duty to choose who you believe, and I know you can do that.

12     As we go through the testimony today, I'm going to break
13 it down into three sections.  The first section is going to be
14 the need to maintain and restore discipline.  As I've told you,
15 this is the largest prison in the State of Alabama, 2200
16 inmates, 14 to 22 correctional officers at any point in time.
17 Order and discipline is imperative.  It must be followed or
18 else chaos can ensue.  Harm can ensue.

19     In fact, you'll hear from Mr. Ward, a few months ago, he
20 was stabbed in the arm by another prisoner.  It's a dangerous,
21 dangerous place.  Order must be followed.

22     Second, the amount and need of force used.  Plaintiff
23 Gaston disobeyed a direct order.  In response to that, Mr. Ward
24 didn't beat him up.  He used limited amount of force.  One
25 strike, one punch, that is all he used.  Plaintiff Gaston

1  squared up to him to fight, and Mr. Ward used one punch.

2  You'll also hear that Mr. Gaston hit Mr. Ward, one punch.  They

3  both hit each other.

4      Three, minimal physical injury.  At the end of the day,

5  that's what this case is about.  What injuries does he have, or

6  did he have?  A cut on his limp and a bump on his head from one

7  punch.  That is all.  And I know you can evaluate the facts

8  fairly.  You've all said that you can do it.  I pray that you

9  keep an open mind as we go throughout this testimony.  Thank

10  you for your time.

11      THE COURT:  Thank you.  At this time, we'll break for

12  45 minutes for lunch.  I'd ask you to please go to the jury

13  room, and then you can get some lunch.  I say 45 minutes just

14  as I promised you this morning to keep things going as quickly

15  as we can to be respectful of your time.

16      Again, I'll remind you not to talk about the case with

17  anyone, not to talk about the case with even each other, until

18  you begin your deliberations.  At this time you can go for

19  lunch.  I'll see you back here at probably 1:25 p.m.

20              (Jury out at 12:41 p.m.)

21      THE COURT:  Any objections to the court's preliminary

22  instructions?

23      MR. BANKS:  No, Your Honor.

24      MS. BAUER:  No, Your Honor.

25      THE COURT:  Any objections to plaintiff's opening

1 statement?

2      MS. BAUER:  No, Your Honor.

3      THE COURT:  Any objections to defendant's opening

4 statements?

5      MR. BANKS:  Yes, Your Honor.  Based on our hearing on

6 motions in limine and the court's indication on how this case

7 will proceed, I do not believe there is a good faith basis that

8 any prior -- or any subsequent incident of the defendant being

9 assaulted by any other inmate, that is completely irrelevant to

10 today's case, will come out.  And therefore, that was improper

11 during opening statements.

12      THE COURT:  Mr. Freese.  Ms. Bauer.

13      MS. BAUER:  Your Honor, it was used to -- or -- sorry.

14 We believe that was relevant and pertinent for the jury to

15 consider in light of the fact that they will consider,

16 subjectively, Mr. Ward's assessment and perception of the need

17 to use force.

18      THE COURT:  I tend to agree.  Mr. Banks, tell me why I

19 have that wrong.  I don't think the point was anything about

20 discipline or anything of that nature.  It was the importance

21 of safety and maintaining order.

22      MR. BANKS:  Your Honor, my --

23      THE COURT:  Tell me if I'm missing a nuance.

24      MR. BANKS:  My concern here is, one, as to relevance.

25 Generally, because this happened after the incident that we are

1  here about today, and therefore, has no bearing on this

2  defendant's subjective impressions on March 12th of 2021.

3  Additionally, Your Honor, to the extent you do find it

4  relevant for the purpose laid out by opposing counsel, it goes

5  to confusing the issues.  The subjective mindset of this

6  defendant, at that time that he struck Mr. Gaston, is the

7  relevant portion, not any time subsequent to that, as to the

8  reasonableness of force applied.

9  THE COURT:  But why doesn't it illustrate danger in a

10  prison generally?

11  MR. BANKS:  Your Honor --

12  THE COURT:  Your point is, maybe, that it does, but

13  that it's unfairly prejudicial because it comes after.

14  MR. BANKS:  Correct, Your Honor.  It would be a

15  different instance, if it was prior to this instant, where the

16  defendant had that as, somewhat, background history in this

17  facility.  However, as opposing counsel laid it out, that

18  happened recently, not prior to this incident such that it's

19  affected his subjective state of mind on March 12th, 2021.

20  THE COURT:  The second part I may have missed.  Is

21  that the point that was made that it impacted Mr. Ward's

22  subjective state of mind on the date in question?  I took it

23  as, This is a dangerous job, and here's something that

24  happened.

25  MR. FREESE:  That is the only point that was being

1 made is that it's a dangerous job, and this is something that's

2 happened.

3          THE COURT:  That's what I heard.  Mr. Banks, I think

4 maybe the answer -- tell me if either side disagrees -- is to

5 make that point but not necessarily attach a date in it.  Now,

6 I know that came out in opening, but to say, have you ever been

7 assaulted while on duty?

8          MR. FREESE:  Understood.

9          THE COURT:  Mr. Banks.

10          MR. BANKS:  Yes, Your Honor.

11          THE COURT:  Other objections to defendant's opening

12 statement?

13          MR. BANKS:  No, Your Honor.

14          THE COURT:  Anything else before we go off the record,

15 and you all can have what's left of 45 minutes for lunch?

16          MR. BANKS:  No, Your Honor.

17          THE COURT:  Just please be respectful of the jury's

18 time.  They're the boss.  You'll see that's why I stand when

19 they come in and out because they're the judge of the facts.

20          MR. BANKS:  Yes, Your Honor.

21          THE COURT:  All right.  We're off the record.

22               (Recess at 12:46 p.m. to  1:35 p.m.)

23          THE COURT:  Mr. Gaston is on the stand.  Mr. Ward is

24 here.  The lawyers are here.  Anything to take up before we get

25 the jury?

1          MR. BANKS:  Not from the plaintiff, Your Honor.

2          THE COURT:  Very good.

3          MS. BAUER:  No, Your Honor.

4          THE COURT:  Thank you.

5                    (Jury in at 1:37 p.m.)

6          THE COURT:  The jury is in.  I said before, you're the

7    judge of the facts, and that's why I stand for you as you come

8    in and go out.  We're going to start now with the evidence in

9    this case beginning with the plaintiff's case in chief.

10   Mr. Banks.  Mr. Brown.

11         MR. BROWN:  Thank you, Your Honor.  The plaintiff

12   calls the plaintiff, Roderick Gaston, to the stand.

13                    RODERICK GASTON,

14   having been first duly sworn by the courtroom deputy clerk, was

15   examined and testified as follows:

16         COURTROOM DEPUTY:  Please, state and spell your name

17   for the record.

18         THE WITNESS:  Roderick Gaston, R-O-D-E-R-I-C-K,

19   G-A-S-T-O-N.

20         COURTROOM DEPUTY:  Thank you.

21                    DIRECT EXAMINATION

22   BY MR. BROWN:

23   Q    Good afternoon, Mr. Gaston.

24   A    Good afternoon.

25   Q    Mr. Gaston, why are you in handcuffs?

1    A    Because I'm in DOC.  They might kill me.

2    Q    Could you explain to us what the DOC is?

3    A    Department of Corrections.

4    Q    Is that fair to say it's the Alabama Department of

5    Corrections?

6    A    Uh-huh.

7    Q    Where are you serving your sentence?

8    A    I'm serving my sentence in Kilby Correctional Facility.

9    Q    Have you spent the duration of your sentence at Kilby

10   Correctional Facility?

11   A    No.  I ain't spent my whole time at Kilby.  I just spent

12   the little time that I'm at Kilby right now because I'm dealing

13   with these cases -- I mean, dealing with this court.  So I have

14   to go back and forth to court from Kilby.  But I spent my time

15   at -- I've been some of everywhere, you could say, Bullock,

16   Staton --

17   Q    Let me stop you there, Mr. Gaston.  Where were you before

18   you were at Kilby?

19   A    I was at Bullock.

20   Q    How long were you at Bullock?

21   A    About a year and a half.

22   Q    Where were you before Bullock?

23   A    I was at Staton.

24   Q    How long were you at Staton?

25   A    About seven months.

1  Q    And where were you before Staton?

2  A    I was at Limestone.

3  Q    Limestone Correctional Facility?

4  A    Uh-huh.

5  Q    How long were you at Limestone?

6  A    From 2020 to -- about a year and a half, from 2020 to

7  2021.  May 2021 they transferred me.

8  Q    And how long have you been at Kilby?

9  A    I've been at Kilby about four months now.

10 Q    Mr. Gaston, what year did your sentence begin?

11 A    My sentence began in 2016, when I got convicted of the

12 cases.  But I was already in prison before I got convicted of

13 the cases.  So it really started in 2014.

14 Q    Did you enter a plea in this case?

15 A    Yeah.  I entered a plea, 20-year sentence.

16 Q    What did you plead?

17 A    For the four robberies, robbery third, times four.  They

18 gave me 20 years for each one of the sentence, but they ran

19 them all in and made it one 20-year sentence.

20 Q    Did you plead guilty to robbery in the third?

21 A    Yeah, I pleaded guilty to it.

22 Q    How much time is left on your sentence, Mr. Gaston?

23 A    I got 13 years left.

24 Q    Have you attended any parole hearings?

25 A    Yeah.  I just went up for parole.  They denied them, four

1  years.  They set me off four years.

2  Q    When did that parole hearing take place?

3  A    Last Wednesday.

4  Q    Mr. Gaston, I'm going to show you what's marked as

5  Plaintiff's Exhibit Number 1.

6         MR. BROWN:  Permission to approach, Your Honor.

7         THE COURT:  You may.

8  BY MR. BROWN:

9  Q    Mr. Gaston, I represent to you that this is a photograph

10 of Limestone Correctional Facility.  Do you see that there?

11 A    Uh-huh.

12 Q    Mr. Gaston, can you point out to us where the entrance is

13 to the facility?

14 A    The entrance, you talking about coming to right there

15 where it got Limestone Correctional Facility at?

16 Q    Yes, sir.  And do you have a writing utensil?

17 A    No, I don't have one.

18        MR. BROWN:  Permission to approach, Your Honor.

19        THE COURT:  You may.

20 BY MR. BROWN:

21 Q    Mr. Gaston, if you could, please circle where the entrance

22 to the facility is.

23 A    (Witness Complies.)  Right where it says Limestone

24 Correctional Facility.

25 Q    Thank you.  Can you identify where your sleeping quarters

1  were at Limestone?

2  A    Yeah.  It was -- the sleeping quarters are going to be --

3  all right.  You see, there's the entrance part (indicating),

4  that's the like --

5  Q    Mr. Gaston, I'm sorry.  Could you angle that so the jury

6  can see?

7  A    That's the entrance part right there.  That's the prison.

8  That's the cross gate right there.  All right.  You got, this

9  the health care part right here.  This B-dorm, C-dorm, D-dorm,

10  and E-dorm right here.  And then if you go through that gate --

11  and when you come through that gate right there, you got

12  L-dorm, K-dorm, J-dorm, and I-dorm.  And that's the dorm I was

13  in right there (indicating).

14  Q    So you stayed at L-dorm?

15  A    Yes, sir.

16  Q    Mr. Gaston, is that paragraph, is that a fair and accurate

17  depiction of how Limestone Correctional Facility would have

18  appeared on March 12th, 2021?

19  A    Yes, sir.

20  Q    Is L-dorm where the events of March 12th, 2021 occurred?

21  A    Yes, sir.

22        MR. BROWN:  Your Honor, I request that Plaintiff's

23  Exhibit Number 1 be entered into the record.

24        THE COURT:  Ms. Bauer.

25        MS. BAUER:  No objection, Your Honor.

1          THE COURT:  It will be admitted.

2   BY MR. BROWN:

3   Q    Mr. Gaston, did you know the defendant before March 12th,

4   2021?

5   A    I had knew him from -- he liked to play a lot.  He liked

6   to do his little hand like this.  He be doing this.  He might

7   do this in your face.  He might step up to you and be like, Oh,

8   I gotcha (demonstrating).  You know what I'm saying?

9          He like play a lot, so that's what people know him by.

10  Oh, he a playful police.  He playful.  He don't want to do

11  nothing but just play with you.  You know what I'm saying?

12  That's the only way I knew him, by that, until I got to

13  Limestone.  You know what I'm saying?

14  Q    Did you know him personally?

15  A    No, sir, I did not.

16  Q    So this was what his reputation was leading up to this?

17  A    Yeah.

18  Q    Mr. Gaston, I want you to tell us about what happened on

19  March 12th of 2021.  But before that, did you have any

20  interactions with the defendant in the days leading up to the

21  incident we're about here today?

22  A    Yeah.  The 10th, we was in J-dorm, and they was calling.

23  The yard was fixing to close.  So we was trying to beat the

24  sergeant out because when the sergeant come out on the yard,

25  and if we ain't out that door, if we ain't in our dorm, in our

right dorm, he gonna take your name, write your name, take your
I.D., and write you up, and all types of stuff.  So we try to
beat him out.  He talking to a guy in the hallway.  He standing
in front of the cube.

Limestone, when you come in, you got one side on this side
and one side on this side (indicating).  You got an A-side and
a B-side.  And the cube go right here (indicating).  So he got
the door open talking to an inmate in the cube.  So we trying
to tell him to open up the door and let us go on and go out,
let us go out.  So he like, Hold up, wait. Hold up.

So, dude, like, man, that's some f'd up stuff.  You know
what I'm saying?  So he be like, Man, who you talking to?  F
you.  You know what I'm saying?

So he looked at me, so I said, F you.  You know what I'm
saying?

So he was like -- he rolled the door -- hold up.  He
rolled the door.  When he rolled the door, that's when he be
like, I be giving people the one.  You better ask about them.
I be giving people the one.

So I said, So you gonna really give me the one?

So he be like, Yeah, I'll give you the one.

I like, Okay.  So you going to give me the one?  I ain't
going to go to jail?  I ain't doing nothing?  I ain't going to
no lockup or nothing?

No, you ain't going to go to lockup.  I'm gonna make sure

1   you don't go to lockup.

2        So I said, All right, cool.

3        So he be like, Look, I come back Friday as the B-side yard

4   rover.  When I come back Friday, I'll give you the one.  We can

5   get the one then.

6        I said, All right, cool.

7        So he let us on out the door.  We gone on out to our dorm.

8   I'm cold.  So Friday come --

9   Q    Well, Mr. Gaston, let me stop you there.  You're talking

10  about this on Wednesday.  Is that March 10th?

11  A    Yes, Wednesday, March 10th.

12  Q    Could you describe to me what "the one" is?

13  A    "The one" is when an inmate or officer -- an inmate and an

14  officer get in a fight where they go somewhere, and they fight,

15  and there don't be no -- no type of bloodshed, no type of

16  problem behind nothing.  That goes for inmate and inmate.  If

17  they want the one, they going to get the one.  They go

18  somewhere where your people hold you.  You on this side.  You

19  on this side.  Y'all go on and square it off.

20       That's what "the one" mean.  So when he said he wanted the

21  one, that's why I said, So I'm not going to go to jail?  I'm

22  not going to lockup or nothing behind none of this?  I ain't

23  going to get no disciplinary, no nothing?

24       He was like, No.  You ain't going to get no disciplinary.

25  I give people the one.

1  Q    Mr. Gaston, is the one -- so does this happen around other

2  inmates and other guards normally?

3  A    Yeah.  If you want the one, they let you get the one.

4  Police let you get the one.

5  Q    So they let you get the one when other people are

6  watching?

7  A    Yeah, they'll let you get the one.

8  Q    Because you --

9  A    They'll just tell you, Don't take it outside the dorm,

10  man.  Don't say nothing about it.  Don't say this.  Don't say

11  this around sergeants, or don't say this around lieutenants or

12  stuff like that.  But you got some lieutenants and sergeants,

13  they be with that.  You know what I'm saying?  They be with

14  giving people the one and letting people catch the one and all

15  types of stuff.

16  Q    So there's generally places where the one can take place

17  and other places where the one cannot take place?

18  A    Yeah.

19  Q    Mr. Gaston, can you explain what you mean when you say

20  that you thought you weren't going to go to jail?  Since you're

21  already in prison, can you explain that to me?

22  A    Lockup.  They call lockup "jail" because people be already

23  saying we're already inside a world.  You know what I'm saying?

24  We in a world inside of another world.  You know what I'm

25  saying?  So they say lockup is jail.

1    When they come and get you, they don't come and say, Oh,
2 you fixing to go to lockup.  They come say, You're fixing to go
3 to jail.  He going to jail, you know, or -- it will be the
4 warden or somebody or captains or somebody be like, He fixing
5 to go to lockup.  But mostly, sergeants, COs, lieutenants, Oh,
6 he going to jail.
7 Q    Mr. Gaston, could you explain what lockup is?
8 A    Lockup -- Limestone lockup -- all right.  You see these
9 dorms at where I told you these dorms right here, these dorms
10 (indicating), these lockup dorms.  You got two sides of lockup
11 dorms.  You got one side that's regular population, and one
12 side that's what they call -- hold on.  One side regular
13 population and the other side is statewide where, from other
14 prisons, they come and go to that lockup because they got major
15 time.
16    In Kilby lockup, you can't see nothing out there.  You
17 can't see nothing.  They close the tray slider.  They close the
18 one door.  You don't know who out there until you hear a radio
19 or something.  And that's when you got to get on top of the
20 thing and stand up there and holler for the police, like, Hey,
21 help.  Hey, hey, come help.  Come to this cell right here.
22    And that's the only way -- they ain't just going to open
23 the slat.  They going to open the thing.  And if you keep
24 beating on it, beating on it, they'll put the mace up under it
25 and say, Now, beat on it again.  We're going to spray up in

here.  And they'll spray up in there and close it up, then
they'll come back.  That's what lockup is.

Q    Thank you, Mr. Gaston.  So the events of Wednesday -- this
is March 10th, 2021, correct?

A    Uh-huh.

Q    Mr. -- excuse me, the defendant says, I'm going to give
you the one on Friday?

A    Uh-huh.

Q    Okay.  Take me to Friday.  When is the first interaction
you have the defendant?

A    All right.  The first interaction I had with him when he
came on at 6:00.  They opened the yard.  They opened the yard,
probably, about 6:30 that evening because it was during the
summertime.  So I see Officer Ward -- I see Officer Ward and
Officer Chandler.  They was coming around towards K-dorm.
Like, they the B-side yard rover.  They got to go in there,
inside the dorms and stuff, and make sure that everything's
straight in the dorms, ain't nobody done hung themselves or
anybody done jumped on anybody or stuff like that.

Q    Mr. Gaston, let me stop you.  Can you explain what a yard
rover is?

A    The yard rover supposed to be the person that's out there
roving the yard, make sure nothing happen on the yard, don't no
stabbings happen, don't no fights or anything jump out from the
yard.  That's what the yard rover is.

1     You got the yard rovers.  Then you might have the

2 supervisors up top watching the yard.  But they going to be

3 mostly just sitting up there for a minute or two, and then they

4 going right back in the shift commander's office.  And the yard

5 rovers will be out there.

6 Q    On March 12th, 2021, at this time, were you the only

7 inmate in the yard?

8 A    No, sir.  The whole yard was open.  The whole yard was

9 open.  When him and Officer Chandler came around, he seen us

10 and I said, What's going on, Officer Ward?  What's up, Officer

11 Chandler?

12     They were like, What's up?  He was like, Hey, you still

13 want the one?

14     I was like, So, you really going to give me the one?

15     He be like, Yeah.  He be like, Hold up.  He took his radio

16 off.  He took his mace off.  He told Officer Chandler, Hey,

17 Officer Chandler, hey, hold this.

18     So Officer Chandler was like, All right.

19     So then, when he swung back around, bam.  And hit me, and

20 I was like, damn, he done hit me for real.  So that's when

21 Officer Chandler ran over and grabbed me, posts my arms up

22 against the Limestone -- like, the dorms is like this, but

23 these bricks (indicating).  You know what I'm saying?

24     And he post my arm up on there.  So when Ward swung again

25 and hit me again, that's when I swung back.  And when I swung

1  back, that's when the supervisor and stuff was up top.  They

2  called the code red.

3      When they called code red, they all ran down to the -- to

4  where I was at, Officer Chandler, Officer Ward, and Officer

5  Knowles, they were the one that wrestled me to the ground.  And

6  when they wrestled me to the ground, that's when Ward said what

7  he said.  That's when Officer Ward said what he said, while I

8  was on the ground.

9  Q    Before the defendant hit you, did he say anything?

10  A    When he told me do I want the one?  He asked me did I want

11  the one before he hit me.  Did I still want the one?

12  Q    Was there any command to lock down?

13  A    No.  There wasn't no command to lock down.  The yard was

14  still open.  The only way they locked the yard down is when

15  that incident jumped off, and they had to call the code red.

16      MS. BAUER:  Your Honor, objection.  There's been two

17  facts that are stipulated to that the plaintiff's counsel is

18  eliciting testimony about.

19      THE COURT:  Mr. Brown.

20      MR. BROWN:  Your Honor, I was just getting the

21  narrative from the plaintiff.  If we stipulated to the fact

22  that the plaintiff was hit -- we stipulated to that, and we

23  stipulated to the fact of the causation of the injuries.  I

24  don't know if we stipulated or not to whether or not there was

25  a command to lock down or -- you know, those are the only two

1 facts that we've stipulated to so far that I've asked him

2 about.

3       THE COURT:  Overruled.  Unless I'm missing something,

4 Ms. Bauer.

5       MS. BAUER:  We did stipulate to the fact that he was

6 given a direct order to lock down and that he responded with

7 insults and profanity, and we also did stipulate to the fact

8 that it was one punch.

9       THE COURT:  Overruled.  That will be for cross.

10       MR. BROWN:  Thank you, Your Honor.

11 BY MR. BROWN:

12 Q    Mr. Gaston, when you're against -- you said you were

13 against a brick wall?

14 A    Yes, sir.

15 Q    And after that, were you taken -- were you taken down to

16 the ground?

17 A    Yeah.  When he hit me the second time, I swung back on

18 him.  And when I swung back, they took me to the ground.  They

19 wrestled me to the ground, Officer Chandler and Officer

20 Knowles.  And that's when they hollered, Yard closed, yard

21 closed.  I was already on the ground.

22 Q    What was this ground made out of?

23 A    It was like rocks -- it's like rocks and dirt.

24 Q    Where did you go after this fight?

25 A    They took me to the shift commander's office and put me in

1  the back of the shift office until they got everybody out of

2  the yard.

3  Q   After that, did you go to an infirmary or anything?

4  A   Yeah.  I went to the infirmary when the lieutenant came up

5  in there and asked me what was going on, and he took me on over

6  to the infirmary where the other lieutenant was at.

7  Q   Were you injured?

8  A   Yeah.  I had a knot on my head, and my lip was swollen,

9  cut on the inside.

10  Q   Mr. Gaston --

11       MR. BROWN:  First, may I approach, Your Honor?

12       THE COURT:  You may.

13  BY MR. BROWN:

14  Q   I'm going to show you what's been premarked as Plaintiff's

15  Exhibit Number 2, and I represent to you, this is photographs

16  of the incident.

17     Mr. Gaston, are those images a fair and accurate depiction

18  of what you appeared like after the fight on March 12th of

19  2021?

20  A   Uh-huh.

21  Q   Can you explain the injuries you received as a result of

22  this fight?

23  A   The knot is on top of the head.  The knot that was on top

24  of the head, right there (indicating), when he hit me and when

25  I fell on the ground.  And my lip was busted.  You could

1  tell -- you could tell how swollen my lip was on the front

2  part, on the first one and -- yeah, the first one.  And the

3  knot was on the side.  You can see where the bruise at, on the

4  side, from where they took me down, right there at the bottom

5  (indicating), on the sixth one.

6  Q    Did you have a knot on your head before this fight?

7  A    No, sir.

8  Q    Did you have a busted lip before this fight?

9  A    No, sir.

10 Q    Afterwards, did you have any pain that you attribute to

11 the injuries you sustained on March 12th, 2021?

12 A    I had just a little light headache after them days, like,

13 a couple of days I had some headaches and stuff, you know.  But

14 I ain't right -- and then, my lip was split.  I couldn't eat

15 for about two weeks because, you know, when you trying to eat

16 something with a busted lip, on the inside, it burns real bad.

17 So that was about it.

18 Q    Were you able to return to your dorm after the fight?

19 A    No, I went to -- I went to lockup.

20 Q    You went to lockup after the fight?

21 A    Uh-huh.

22 Q    How long were you in lockup?

23 A    For, like, three and a half weeks.

24 Q    Were you able to go to your dorm after three and a half

25 weeks in lockup?

1   A      Yeah.  They had -- they had found me not guilty on the

2   disciplinary due to the officer admitting that he --

3   Q      Mr. Gaston, thank you.  Why are you no longer at

4   Limestone?

5   A      Because of that incident.

6   Q      Can you expound on that a little bit more?

7   A      Because of -- I put the lawsuit on one of the ADOC

8   officers at Limestone, so you can no longer be at Limestone.

9   Q      And then, after Limestone, you moved to Staton?

10  A      Yeah, I moved to Staton then.

11  Q      Did you feel safe at Limestone after the fight?

12  A      After the fight, I really didn't want to be there anymore

13  because you could -- you could just -- I'm gonna put it like

14  to -- I'm gonna to put it like this, and I don't know how

15  y'all -- I don't know how you gonna take it, but Limestone

16  Correctional Facility is a really -- they is really -- they

17  really racist there.  You know what I'm saying?

18      I'm going to be honest with you.  I ain't fixing to

19  sugarcoat nothing.  I'll be honest.  They really racist there,

20  and I didn't feel no type of justice was going to happen no

21  type of way.  I wasn't going to get no type of justice until

22  that sergeant showed me that everybody there ain't racist.

23  Q      When you were at Staton, did you feel safe?

24  A      Staton, I was all right at Staton.

25  Q      Why did you leave Staton and go to Bullock?

1   A    Because they said they had to transfer 300 people because

2   of the dorm -- one of the dorms, when you first come through

3   Staton, you got the dorm and mechanic shop -- old mechanic

4   shop, and it had black mold in there and stuff.  So they said

5   they had to transfer all them people into the population, and

6   they had to transfer 300 people out of each dorm.  You had to

7   be a certain amount of people, up to 300 people.  And they were

8   transferred, 60 this day, 55 this day, 61 this day.  They was

9   just trying -- they were just trying to leave Bullock.

10  Q    Well, I can imagine presence of black mold any where would

11  make somebody feel unsafe, but did you feel unsafe at Bullock

12  for any other reasons?

13  A    Yeah.  I didn't really like Bullock.  Bullock, I got a

14  couple of threats at Bullock from different officers, you know,

15  saying that, Oh, you put a lawsuit on an officer.  Oh, you

16  would do this.  Oh, you one of them type.  Oh, I going to get

17  you handled.  I'll get you stabbed.  I'm going to off you.  You

18  know what I'm saying?

19       And I had told the people, I told the DOJ man.  But I

20  guess, he got me transferred from Bullock.

21  Q    Could you explain what "getting handled" or "getting

22  off'd" means?

23  A    Getting something did to you.  Getting you killed or

24  getting you stabbed real bad or getting you jumped on real bad.

25  And they can't -- you can't say that the police did it because

they ain't put their hand on you.  They could write it up as an
inmate did it.  You had a problem with an inmate, you know.

Q    Were you concerned this was going to happen at Bullock?

A    Yeah.  I was really concerned it was going to happen at
Bullock.

Q    And why did you -- why would you leave Bullock and end up
at Limestone -- excuse me -- end up at Kilby?

        MS. BAUER:  I'd like to object, again, Your Honor.
I'm sorry --

        THE COURT:  Grounds.

        MS. BAUER:  Irrelevance.

        THE COURT:  Mr. Brown.

        MR. BROWN:  Your Honor, I'm getting narrative from the
plaintiff and trying to figure out why he's currently at Kilby
Correctional Facility, which is a -- I believe, the testimony
would be relevant to the fact about the foundation for why he
filed this lawsuit.

        THE COURT:  Overruled.  But not much more here.

        MR. BROWN:  Understood.

BY MR. BROWN:

Q    Do you feel safe at Kilby?

A    It's all right.  I ain't going to say -- I don't -- it's
all right.  Kilby's all right.

Q    Mr. Gaston, why did you file this lawsuit?

A    Because when I beat the -- when I beat the disciplinaries

1   and said -- a colleague of his had told me, Hey, you know, you

2   could put a lawsuit on him for doing this.  You know what I'm

3   saying?

4        I was like, For real?

5        He was like, You can't do it back in seg, but you can get

6   out of seg, and then you can put it on him.

7        So when I had gotten out of seg, I had seen one of the law

8   library mans, and I asked him about how could I do this.  And

9   he put the motion in for me, start it up for me, and that's how

10  I got it started.

11  Q    What do you want from this lawsuit?

12  A    I want justice, for real.  I want justice, and, you know,

13  I want something for having pain and then going through all of

14  this with him, going through all this.  He lying on me.  Told

15  them I swung on him first.  I want -- I had to go to jail -- I

16  had to go to lockup because they said they couldn't get the

17  truth out of him at first, until they had to tell him that the

18  camera was showing, that they was going to show the camera to

19  him.  And that's when he went on and admitted it, you know.  I

20  ain't --

21            MS. BAUER:  Objection.

22            THE COURT:  Grounds.

23            MS. BAUER:  Your order, motion in limine.  Everything

24  happening after the incident.

25            THE COURT:  Overruled.

BY MR. BROWN:

Q    Mr. Gaston, this is a civil trial, so there are damages, and there would be money damages.  Do you have any plans for what you would do with those money damages?

A    Yeah.  If I could get some money back, I'm going to help my momma.  My momma out there struggling.  My daddy done left her in 2021 with the coronavirus.  You know, my momma the only person I got in my corner.  She send me a little money, you know what I'm saying, when she can and stuff.

So yeah, I want to contribute back to my momma.  I want to help her with her bills, car note, you know.  That's what I'm gonna do with it.

Q    Thank you, Mr. Gaston.  And going back to March 12th, 2021, when you're describing the one, is it fair to say it's kind of like a schoolyard brawl?

A    Yeah.  That what you can call it, for real.

Q    Was what happened to you on March 12th, 2021?  Was that the one?  Was that like a schoolyard brawl?

A    No.  That wasn't the one.  That was just some coward stuff.  That was just you scared to go in here where you said you gonna take me to, in this area or the dorm, and we going to catch the one.

But you want to swing in front of the whole yard.  I guess you trying to get some claps.  I guess trying to get his name repped up or something.  So he swung on him and all that.  But

1  that wasn't -- that wasn't no one.  That was not the one.

2  Q    After the defendant hit you, you go to the ground.  Is

3  there anything else the defendant said to you?

4  A    Yeah.  When I was down on the ground, he looked over at me

5  and said, I ain't no bitch ass nigga.

6          MR. BROWN:  No questions for now.

7          THE COURT:  Thank you.  Mr. Brown, did you want to

8  move Exhibit 2 into evidence?

9          MR. BROWN:  Thank you, Your Honor.  I offer to move

10  Plaintiff's Exhibit Number 2 into evidence.

11          THE COURT:  Ms. Bauer.

12          MS. BAUER:  No objection, Your Honor.

13          THE COURT:  It will be admitted.

14          MR. BROWN:  Thank you, Your Honor.

15          THE COURT:  Cross.

16                    CROSS-EXAMINATION

17  BY MR. FREESE:

18  Q    Mr. Gaston, how you doing?

19  A    I'm all right.  How about yourself?

20  Q    Good.  I only have a few questions for you.

21  A    All right.

22  Q    And we may go over some of the same information, but

23  that's all right.  You're currently an inmate in the State of

24  Alabama, correct?

25  A    Yes, sir.

1 Q    And you're serving time for four counts of third-degree

2 robbery, correct?

3 A    Yes, sir.

4 Q    And you understand that robbery in the third degree is

5 when, in the course of committing a theft, an individual uses

6 against the person --

7         MR. BROWN:  Your Honor, objection.  The legal

8 conclusion.  The only stipulation that we rolled out, Your

9 Honor, is the fact that the fact of the conviction can come in.

10         MR. FREESE:  Your Honor, the agreement says the nature

11 of the conviction.

12         THE COURT:  It's overruled.

13 BY MR. FREESE:

14 Q    I'll restate my question, Mr. Gaston.  And you understand

15 that robbery in the third degree is when, in the course of

16 committing a theft, an individual uses force against the person

17 of the owner, or any other person present, with intent to

18 overcome his physical resistance or physical power of

19 resistance, or threatens the imminent use of force against the

20 person of the owner, or any person present with the attempt to

21 compel acquiescence or taking of or escaping with property,

22 correct?

23 A    If that's what you want to call it.

24 Q    Were you convicted of --

25 A    If that's what you want to call it.

1   Q     Okay.  And third-degree robbery is a felony, correct?

2   A     Yeah.

3   Q     It's a violent felony, correct?

4   A     No.  It's not a violent felony.  Third-degree robbery

5   class, it don't carry nothing but up to 10 to 15 years.  I got

6   a 20-year sentence.  So you do the math on that.  I got a

7   20-year sentence, when it came up to 10 in 15 years.

8   Q     I understand.

9   A     All right.

10  Q     So you have four 20-year sentences that you're serving

11  concurrently, correct?

12  A     Yes.  Concurrent, meaning one.

13  Q     Each charge was 20 years?

14  A     Yes.  Each charge was 20 years made to one.

15  Q     Thank you.  And so you -- your sentence for those crimes

16  started in 2016?

17  A     Correct.

18  Q     And they'll go until 2036?

19  A     Correct.

20  Q     So, in your previous testimony, am I correct in saying

21  that you said Officer Ward did not give you an order to lock

22  down?

23  A     No, he did not.

24  Q     And that's your testimony, right now, today?

25  A     That's my testimony.

1    Q    And it's accurate?

2    A    It's accurate.  He did not give me no -- he did not say no

3    lockdown or none of that.  The only way they lock that yard

4    down is when me and Officer Ward got into it, and when the

5    officer called it -- I mean, the sergeant called the code.

6    Q    So you never heard an order lockdown?

7    A    No, sir.

8    Q    Are you aware that you filed a complaint in this case?

9    A    I'm here, ain't I?

10   Q    So you were aware that you filed a complaint, yes?

11   A    I'm saying I'm here, ain't I?

12   Q    Okay.  And do you know all the facts that are stated in

13   that complaint?

14   A    Yeah.  I know he wrote me up saying that he ordered me to

15   lock down, and I said, F him.  He ain't talking about nothing.

16   And all that.  I read all that.

17   Q    I understand.  But it's your complaint, correct?

18   A    What?  What I'm saying today?

19   Q    The filing you filed in this court to initiate this

20   lawsuit is your complaint, correct?

21   A    Yeah.

22   Q    And you signed it with your name, correct?

23   A    Yeah, true.

24        MR. FREESE:  Your Honor, permission to approach.

25        THE COURT:  You may.

BY MR. FREESE:

Q    Let me know when you've had enough time to review it,

Mr. Gaston.

A    Yeah, that's my signature.  It's my signature.

Q    That's your signature?

A    Yeah.

Q    Do you recognize this document?

A    Yeah.

Q    This is your complaint in this case?

A    Yeah.

          MR. FREESE:  Your Honor, I move to admit Defendant's

Exhibit 1.

          THE COURT:  Mr. Brown.

          MR. BROWN:  No objection, Your Honor.

          THE COURT:  It will be admitted.

BY MR. FREESE:

Q    Mr. Gaston, can you flip to Page 4 for me, please?  And at

the bottom, it should say "statement of claim", right there.

A    All right.  Do you want me to read this?

Q    No.  I'm just saying are you on Page 4 looking at

"statement of claim"?

A    Yeah.

Q    Okay.  And it reads on March 12, 2021, Officer Dustin T.

Ward was assigned to B-side yard rover.  At 7:12 p.m., Officer

Ward approached the L-dorm front door.  Officer Dustin T. Ward

1  gave plaintiff Gaston a direct order to lock down.

2       Inmate Gaston said, Fuck you.  You aren't about anything.

3       At that time, Officer Ward took off his spray and radio

4  and told an assisting officer Chandler to hold them.  Is that

5  accurate so far?

6  A    That's what he wrote on the disciplinary report.  That's

7  what he wrote on the disciplinary report.  But if you go to

8  that disciplinary report, you'll see that the disciplinary

9  report was -- it was -- when he -- when they did the

10 disciplinary report, they found me not guilty on it.  That's

11 what he wrote.  This is his statement on the disciplinary

12 report.

13 Q    Are you aware that this is your complaint filed in this

14 case?

15 A    This is what the guy wrote.  This is what the guy wrote

16 up.

17 Q    And your name is signed to it?

18 A    Yeah, that's my name right there, Roderick Gaston.

19 Q    And above your name, it says, I declare under the penalty

20 of perjury the foregoing is true and correct.

21 A    Perjury, no --

22 Q    I'm not saying you've perjured yourself at all.  I'm just

23 saying, that's what that says, correct?

24 A    Yeah.

25 Q    And you signed that?

1  A      (Nods head.)

2  Q      So you signed and confirmed that everything in this

3  document, your complaint in this case, is true and correct?

4  A      I'm saying that ain't true.  Tell me something -- I said,

5  F you.  That's what the inmate wrote.  That's what he wrote

6  down off the disciplinary report.

7  Q      You filed a claim in this lawsuit, correct?

8  A      Correct.

9  Q      And this is the statement of the claim in your complaint,

10 correct?

11 A      Correct.

12 Q      And you signed this document under the penalty of perjury

13 attesting that --

14 A      Correct.

15 Q      -- everything in this document is true, correct?

16 A      Correct.

17 Q      Thank you.  So if I ask you again, did Officer Ward ask

18 you to lock down on March 12th, 2021?

19 A      Officer Ward didn't ask me to lock down on March 12th,

20 2021.

21 Q      Okay.  So today, you are contradicting what you put in

22 your complaint; is that correct?

23 A      I -- listen, when the guy wrote it up, I signed my name to

24 it while he sent it on out.

25 Q      So you're saying you don't know what was in the complaint?

1   A   He wrote everything that was -- he wrote everything that

2   was on the disciplinary report.  Everything that was on the

3   disciplinary report, that's what he put down right there.

4   Q   So you had no idea what you were filing in this case?  You

5   were just trusting someone else to make a claim that you signed

6   under penalty of perjury?

7   A   He was the law library man.  He was the law library man.

8   He was the law library clerk.

9   Q   Got it.  And it's your testimony that Officer Ward

10  challenged you to the one?

11  A   That's what he did.

12  Q   Did you accept his challenge?

13  A   When he said he wanted the one?  I said so you going to

14  give me the one, and I'm not gonna go no jail?  I'm not gonna

15  get no write up?

16      He said, No.  You ain't gonna go no lockup, you ain't

17  going to jail.  I'm going to make sure you don't go to no

18  lockup.

19  Q   So is that, yes, you accepted his challenge to the one?

20  A   I just said I asked him was he going to really give me the

21  one.  I didn't say -- I didn't say, Yeah, I'm gonna give you

22  the one when you come back.  I just said, Oh, you would give a

23  person the one.  So that ain't accepting his challenge.

24  Q   And so but your only condition to accepting the challenge

25  was that you didn't go to lockup, right?

1   A     I said -- no.  I said, So you telling me if they give you

2   the one, you're not gonna go to lockup, you're not gonna go to

3   jail, you ain't going to get no disciplinary behind this or

4   nothing?

5         And he said, No.  You ain't getting no type of

6   disciplinary, no lockup, no nothing.

7         I said, All right, cool, bet.

8   Q     And at the time Mr. Ward swung on you, is it your

9   testimony that you were surprised by the fact that he had

10  swung?

11  A     Yeah.  I -- I really was surprised because he play a lot.

12  You know what I'm saying?  I told you he does the little hand

13  signal thing.  I got you.  I got you (demonstrating).  You come

14  through, scan your I.D., he might be right there talking about,

15  Oh, I got you.  You know what I'm saying?

16  Q     And you don't think it was because you gave him a direct

17  order to lock down and you responded with fuck you?

18  A     He didn't give me a direct order to lock down.

19  Q     I understand.  I'm just saying, this is what you filed in

20  this case and attested to as being true.

21  A     He didn't give me a direct order.  That's what the inmate

22  wrote off the disciplinary report.

23  Q     Mr. Gaston, are you aware that you and your counsel have

24  stipulated to facts in this case?

25  A     Huh?

1 Q    You have agreed that certain facts are true, and that is

2 the end of it.  Are you aware of that?

3 A    I'm telling you the whole truth and nothing but the truth.

4 Q    My point is, Mr. Gaston, are you aware that your counsel

5 and you have agreed to facts before this -- before we got here

6 today, and attested that they are true, and that cannot be

7 challenged?

8 A    I don't -- I ain't got nothing to say.

9 Q    Okay.

10 A    I don't have nothing to say about that.

11 Q    And it's your testimony that Mr. Ward struck you one time;

12 is that correct?

13 A    No.  Mr. Ward struck me twice.  He struck me the first

14 time, and then when he had my arms pinned up against the wall,

15 he struck me again.  That's when I snatched my arm from behind

16 Officer Chandler because Officer Chandler had my arms pinned

17 up.  That's when I snatched one of my arms back, and I punched

18 Ward back.  And that's when they wrestled me to the ground.

19 Q    So you punched Mr. Ward back?

20 A    Yes, sir, I did.

21 Q    Are you aware that your counsel and you have stipulated to

22 the fact that Mr. Ward struck you one time?

23 A    I don't have nothing to say about that.

24 Q    Okay.  After you were struck, you were taken to be

25 evaluated, correct?

1  A    Yes.

2  Q    And we saw pictures a second ago.  And from those

3  pictures, you testified that you had a cut lip and a bump on

4  your head; is that correct?

5  A    Uh-huh.

6  Q    Did you go to any treatment for the cut on your lip?  Did

7  you get stitches?

8  A    No.

9  Q    No.  Did you get any treatment for your head?

10  A    Yeah.  They gave me some -- they gave me some aspirin and

11  Tylenol.  They kept bringing me aspirin and Tylenol back there.

12  Q    For the headache?

13  A    For the knots, yeah, the headache.

14  Q    So you had no treatment for the lip and aspirin for the

15  headache, correct?

16  A    Yeah.

17  Q    And they sent you back -- sent you to lockup?

18  A    No.  They sent me to lockup.

19  Q    Yeah.  Do you agree that the pictures we saw a second ago

20  when Mr. Brown was asking you questions was an accurate

21  depiction of you right after the incident?

22  A    Yeah.

23        MR. FREESE:  That's all I have, Your Honor.

24        THE COURT:  Thank you.  Mr. Brown.

25

1                    REDIRECT EXAMINATION

2    BY MR. BROWN:

3    Q    Mr. Gaston, when was the order to lock down given?

4    A    It wasn't an order.  The order to lock down, when we had

5    got in the incident, in the fight, and when they wrestled me to

6    the ground, that's when they called lockdown.

7          MR. BROWN:  No further questions, Your Honor.  Does my

8    witness have permission to step down from the stand?

9          THE COURT:  Let's -- thank you.  Do you have more

10   evidence?

11         MR. BANKS:  No, Your Honor.  At this time, the

12   plaintiff rests.

13         THE COURT:  Thank you.  Let's take a ten minute break

14   and head to the jury room.  I'll remind you not to talk about

15   the case with anyone, not to talk about the case with each

16   other.  This can be our afternoon break.  We'll be back in ten

17   minutes.

18                    (Jury out at 2:23 p.m.)

19         THE COURT:  Mr. Gaston, you can step down now.

20                    (Witness excused.)

21         THE COURT:  Ms. Bauer, do you have a motion?

22         MS. BAUER:  Yes, Your Honor.  We would move for

23   judgment as a matter of law.  That the plaintiff has not met

24   their burden of proof, particularly as it comes -- well, should

25   I keep going?

1          THE COURT:  Please.

2          MS. BAUER:  Particularly as it comes to showing that

3    Officer Ward used excessive force.  There's been no testimony

4    regarding the force that was used by Officer Ward.  I mean, I

5    would think that the person who caused the injury and who may

6    have used excessive force would need to -- there needed to be

7    evidence presented regarding his state of mind since the jury

8    instructions require there to be a subjective and objective

9    consideration regarding that.

10         And just that as the -- as part of the jury instructions,

11    it says that the jury is to consider Mr. Ward's motive, as well

12    as any other efforts he made to temper the situation, as well

13    as whether or not it was a good faith effort to maintain and

14    restore discipline.  There's no evidence in the record of any

15    of those things.  And while Mr. Gaston's testimony regarding

16    his perception of the circumstances is very much relevant and

17    the jury should be able to consider that, there has to be also

18    evidence in the record regarding those elements since the jury

19    will be instructed regarding that.

20         THE COURT:  Mr. Banks.

21         MR. BANKS:  Yes, Your Honor.  Under Rule 50, the

22    standard is that when viewing the facts in the light most

23    favorable to the non-movant party, which in this case is us as

24    the plaintiff for Mr. Gaston, whether or not a reasonable juror

25    could conclude we have met a proper -- we made a prima fascia

1   showing on our claim under 1983 for excessive force under the

2   Eighth Amendment.

3       Your Honor, two of the required four elements are

4   stipulated and are not in controversy.  That is that there was

5   an intentional act and force applied, and also, that the

6   defendant was acting under color of state law.  The other two

7   elements are as to the amount of force used.  Your Honor,

8   everything opposing counsel just mentioned are items that the

9   trier of fact, the jury, has to consider.

10      Based on Mr. Gaston's testimony, viewing it in the light

11  most favorable to us, there has at least been a prima fascia

12  showing as to that element having been met.  This defendant

13  struck Mr. Gaston in the face with a closed fist.  He did not

14  use any pepper spray.  He did not use the radio to call for

15  back up.  He did not -- until after hitting him -- use

16  handcuffs.  Nothing in there, Your Honor, shows a reasonable

17  amount of force that would be expected out of an ADOC officer.

18      Additionally, Your Honor, based on the testimony regarding

19  "the one", it's very clear that ADOC officers and employees

20  recognize that this is beyond what they're supposed to do,

21  since they make it a point to include language to limit who

22  knows about it, to make sure it stays within the dorm, between

23  the inmates, between other COs, and does not go further up the

24  chain.

25      Your Honor, as it relates to injury, we have pictures in

1 the record as exhibits, and that's Plaintiff's Exhibit 2, that

2 demonstrate Mr. Gaston's injuries.  Now, if opposing counsel

3 wants to go into the extent of those injuries, as relates to

4 the special interrogatories, that is a separate item as relates

5 to a damages calculation and not to prima fascia as we're

6 required to make under 1983.  For all the reasons and the

7 testimony we heard so far, a reasonable juror could conclude

8 that we've met our burden of at least making a prima fascia

9 showing in this case.

10        THE COURT:  The motion will be denied.  It will be for

11 the jury.  Your points about subjective peace and the injury, I

12 think there's enough to get to the jury.  And the jury's out

13 now, but those will be issues that you can address in your case

14 when we get to it.

15        MS. BAUER:  Okay.  Thank you.

16        THE COURT:  Anything else?

17        MS. BAUER:  No, Your Honor.

18        MR. BANKS:  Not for plaintiff, Your Honor.

19        THE COURT:  All right.  Let's go off the record, and

20 you can have about five minutes left of this break.

21            (Recess at 2:28 p.m. to 2:33 p.m.)

22        THE COURT:  Let's go back on the record while Mr. Ward

23 gets set up.  Parties are here.  Counsel is here.  The jury is

24 not.  I have one question for you, Ms. Bauer.  But anything

25 else to take up before we get the jury?

```
 1          MR. BANKS:  No, Your Honor.

 2          MS. BAUER:  No, Your Honor.

 3          THE COURT:  I know you're upset about that

 4  stipulation.  I think it's appropriate for cross, as it was

 5  addressed.  I think it's appropriate for argument to the extent

 6  you want to deal with it in your case.  I'd also consider a

 7  curative instruction if that's something that you want to

 8  propose.  I'm not saying that you have to or you should, but

 9  just for what that's worth.

10          MS. BAUER:  Okay.  Thank you.

11          THE COURT:  All right.  Let's get the jury.

12                      (Jury in at 2:34 p.m.)

13          THE COURT:  The jury is back in.  I'll remind you that

14  this is important to both parties, and we now will hear the

15  defendant's evidence.  Ms. Bauer.

16          MS. BAUER:  The defense would call the defendant,

17  Dustin Ward.

18                      DUSTIN TYLER WARD,

19  having been first duly sworn by the courtroom deputy clerk, was

20  examined and testified as follows:

21          COURTROOM DEPUTY:  Please, state and spell your name

22  for the record.

23          THE WITNESS:  Dustin Tyler Ward; D-U-S-T-I-N; W-A-R-D.

24          COURTROOM DEPUTY:  Thank you.  Go ahead and spell your

25  middle name.
```

```
 1          THE WITNESS:  T-Y-L-E-R.

 2          COURTROOM DEPUTY:  Thank you.

 3                    DIRECT EXAMINATION

 4  BY MS. BAUER:

 5  Q    All right.  Mr. Ward, where did you grow up?

 6  A    Elkmont, Alabama.

 7  Q    Okay.  Is that where you went to school?

 8  A    Yes, ma'am.  I went to Elkmont Elementary and Elkmont High

 9  School.  It was conjoined as one.

10  Q    Okay.  Where do you live now?

11  A    I currently still live in Elkmont.

12  Q    Okay.  Do you live with any family members?

13  A    I live with my soon-to-be fiancee.

14  Q    Okay.  Does your family live around the area?

15  A    My mother and father live with my little brother six

16  minutes down the road.

17  Q    Okay.  And you mentioned you live with a fiancee.  What is

18  her name?

19  A    Taylor Majoria.

20  Q    And what does she do?

21  A    She's an RN.

22  Q    Okay.  RN, as in, nurse?

23  A    Yes, registered nurse.

24  Q    Okay.  What are some things you like to do?

25  A    Hunting, fishing, anything outdoorsy.
```

1  Q    Okay.  Are those some of the things you did, let's say,

2  last weekend?

3  A    Last weekend I actually worked.

4  Q    Okay.  So you weren't doing any of those activities?

5  A    No, ma'am.  I worked 12- to 14-hour shifts.

6  Q    Okay.  Is your -- you said soon-to-be fiancee.  Are you

7  guys expecting?

8  A    We are.

9  Q    Okay.  And do you know what the gender is?

10  A    It's a little boy.

11  Q    Awesome.  And when is he due?

12  A    August 6th.

13  Q    Awesome.  Where are you currently employed?

14  A    Limestone Correctional Facility for the ADOC.

15  Q    Okay.  And how long have you worked there?

16  A    Going on nine years, will be, in August.

17  Q    Okay.  Have you always worked at that facility?

18  A    I've worked overtime down south at St. Clair.

19  Q    Okay.

20  A    But other than that, primarily at Limestone Correctional

21  Facility.

22  Q    Okay.  Do you have any other source of income apart from

23  as a correctional officer?

24  A    No, ma'am.

25  Q    Okay.  And do you know base salary-wise how much you make

1  as a corrections officer?

2          MR. BANKS:  Objection, Your Honor.  This goes to

3  relevance as it relates to wealth and poverty.

4          THE COURT:  Ms. Bauer.

5          MS. BAUER:  The punitive jury instructions instruct

6  the jury --

7          THE COURT:  It's overruled.

8  BY MS. BAUER:

9  Q    Sorry.  Do you want me to repeat the question, or do you

10  have it?

11  A    Yes, please.

12  Q    Do you know what your base pay is as a corrections

13  officer?

14  A    Around 60,000.

15  Q    Okay.  Thank you.  Do you enjoy -- let's back that up.

16  What made you decide to become a corrections officer?

17  A    Because getting to be able to see the different aspects of

18  how people grew up, how they react in certain situations, like,

19  being inside the facility, and actually trying to help them

20  become a better person.  Whether it be they're a drug addict or

21  for whatever reason, what they're in prison for, I like the

22  aspect of being able to actually try to help people.  I was

23  actually going to use Department of Corrections as a leap way

24  to becoming a game warden but, kind of, fell in love with the

25  job.

1  Q    Okay.  And you've been in that job for nine years, you

2  said?

3  A    Yes, ma'am.

4  Q    Okay.  Are you aware of the specific crimes for which the

5  inmates you interact with at Limestone have been convicted of?

6  A    Generally speaking, no.  If they go on a transfer to like

7  the hospital or something, with their escape sheet, which has

8  all of their information on it, where they was born, their

9  education level, all this that and the third, it states what

10 they're in prison for and what their custody level is.  That's

11 the only way I know what they're in prison for.

12      I don't actually go out of my way and look certain

13 individuals up to figure out what -- their whole background,

14 why they're in prison, what they did to be able to come to

15 prison, their whole -- what is it called -- the -- the whole

16 spreadsheet.

17 Q    Uh-huh.

18 A    Just say, for instance, they're armed robbery or murder,

19 that's all I see.  I don't see what they -- the specifics of

20 what they did.

21 Q    Okay.  And is that a personal choice, or does the ADOC not

22 let you see that information?

23 A    That's a personal choice.

24 Q    And why did you make that choice?

25 A    Because I don't believe that you need to view different

1 people -- like, people differently.  And subconsciously, say,

2 for instance, you have somebody that's in there for sodomy or

3 rape versus somebody that's just in there for receiving stolen

4 property, subconsciously, human nature, people are going to

5 look at them different.

6 Q    Okay.  And so that's a personal choice you made not to do

7 that?

8 A    Yes, ma'am.

9 Q    Okay.  Could you describe to the jury what your job duties

10 are as a corrections officer?

11 A    Yes, ma'am.  So I work night shift, 12-hour shifts.  I get

12 there around 6:00 p.m.  And currently, now, we're locking -- we

13 lock the yard down as soon as we get there, begin count at

14 around 8:00, 9:00, then we do fence checks to make sure the

15 fence -- the outside fence isn't cut for no escapees, and count

16 again, but our job is primarily for security and protection of

17 the inmates.

18 Q    Okay.  When you say "begin the count", what does that

19 mean?

20 A    It's where you do an institutional count, and you count

21 each individual inmate going from dorm to dorm.  And it has to

22 add up to the total count for the facility.

23 Q    Okay.  And what is the reason for having to do the count?

24 A    To make sure that nobody has escaped.

25 Q    Okay.

 1  A    Or attempted to escape.

 2  Q    Please, correct me if I'm wrong, you said part of your job

 3  duties is doing the count, security checks, and fence checks.

 4  Did you mention any other job duties, or is that it?

 5  A    I mean, it goes from -- I've been a firefighter.  I've had

 6  to put fires out.  I've had to stop stabbings.  I've had to

 7  talk to people -- talk people down from wanting to commit

 8  suicide.  I've had to talk people down from wanting to stab

 9  another inmate.  My job title goes everywhere.

10  Q    Okay.  Would you consider your job a dangerous job?

11  A    Yes, ma'am, I would.

12  Q    And why is that?

13  A    Well, you're dealing with criminals that all they have to

14  do all day is think on how they want to get drugs into the

15  camp, how they want to get phones into the camp.  Will they --

16  this guy hasn't paid his debt so -- his prison money, so am I

17  going to beat him up, or I'm going to stab him.  You can't --

18  you can't think what another person is thinking at the time.

19  Q    Okay.  Have you ever been assaulted while you're on duty

20  as a corrections officer?

21  A    Yes, ma'am.

22  Q    Okay.  Could you -- have you ever been stabbed by an

23  inmate while you were on duty?

24  A    Yes, ma'am.

25  Q    Okay.  Do you know how many inmates there are at

1  Limestone, generally speaking?

2  A    Between 22 and 2400.

3  Q    Okay.  Do you know how many correctional officers there

4  are between any given shift?

5  A    Between 14 to 22 or 23.

6  Q    Okay.  So it's 14 to 23 correction officers and between 22

7  to 2400 inmates?

8  A    Yes, ma'am.

9  Q    Okay.  Do you know what level facility Limestone is?

10  A    We are currently a Level 5.

11  Q    Okay.  What is -- do you know whether Limestone was a

12  Level 5 facility in 2021?

13  A    Yes, ma'am, it was.

14  Q    Okay.  Could you explain what a Level 5 facility is?

15  A    Excuse me.  A Level 5 security facility, we house

16  life-without-parole inmates.  So obviously, life without

17  parole, they're life without having the possibility of getting

18  out of prison, which is, primarily, capital murder.  And I

19  believe Alabama has the three strike law, which is, if you

20  have -- I'm sorry -- a violent crime that you committed three

21  times, then they can give you life without parole.

22  Q    Okay.  So the Limestone Correctional Facility, at the time

23  of the incident that we're here about today, was a Level 5

24  facility --

25  A    Yes, ma'am.

1 Q    -- with that designation?  All right.  So let's talk about

2 the incident, why we're here today.

3      Can you tell the jury what you recall happening on the

4 evening of March 12th, 2021, please?

5 A    Yes, ma'am.  I was walking from K-dorm to L-dorm, which I

6 think y'all seen the layout of the prison.  It's a big circle.

7 So going around the yard announcing yard closed because it

8 happened at 7:12 --

9 Q    Yes.

10 A    -- the incident.  It was starting to get dark outside, so

11 we got to get ready for count.  So announcing yard closed.

12 Generally, walked around twice.  Come back around to L-dorm

13 when Mr. Gaston came up to me and said, What's up.

14      I said, What's up.

15      And excuse my language.  He said, Shit, you gonna give it

16 to me?

17      I was like, Yeah, I'll give it to you, Bro, but we gonna

18 wait.  The yard's open right now.

19      Excuse my language, again, but he said, Fuck that.  I want

20 it right now.

21      I said, Well, you're gonna end up going to jail, Bro.

22      He said, I don't care.  I want it right now.  Take that

23 equipment off.

24      So I took my spray and my radio off, and as I was handing

25 it to Officer Chandler, I looked behind me, and Mr. Gaston

1  rushed me like he was going to tackle me.  I turned around and

2  said, You really gonna sneak me like that?

3       He said -- excuse my language one more time -- he said,

4  Shit, you ain't talking about nothing.  You ain't nothing but a

5  pussy ass white boy.

6       And then, he took a fighter's stand, and I took a closed

7  fist strike to the facial area one time.

8  Q    Okay.  And after you struck Mr. Gaston one time, what

9  happened?

10 A    Officer Chandler and I grabbed him and placed him on the

11 ground and put him in restraints to the back.

12 Q    Okay.  And did you strike Mr. Gaston at that time?

13 A    No, ma'am.

14 Q    Okay.  And after Mr. Gaston was cuffed, what happened

15 after that?

16 A    Officer Chandler escorted him to the shift office.

17 Q    Okay.  Did you say anything to Mr. Gaston at that time?

18 A    No, ma'am.

19 Q    Did you say anything to Mr. Gaston while he was being

20 cuffed and lying on the floor?

21 A    No, ma'am.

22 Q    You heard Mr. Gaston testify that you said a very racially

23 charged comment and swore at him while he was laying down.  Did

24 you make any of those comments?

25 A    No, ma'am.

1 Q    Okay.  At the time that Mr. Gaston approached you in the

2 yard, had you given him a direct order to lock down?

3 A    Yes, ma'am.

4 Q    Okay.  And when you said Mr. Gaston walked up and said

5 what's up and asked you were you going to give it to him, and

6 you said, Yeah, I'll give it to you, but we're going to have to

7 wait, were you saying that you were going to give Mr. Gaston

8 "the one"?

9 A    He's the one that brought up "the one" initially.

10 Q    Okay.  At that time, were you intending to fight

11 Mr. Gaston?

12 A    No, ma'am.  I was intending to defend myself.

13 Q    Okay.  And when you say you were intending to defend

14 yourself, what did you need to defend yourself against?

15 A    The possibility of him hurting me.

16 Q    Okay.  Is that -- was that your perception of the

17 circumstances at that time?

18 A    Yes, ma'am.

19 Q    Okay.  When you struck Inmate Gaston, was it to -- what

20 were you intending to do by striking him?

21 A    Gain control of the situation.

22 Q    And when you say "gain control of the situation", what

23 does that mean?

24 A    The possibility of him wanting to fight.

25 Q    Okay.  And how many times did you strike Mr. Gaston?

1  A    One time.

2  Q    Okay.  Would you say as a correctional officer it is

3  important that inmates obey direct orders to lock down?

4  A    Yes, ma'am.

5  Q    Okay.  Would you say as a correctional officer it is

6  appropriate for inmates and correctional officers to be getting

7  into fights?

8  A    No, not getting in fights.  But to be able to control the

9  situation --

10  Q    Okay.

11  A    -- if need be, yes.

12  Q    Okay.  And would you say it is appropriate for inmates to

13  be challenging guards, correctional officers, to fights?

14  A    No, ma'am.

15  Q    Okay.  When you were locking down the yard, did the other

16  inmates respond to your order to lock down?

17  A    For the most part, yes.

18  Q    Okay.  So everyone else seemed to understand that you were

19  locking down the yard and that they needed to go back to their

20  dormitories?

21  A    Yes, ma'am.  You have a few that want to go try to handle

22  their business.  But for the most part, people start locking

23  down when they start announcing it.

24  Q    Okay.  And it's your testimony that, when you ask them to

25  lock down, then Mr. Gaston approached you?

1   A    Yes, ma'am.

2        MS. BAUER:  Okay.  Nothing further.

3        THE COURT:  Thank you.  Cross.

4        MR. BANKS:  Yes, Your Honor.

5                    CROSS-EXAMINATION

6   BY MR. BANKS:

7   Q    Mr. Ward, like you said, you've worked for the ADOC for

8   about nine years?

9   A    Yes, sir.

10  Q    The bulk of that time has been with Limestone?

11  A    Yes, sir.

12  Q    Started with the ADOC back in August of '14?

13  A    Yes, sir.

14  Q    So you were at Limestone on March 12th of '21?

15  A    I was.

16  Q    Like we've said, you were the B-side yard rover?

17  A    Yes, sir.

18  Q    And like you've kind of told us, your job was to go about

19  and make sure the yard was secure and everybody was protected

20  at that point?

21  A    Yes, sir.

22  Q    And before we get to actual -- the actual events on March

23  12th, I just want to talk about some items generally, all

24  right?

25       So you'd agree with me that your job is to provide

1 protection and safety at the facility you're stationed as an

2 ADOC employee?

3 A    Yes, sir.

4 Q    That means the safety and protection of other officers?

5 A    Other officers, yes, sir.

6 Q    Yourself?

7 A    Yes, sir.

8 Q    And the inmates?

9 A    Yes, sir.

10 Q    And sometimes, to help keep eyes on everybody, like you

11 said, the ratio's kind of high for prisoners, right?

12 A    Yes, sir.

13 Q    About 100 to 1?

14 A    Yes, sir.

15 Q    And to help that, you've got cameras at that facility?

16 A    At the time, we did not.

17 Q    Did not have cameras at the facility?

18 A    They weren't active at the time.

19 Q    Okay.  But there were cameras at the facility that just

20 were not working?

21 A    They hadn't had them installed all the way yet.

22 Q    Okay.

23 A    And we -- as officers, it's only captains and above that

24 have access to the cameras.

25 Q    Okay.  And on that day, you were not -- as a correctional

1 officer with Limestone, you do not have a body cam that you

2 wear?

3 A    No, sir.

4 Q    But now you do have cameras?

5 A    Not a body cam, no.

6 Q    Not you, my fault.  Limestone has cameras?

7 A    Yes, sir.

8 Q    And that's to help keep everybody safe?

9 A    Yes, sir.

10 Q    Everybody protected?

11 A    Yes, sir.

12 Q    And maybe make sure somebody doesn't slip out the fence?

13 A    Yes, sir.

14 Q    Okay.  So because the cameras -- you did not have a body

15 cam, we have no footage from March 12th, 2021?

16 A    Can you repeat the question?

17 Q    Because you did not have a body cam on March 12th, 2021,

18 we have no video footage of what happened?

19 A    That I know of, yes, sir.

20 Q    So you have not seen any body cam footage from you on

21 March 12th, 2021?

22 A    I do not have a body cam, sir.

23 Q    Right.  So you've not seen any footage from that?

24 A    No, sir.

25 Q    Nothing showing your point of view as everything was

 1  happening?

 2  A    Yes, sir.

 3  Q    Because the cameras were not working, we do not have any

 4  video footage from Limestone facility, period, on March 12th,

 5  2021?

 6  A    That I know of.  I don't have access to the dormitory

 7  camera, sir.

 8  Q    You've never seen any dormitory camera footage from March

 9  12th, 2021?

10  A    No, sir.

11  Q    From L-dorm, right?

12  A    Yes, sir.

13  Q    Not from K-dorm?

14  A    No, sir.

15  Q    B-side yard?

16  A    There's really no cameras on the yard itself.

17  Q    Right.  So we've seen -- you've seen no footage of that?

18  A    Yes, sir.  Never.

19  Q    Okay.  And we talked, kind of, about the facility.  Now, I

20  want to talk about you generally.  To help do your job, you're

21  given some equipment?

22  A    Yes, sir.

23  Q    To help keep everybody safe and protected?

24  A    Yes, sir.

25  Q    Part of that is the defensive spray?

```
 1   A      Yes, sir.

 2   Q      What most of us call mace?

 3   A      SABRE Red, yes.

 4   Q      You've got a radio?

 5   A      Yes, sir.

 6   Q      That's to call in to different officers?

 7   A      Yes, sir.

 8   Q      Or receive code calls?

 9   A      Yes, sir.

10   Q      I'm guessing you got some handcuffs on you when you're on

11   shift?

12   A      Yes, sir.

13   Q      Maybe a flashlight?

14   A      To count, yes.

15   Q      Okay.  Nothing else?

16   A      No, sir.

17   Q      No baton?

18   A      No, sir.

19   Q      Okay.  And you'd agree with me that the flashlight, the

20   mace, the radio, and the cuffs are all important in doing your

21   job?

22   A      Yes, sir.

23   Q      The job that you've described as keeping everybody safe

24   and protected?

25   A      Yes, sir.
```

1   Q    Like I've said, the handcuffs can help restrain an inmate

2   who might be a little rowdy, right?

3   A    Generally speaking, yes.

4   Q    Radios help to call in backup?

5   A    Yes, sir.

6   Q    Or to hear calls for backup?

7   A    Yes, sir.

8   Q    Mace is to help control some inmates who might get unruly?

9   A    Yes, sir.

10  Q    Protect yourself?

11  A    Yes, sir.

12  Q    Protect other officers?

13  A    Yes, sir.

14  Q    Protect other inmates?

15  A    Yes, sir.

16  Q    Like we said, you were working on March 12th, 2021, right?

17  A    Yes, sir.

18  Q    And around 7:00 that night, you were working on the B-side

19  yard?

20  A    That's correct, yes, sir.

21  Q    Like you said, you did a little lap.  You claim that you

22  gave an order to lock down.

23  A    I did give an order to lock down, sir.

24  Q    But like you just said on direct, after you gave that

25  command, you and Mr. Gaston kept talking.

1   A    I'm sorry.  Yes, sir.

2   Q    While you and Mr. Gaston were talking, you did not give

3   him another order to lock down?

4   A    Yes, sir.

5   Q    As in, that's correct?

6   A    Yeah, that's correct.

7   Q    While you were sitting there talking, you claim that

8   Mr. Gaston's the one that brought up "the one".

9   A    Yes, sir.

10  Q    And like you just said on direct, that's not appropriate

11  for ADOC employees to do.

12  A    Yes, sir.

13  Q    It's not appropriate to fight inmates?

14  A    If need be, yes.

15  Q    Let me be clear.  On direct, you said it's fine for you to

16  use self-defense against inmates, correct?

17  A    I mean, fighting, self-defense, yes.  It's --

18  Q    Same thing?

19  A    It can be, yes.

20  Q    Okay.  But you'd agree, generally, it's not okay for an

21  ADOC employee to fight an inmate?

22  A    Yes, sir.

23  Q    Not appropriate to give them "the one"?

24  A    Yes, sir.

25  Q    And so, based on your testimony, when Mr. Gaston came up

1  and said he wanted "the one", at that point, you said, Not

2  right now.

3  A    Yes, sir.

4  Q    You're in the position of authority here?

5  A    I'm in the position of trying to deescalate.

6  Q    Right.  And because you're trying to deescalate, you have

7  certain authority granted to you, by the state, with your

8  position, right?

9  A    Yes, sir.

10  Q    That's why you got the mace.

11  A    Yes, sir.

12  Q    Why you got the cuffs.

13  A    Yes, sir.

14  Q    Why you go through the background check to get hired by

15  the ADOC.

16  A    Yes, sir.

17  Q    Okay.  So as you're sitting there talking and Mr. Gaston

18  says something to you, you decide to hand Officer Chandler your

19  mace, right?

20  A    Yes, sir.

21  Q    And your radio?

22  A    Yes, sir.

23  Q    And at that point, you hit Mr. Gaston with a closed fist?

24  A    After Mr. Gaston became belligerent and got into a

25  fighter's stance, yes.

1  Q    Belligerent?

2  A    Yes.

3  Q    Not what you described on direct, correct?

4  A    He was acting out, yes.

5  Q    Okay.  And while he was acting out, your mace was with

6  another officer?

7  A    Yes, sir.

8  Q    Your radio was with another officer?

9  A    Yes, sir.

10  Q    Tools we just said are there to help maintain safety.

11  A    Yes, sir.

12  Q    And keep everybody protected.

13  A    Yes, sir.

14  Q    Including yourself?

15  A    Yes, sir.

16  Q    And instead of using those items, you hit Mr. Gaston with

17  a closed fist.

18  A    Yes, sir.

19  Q    And after this, you wrote Mr. Gaston up?

20  A    I did not write the disciplinary, no, sir.

21  Q    But you're aware of that disciplinary report?

22  A    No, sir.

23  Q    You're not aware of that disciplinary report?

24  A    No, sir.  I'm aware of it, but I wasn't aware of what was

25  written in the disciplinary.

1  Q     You're aware of it now --

2  A     Yes.

3  Q     -- of that disciplinary report?

4  A     Yes, sir.

5  Q     Because you're aware of -- now, you're aware that that was

6  a disciplinary record for failure to obey a direct order?

7  A     Yes, sir.

8  Q     You're also aware that Mr. Gaston was not guilty on that

9  failure to obey a direct order, correct?

10        MS. BAUER:  Objection, Your Honor.

11        THE COURT:  Sustained.

12        MR. BANKS:  Your Honor, if I may respond.

13        THE COURT:  Please.

14        MR. BANKS:  During direct, and while I understand

15  opening statements is not evidence, opposing counsel has opened

16  to try to elicit testimony, and has elicited testimony, that

17  this defendant was acting appropriately to respond to a direct

18  order that he issued and Mr. Gaston's failure to do so.

19        He's asserted that as a fact, as though it has been found

20  by some other board.  We're offering this, Your Honor, as

21  impeachment to go against that testimony because it is clear,

22  from the records, that Mr. Gaston was found not guilty of that

23  based on this defendant's own admission of fault.

24        THE COURT:  The objection is sustained.

25        MR. BANKS:  Yes, Your Honor.

1 BY MR. BANKS:

2 Q    Do you agree with me that, as an ADOC employee, you know

3 different tactics to control a situation?

4 A    We are trained in certain aspects, yes.

5 Q    Right.  And that includes how to do takedowns?

6 A    Yes, sir.

7 Q    Holds?

8 A    Yes, sir.

9 Q    Maybe some wrist locks?

10 A    Yes, sir.  Along with front strike theories.

11 Q    Right.

12 A    Yes, sir.

13 Q    But you have takedowns?

14 A    Yes, sir.

15 Q    Locks?

16 A    Yes, sir.

17 Q    And pins?

18 A    We don't have any locks -- what do you mean by "locks"?

19 Q    Shoulder locks, wrist locks, arm locks?

20 A    No.

21 Q    So no takedowns?

22 A    We have takedowns, yes.

23 Q    Okay.  And after you struck Mr. Gaston, you took him down?

24 A    No, sir.

25 Q    You did not take Mr. Gaston down to the ground?

1   A    Me and Officer Chandler assisted him to the ground, yes.

2   Q    So you, along with another officer, assisted Mr. Gaston in

3   getting to the ground?

4   A    Yes, sir.

5         MR. BANKS:  Nothing further, Your Honor.

6         THE COURT:  Thank you.  Redirect.

7                    REDIRECT EXAMINATION

8   BY MS. BAUER:

9   Q    Just a couple of questions.  First, you were just asked,

10  regarding the radio and the mace that you gave to Officer

11  Chandler, and you said you had given Officer Chandler your mace

12  and your radio, correct?

13  A    Yes, ma'am.

14  Q    Did you -- why did you choose to give Officer Chandler the

15  radio and the mace?

16  A    Because, like I said, I've been working there nine years,

17  and I could tell Mr. Gaston was going to take more than spray

18  or calling for assistance at the moment, that he was going to

19  end up causing me physical harm.

20  Q    Okay.  And have you had to use mace before against

21  inmates?

22  A    Yes, ma'am.  Primarily use it inside the facility, like,

23  inside the dorm stories.  Outside it's used as, like, a mist.

24  Q    Okay.

25  A    So the wind can dissipate it or possibility of spraying

1 another inmate with it, outside of the dormitory, with the wind

2 carrying it off, and causing a bigger, like, more distress for

3 other inmates.

4 Q   Okay.

5 A   Causing a bigger issue.

6 Q   Okay.  So it's your testimony that you sometimes

7 intentionally choose not to use mace outside because the wind

8 can carry it off and affect other people?

9 A   Generally speaking, when we're still locking the yard down

10 and there's other inmates around right then, yes.

11 Q   Okay.  When you were trained or going through training as

12 a correctional officer, did you have to get maced?

13 A   Yes, ma'am.

14 Q   Okay.  And having been maced -- well, have you ever been

15 punched?

16 A   I have.

17 Q   Okay.  Having been both punched and maced before, which

18 one would you prefer?

19 A   I'd rather get punched in the face.

20 Q   Why is that?

21 A   Because the spray will last, sometimes, upwards of a day

22 to three days, burning.

23 Q   Okay.  So to you, is it fair to say, that you punching

24 Mr. Gaston one time to control the situation was, from your

25 perspective, the kinder thing to do to Inmate Gaston than to

1  mace him at that time?

2  A    Yes, ma'am.

3  Q    Okay.  And it was also a specific judgment call, on your

4  part, not to mace him and thereby potentially spray or have the

5  spray mist other people in the yard?

6  A    Yes, ma'am.  Other -- Officer Chandler or other inmates,

7  yes.

8             MS. BAUER:  Okay.  Nothing further, thank you.

9             THE COURT:  Thank you.  Any recross?

10            MR. BANKS:  No, Your Honor.

11            THE COURT:  Thank you.  You can step down, sir.

12                      (Witness excused.)

13            THE COURT:  Any other evidence for the defendant?

14            MS. BAUER:  No, Your Honor.  The defendant rests.

15            THE COURT:  The defense has rested.  Any rebuttal

16  evidence for plaintiff?

17            MR. BANKS:  No, Your Honor.

18            THE COURT:  Ms. Bauer, do you have a motion?

19            MS. BAUER:  We would move again for --

20            THE COURT:  If you do, I propose we take it up at

21  sidebar.

22            (Sidebar conference on the record, as follows:)

23            THE COURT:  Ms. Bauer, do you have a motion?

24            MS. BAUER:  Yes, Your Honor.  We would move, again,

25  for judgment as a matter of law.  The plaintiff cannot meet

1 their burden by preponderance of the evidence to show that our

2 client used excessive force against Inmate Gaston.

3          THE COURT:  Any argument?

4          MS. BAUER:  Yes.  Sorry, just a moment.

5          THE COURT:  Take your time.

6          MS. BAUER:  Yes.  The plaintiff has failed to put on

7 any evidence showing that Mr. Ward used force maliciously or

8 sadistically to cause harm.  Though he has cast doubt on

9 whether or not what Mr. Ward could have or should have done

10 under the circumstances, that does not rise anywhere near the

11 standard necessary to show or to put on evidence showing that

12 Officer Ward used malicious or sadistic force to cause harm.

13 Yes.

14          THE COURT:  Mr. Banks.

15          MR. BANKS:  Yes, Your Honor.  In addition to the

16 grounds previously raised and in light -- viewing the facts in

17 the light most favorable to the plaintiff, based on the Rule 50

18 standard, Your Honor, again, we have evidence that this

19 defendant had other means that the ADOC issued to do his job

20 protecting and serving.  This defendant took an intentional act

21 and chose to remove his mace and radio that were there for the

22 actual protection and safety of himself, inmates, and other

23 correctional officers, and chose to strike Mr. Gaston with a

24 closed fist.

25          After that, took Mr. Gaston down to the ground or

1  assisted, along with another officer.  And then we also heard

2  testimony again, Your Honor, of a racial remark once Mr. Gaston

3  was on the ground, showing some form of malice or other

4  conscious disregard as to the action he was taking, if not some

5  sadistic ulterior motive.  And for those reasons, a reasonable

6  jury could conclude that we met our burden in this case.

7         THE COURT:  The motion will be denied.  It will be for

8  the jury.  Anything before I instruct the jury and you all give

9  your closings?

10        MS. BAUER:  No, Your Honor.

11        MR. BANKS:  No, Your Honor.

12            (Sidebar conference concluded.)

13        THE COURT:  That concludes the evidence in the case.

14  I, now, will give you my final instructions, and we'll hear

15  closing arguments from the parties.

16        Members of the jury, it's my duty to instruct you on the

17  rules of law that you must use in deciding this case.  The jury

18  trial has, in effect, two judges.  I'm one of the judges.  The

19  other judge is the jury.  My duty is to preside over the trial

20  and to decide what evidence is proper for your consideration.

21  My duty at the end of the trial is to explain to you the rules

22  of law that you must follow and apply in arriving at your

23  verdict.

24        First, I'll give you some general instructions that apply

25  in every case.  For example, instructions about burden of proof

1 and how to judge the believability of witnesses.  Then, I'll

2 give you some specific rules of law about this particular case.

3 Finally, I'll explain to you the procedure you should follow in

4 your deliberations.

5      When I have finished, you will go to the jury room and

6 begin your discussions, sometimes called deliberations.  Your

7 decision must be based only on the evidence presented here.

8 You must not be influenced, in any way, by either sympathy for

9 or prejudice against anyone.  You must follow the law as I

10 explain it.  Even if you do not agree with the law, you must

11 follow all of my instructions as a whole.  You must not single

12 out or disregard any of the instructions on the law.

13      As I said before, you must consider only the evidence that

14 I have admitted in the case.  Evidence includes the testimony

15 of witnesses and the exhibits admitted.  Anything the lawyer's

16 say is not evidence and isn't binding on you.  You shouldn't

17 assume from anything I've said that I have any opinion about

18 any factual issue in this case.  Except for my instructions to

19 you on the law, you should disregard anything I may have said

20 during the trial in arriving at your own decision about the

21 facts.

22      Your own recollection and interpretation of the evidence

23 is what matters.  In considering the evidence, you may use

24 reasoning and common sense to make deductions and reach

25 collusions.  You shouldn't be concerned about whether the

1 evidence is direct or circumstantial.

2     Direct evidence is the testimony of a person who asserts

3 that he or she has actual knowledge of a fact, such as an

4 eyewitness. Circumstantial evidence is proof of a chain of

5 facts and circumstances that tends to prove or disprove a fact.

6 There's no legal difference in the weight you may give to

7 either direct or circumstantial evidence.

8     Again, the lawyers' questions and objections aren't

9 evidence. Only the witnesses' answers are evidence. Don't

10 decide that something is true just because a lawyers' question

11 suggested that it is. The question is not evidence unless the

12 witness agreed with it.

13     Similarly, during the trial, I ruled on objections by the

14 lawyers about whether certain evidence could be presented. It

15 is the lawyers' job to make objections if the lawyer believes

16 an objection is proper. Do not concern yourself with why I

17 ruled as I did because my rulings are based on rules of law.

18     If I sustained an objection, you must not guess about what

19 the possible testimony or exhibits may have been. And if I

20 overruled an objection and allowed the evidence, my ruling does

21 not indicate whether you should believe that evidence. You

22 should consider that evidence along with all of the other

23 evidence in the case and must not consider any evidence that I

24 excluded. You should not consider any rulings I made or

25 anything that I have said or done as an indication from me

1  about how you should decide the case.

2       Under our system, I am the judge of the law.  You are the

3  only judges of the facts.  I cannot give you my opinion of the

4  case or comment on the evidence.  When I say you must consider

5  all the evidence, I don't mean that you must accept all the

6  evidence as true or accurate.  You should decide whether you

7  believe what each witness had to say and how important that

8  testimony was.

9       In making that decision, you may believe or disbelieve any

10  witness in whole or in part.  The number of witnesses

11  testifying concerning a particular point doesn't necessarily

12  matter.  To decide whether you believe any witness, I suggest

13  that you ask yourself a few questions.  Did the witness impress

14  you as one who was telling the truth?  Did the witness have any

15  particular reason not to tell the truth?  Did the witness have

16  a personal interest in the outcome of the case?  Did the

17  witness seem to have a good memory?  Did the witness have the

18  opportunity and ability to accurately observe the things he or

19  she testified about?  Did the witness appear to understand the

20  questions clearly and answer them directly?  Did the witness's

21  testimony differ from other testimony or other evidence?

22       You should also ask yourself whether there was evidence

23  that a witness testified falsely about an important fact, and

24  ask whether there was evidence that, at some other time, a

25  witness said or did something, or didn't say or do something,

1  that was different from the testimony the witness gave during

2  this trial.

3      To decide whether you believe a witness, you may consider

4  the fact that the witness has been convicted of a felony or a

5  crime involving dishonesty or a false statement.  But keep in

6  mind, that a simple mistake doesn't mean a witness wasn't

7  telling the truth as he or she remembers it.  People naturally

8  tend to forget some things or remember them inaccurately.  So

9  if a witness misstated something, you must decide whether it

10  was because of an innocent lapse in memory or an intentional

11  deception.  The significance of your decision may depend on

12  whether the misstatement was about an important fact or an

13  unimportant detail.

14      Sometimes, the parties have agreed that certain facts are

15  true.  This agreement is called a stipulation.  You must treat

16  these facts as proved for this case.  The parties have

17  stipulated to the following facts.  On March 12th, 2021, at

18  around 7:12 p.m., Defendant Ward and Correctional Officer John

19  Chandler were locking down the B-side yard at the Limestone

20  Correctional Facility to perform a master roster count.  When

21  Defendant Ward approached the L-dorm in the B-side yard, he

22  gave a direct command to inmates standing around the L-dorm to

23  lock down inside of the L-dorm.

24      Plaintiff Gaston was one of the inmates standing around

25  the L-dorm and to whom the command to lock down was given.  In

1  response to the direct order given by Defendant Ward to lock

2  down, Plaintiff Gaston responded with profanity and insult.

3  Defendant Ward handed his pepper spray and radio to another

4  officer, and then struck Gaston in the face one time.

5  Defendant Ward was acting under color of state law when the

6  March 12th, 2021 incident occurred.

7      In this case, Mr. Gaston claims that Mr. Ward, while

8  acting under color of law, intentionally violated Mr. Gaston's

9  Eighth Amendment right as a prisoner to be free from cruel and

10  unusual punishment.  The constitution guarantees that every

11  person, who is convicted of a crime or a criminal offense, has

12  the right not to be subjected to cruel and unusual punishment.

13  This includes, of course, the right not to be assaulted or

14  beaten without legal justification while incarcerated.

15      To succeed on this claim, Mr. Gaston must prove each of

16  the following facts by a preponderance of the evidence.  First,

17  that Mr. Ward intentionally struck Mr. Gaston.  The parties

18  have agreed that Mr. Ward intentionally struck Mr. Gaston, so

19  you should accept that as a proven fact.

20      Second, that the force used against Mr. Gaston by Mr. Ward

21  was excessive.

22      Third, that Mr. Ward's conduct caused Mr. Gaston's

23  injuries.

24      And fourth, that Mr. Ward acted under color of law.  The

25  parties have agreed that Mr. Ward acted under color of law, so

1  you should accept that as a proven fact.

2      For the second element, you must decide whether the force

3  used in this case was excessive, based on whether the force was

4  applied in a good faith effort to maintain or restore

5  discipline, or instead, whether it was applied maliciously or

6  sadistically to cause harm.  In making that decision, you

7  should consider the amount of force used in relationship to the

8  need presented, the motive of Mr. Ward, the extent of the

9  injury inflicted, and any effort made to temper the severity of

10  the force used.

11      Of course, officers may not maliciously or sadistically

12  use force to cause harm, regardless of the significance of the

13  injury to the prisoner.  But not every push or shove, even if

14  it later seems unnecessary, is a constitutional violation.

15  Also, an officer always has the right to use the reasonable

16  force that is necessary under the circumstances to maintain

17  order and ensure compliance with jail or prison regulations.

18      For the third element, Mr. Ward's conduct caused

19  Mr. Gaston's injury if Mr. Gaston would not have been injured

20  without Mr. Ward's conduct.  And the injuries were a reasonably

21  foreseeable consequence of Mr. Ward's conduct.  If you find

22  Mr. Gaston has proved each of the facts he must prove, you must

23  find for Mr. Gaston and consider the issue of damages.  If you

24  find that Mr. Gaston has not proved each of these facts, then

25  you must find for Mr. Ward.

1      Mr. Gaston can recover compensatory damages only if you

2  find that Mr. Gaston has suffered more than a minimal physical

3  injury.  Thus, you must first determine whether Mr. Gaston

4  suffered more than a minimal physical injury.  Minor cuts and

5  bruises are examples of minimal physical injuries.  If

6  Mr. Gaston has failed to prove that he suffered more than a

7  minimal physical injury, then you must award nominal damages of

8  $1.  This is because a person whose constitutional rights were

9  violated is entitled to a recognition of that violation, even

10  if he suffered no actual injury.

11      If you find that Mr. Gaston has proved more than a minimal

12  physical injury, then you must consider Mr. Gaston's claims for

13  compensatory damages.  You should assess the monetary amount

14  that a preponderance of the evidence justifies as full and

15  reasonable compensation for all Mr. Gaston's damages, no more,

16  no less.

17      You must not impose or increase these compensatory damages

18  to punish or penalize Mr. Ward.  You must not base these

19  compensatory damages on speculation or guess work.  But

20  compensatory damages are not restricted to actual loss of

21  money.  They also cover the physical aspects of the injury.

22  Mr. Gaston does not have to introduce evidence of a monetary

23  value for intangible things, like physical pain.  You must

24  determine what amount will fairly compensate him for those

25  claims.  There's no exact standard to apply, but the award

1  should be fair in light of the evidence.

2      You should consider the following elements of damage, to

3  the extent you find that Mr. Gaston has proved them by a

4  preponderance of the evidence, and no others.  Mr. Gaston's

5  physical injuries including ill health, physical pain and

6  suffering, disability, disfigurement, and discomfort, including

7  such physical harm that Mr. Gaston is reasonably certain to

8  experience in the future.  And Mr. Gaston's mental and

9  emotional distress, impairment of reputation, and personal

10  humiliation, including such mental or emotional harm that

11  Mr. Gaston is reasonably certain to experience in the future.

12      You may award $1 in nominal damages and no compensatory

13  damages if you find that Mr. Gaston has submitted no credible

14  evidence of injury, or Mr. Gaston's injuries have no monetary

15  value or are not quantifiable with any reasonable certainty, or

16  Mr. Ward used both justifiable and unjustifiable force against

17  Mr. Gaston, and it entirely unclear whether Mr. Gaston's

18  injuries resulted from the use of justifiable or unjustifiable

19  force.

20      Mr. Gaston also claims that Mr. Ward's acts were done with

21  malice or reckless indifference to Mr. Gaston's federally

22  protected rights, which would entitle Mr. Gaston to an award of

23  punitive damages.  Mr. Gaston must prove, by a preponderance of

24  the evidence, that he is entitled to punitive damages.  If you

25  find for Mr. Gaston and find that Mr. Ward acted with malice or

1  reckless indifference to Mr. Gaston's federally protected

2  rights, the law allows you, in your discretion, to award

3  Mr. Gaston punitive damages as a punishment for Mr. Ward and as

4  a deterrent to others.

5       An officer acts with malice if his or her conduct is

6  motivated by evil intent or motive.  An officer acts with

7  reckless indifference to the protected federal rights of

8  Mr. Gaston when an officer engages in conduct with a callous

9  disregard for whether the conduct violates Mr. Gaston's

10  protected federal rights.  If you find that punitive damages

11  should be assessed, you may consider the evidence regarding

12  Mr. Ward's financial resources fixing the amount of punitive

13  damages to be awarded.

14       In this case, it is the responsibility of Mr. Gaston to

15  prove every essential element of his claim by a preponderance

16  of the evidence.  This is sometimes called the burden of proof

17  or the burden of persuasion.  Preponderance of the evidence

18  simply means an amount of evidence that is enough to persuade

19  you that Mr. Gaston's claim is more likely true than not true.

20  If the proof fails to establish any essential part of a claim

21  or contention by a preponderance of the evidence, you should

22  find against Mr. Gaston.

23       In deciding whether any fact has been proved by a

24  preponderance of the evidence, you may consider the testimony

25  of all of the witnesses, regardless of who may have called

1  them, all of the exhibits received in evidence, regardless of
2  who may have produced them.  If the proof fails to establish
3  any essential part of Mr. Gaston's claim by a preponderance of
4  the evidence, you should find for Mr. Ward.

5      Of course, the fact that I have given you instructions
6  concerning the issue of plaintiff's damages should not be
7  interpreted, in any way, as an indication that I agree that the
8  plaintiff should or should not prevail in this case.  Your
9  verdict must be unanimous.  In other words, you must all agree.

10     Your deliberations are secret and you'll never have to
11  explain your verdict to anyone.  Each of you must decide the
12  case for yourself but only after fully considering the evidence
13  with the other jurors.  So you must discuss the case with one
14  another and try to reach an agreement.

15     While you're discussing the case, don't hesitate to
16  reexamine your own opinion and change your mind if you become
17  convinced that you are wrong.  But don't give up your honest
18  beliefs just because others think differently or because you
19  simply want to get the case over with.  Remember that, in a
20  very real way, you are judges, judges of the facts.  Your only
21  interest is to seek the truth from the evidence in this case.

22     We'll now hear closing arguments from the parties.  Each
23  side will have 15 minutes.  Mr. Banks.  Mr. Brown.

24         MR. BROWN:  Your Honor.

25         MR. BANKS:  Do you want me to set up at the podium,

1  Your Honor?

2          THE COURT:  Please, you may.

3          MR. BROWN:  May it please the court.  Members of the

4  jury, my name is Nick Brown, and I represent the plaintiff,

5  Roger Gaston.  I want to thank all of you for taking the time

6  today to fulfill your civic duty and serve on this jury.  It's

7  a big time commitment, but it's very important that you're

8  here.  So I'm glad that you're all here fulfilling that duty.

9  So I do want to thank you.

10         As you heard earlier today, I think I characterized what

11  happened on March 12, 2021 as, kind of, something like a

12  schoolyard brawl.  And thinking about it, what happened here is

13  a little bit different.  In a schoolyard brawl, you have two

14  people fighting, but one of them might be bigger than the

15  other, but they're equals.  You might have heard earlier

16  talking about a fight back in the day between two people,

17  they're equals.  One might be bigger than the other, one

18  faster, one stronger, but they're equals.

19         And it goes back to authority, and what happens when

20  people in power abuse that authority.  And it's more similar to

21  a coach and a player.  If you think of a coach, they're there

22  for a purpose of getting the best out of that player.  And

23  hopefully, not just what they're doing in terms of their

24  athletic ability, but getting them ready to go out in the

25  world.  And sometimes, we'll see that coaches will abuse that

1   authority.  They will get angry at a player, and they'll run

2   them into the ground.  They'll do something beyond yelling at

3   them.  Sometimes, even hit them.

4        And what we have here is we have defendant who is a

5   correctional officer.  He works at a correctional facility.

6   Mr. Gaston serves in that facility as an inmate.  He's there to

7   pay his debt back to society.  He's there to serve his time

8   before he returns.  And we sometimes characterize what happens

9   in prisons being a different world, but the matter of the fact

10  is is that these are still human beings, still people, still

11  citizens, still individuals that have constitutional rights.

12       On March 12th, 2021, the defendant hit the plaintiff.

13  That's not in dispute.  But we have seen nothing in the

14  evidence today that shows that the defendant was right to clock

15  the plaintiff in the face.  Nothing -- no policy, no -- that

16  says that it's okay to use your fist instead of using your mace

17  or calling in, using your radio and calling in backup and using

18  your fist as the first choice of action.

19       Now, at the end of this, I am going to ask you to return a

20  verdict in favor of the plaintiff and give the plaintiff some

21  money.  And we haven't shied away from it all day.  Mr. Gaston

22  is -- he's an inmate.  You've heard why he is serving time in

23  Kilby Correctional Facility right now.  And I'll be frank with

24  you.  I don't agree with what Mr. Gaston did to get to prison,

25  neither does my co-counsel.

1     What the defendant did was wrong, and that's why he's in

2  prison, to rehabilitate.  But that does not mean that because

3  he is in prison that he is deprived from his constitutional

4  rights, from his ability to be able to move around and not get

5  hit in the face.  What we're talking about here, when we talk

6  about authority and individuals in a position of power, and

7  when that's abused, corrupted, it can get to malice.  And

8  that's what this case turns on.

9     When the plaintiff was hit, the punch was a sucker punch.

10  He was not expecting that.  And he was certainly not expecting,

11  when he was on the ground, to have an officer yell at him, I

12  ain't no bitch ass nigga.

13     Now, this is a civil case.  This is not a criminal trial.

14  What's at stake here is damages and liability.  And as you've

15  heard earlier today, is that you will weigh the evidence using

16  the standard notice of the preponderance of the evidence.  All

17  of the evidence and testimony heard today, if you'll imagine

18  you have a scale before you, you put it on the side of the

19  scale that you believe goes in favor of who.  And if it tips,

20  even slightly, in the direction of -- in one way, then that way

21  that's heavier goes toward that party.  And we believe that the

22  facts and evidence today support a verdict in favor of the

23  plaintiff.

24     After I sit down, you'll hear from the defendant, and then

25  you'll hear from us in a rebuttal, and the judge will give you

1  a few more instructions before you go back there in that room

2  and deliberate.  And you'll have a verdict form before you.  So

3  I just want to walk through that verdict form.

4      One of the things you'll do, as a juror, is you'll elect a

5  foreperson, and you'll reach a unanimous verdict.  And the

6  foreperson will sign the sheet and date it.  Now, there's four

7  questions -- five questions, really, but there's four on the

8  second page here.

9      THE COURT:  Mr. Brown, stop for one minute, please.

10  I'm sorry to interrupt you.  I think you don't have the current

11  verdict form, the final verdict form.  Will you pull that down,

12  please?

13      COURTROOM DEPUTY:  Here you go.

14      MR. BROWN:  Thank you, Your Honor.  The verdict form

15  you'll receive has four questions.  And I apologize for the

16  confusion.  And these four questions outline the four elements

17  that the judge just instructed you about, but there's a slight

18  difference with the fourth element.  Now, we've already

19  stipulated to the fact, on the first element, that Mr. Ward

20  intentionally violated Mr. Gaston's constitutional right to be

21  free from the use of excessive force while incarcerated.

22  There's no dispute that the defendant hit the plaintiff.

23  There's an answer for yes or no, and you'd mark no there.

24  Excuse me, you'd mark yes there.

25      The second, Mr. Gaston proved that Mr. Ward's conduct

1  caused Mr. Gaston's physical injury.  Again, there's no dispute

2  about that.  You've heard testimony, nothing there to -- we've

3  heard testimony that supports that.  Mr. Gaston proved that

4  Mr. Ward's conduct caused Mr. Gaston's physical injury.  And

5  your answer there will be yes.

6      Now, third, that Mr. Gaston proved he suffered more than a

7  minimal physical injury and that compensatory damages should be

8  awarded to Mr. Gaston.  This goes to what Judge Danella was

9  talking about with compensatory damages.

10     Now, minimal physical injury, we've seen the photographs

11 of what happened to Mr. Ward, and it's easy for me, as a

12 lawyer, to get up and say that that's the minimal physical

13 injury.  But we're talking about a busted lip and knot on the

14 head, and we heard testimony about the pain that that caused

15 him and about how, in the time afterwards, he had difficulty

16 eating.

17     In addition to that, we heard testimony from Mr. Gaston

18 about why he had to transfer from different prisons and his

19 feeling of safety about the lawsuit that he filed, this present

20 lawsuit.  So what we're going to do is, now, to ask the jury to

21 return and answer yes to number three.  And if your answer is

22 yes, for the amount of compensatory damages, we would ask that

23 you award Mr. Gaston the amount of $10,000.

24     Finally, we go back to malice, that Mr. Gaston has proved

25 that Mr. Ward acted with malice or reckless indifference to

1  Mr. Gaston's federally protected rights and that punitive

2  damages should be awarded against Mr. Ward.  You just heard

3  that punitive damages are damages to punish and deter future

4  conduct, such as this, from happening again.  On March 12th,

5  2021, after Mr. Gaston was hit, he went to the ground.  We

6  already heard what the defendant said to him.  He called him a

7  bitch ass nigga.

8          Is that something that you say to keep the peace and

9  restore order?  Is that something you say in a prison yard to

10 keep the peace and restore order?  So I ask you to think about

11 that when you go back to deliberate.  And I ask, as well, that

12 you assess punitive damages against Mr. Ward in the amount of

13 $65,000.

14         Again, I know what we're asking for is a lot.  But when we

15 get back to what we're talking about and positions of authority

16 and how that can be abused, there has to be a message to show

17 that that will not be tolerated.  I want to thank you all for

18 your time this afternoon.  You'll hear from the defense, and

19 you'll hear from Mr. Banks for a little bit.  Thank you once

20 again.

21         THE COURT:  Ms. Bauer.

22         MS. BAUER:  Good afternoon.  Before I go into my

23 closing, I would just like to clarify two things that were just

24 said to you.  Number one is, on the special verdict form that

25 you will take back, you will see this.  But number one says

1   that Mr. Gaston has proved that Mr. Ward intentionally violated

2   Mr. Gaston's constitutional right to be free from use of

3   excessive force while incarcerated.  That is not a stipulated

4   fact.  There has been a lot of discussions in front of you

5   regarding what the parties have and have not agreed to.  Judge

6   Danella just instructed you regarding that, and when you go

7   back to the jury room, you will have the jury instructions, and

8   you'll have those facts in front of you.

9       But I would like to urge you to please look at those

10  facts, and do not believe that we have stipulated to number one

11  on the Special Interrogatory Form.  That is exactly what is at

12  issue here today is whether or not Mr. Ward's one punch to

13  Mr. Gaston was use of excessive force.  And we would submit it

14  absolutely did not.

15      So going into the closing now.  One punch, that's why

16  we're all here today.  One punch that Mr. Ward used against

17  Mr. Gaston when he was locking down the yard on March 12th,

18  2021.  One punch that was used to control a situation, and as

19  you heard Mr. Ward say, to defend himself.  You heard

20  Mr. Gaston get up on the stand and tell you all that he had

21  accepted the fight to "the one".

22      His issue was that it didn't happen where he wanted it to

23  happen.  It was in front of everybody else.  He got sucker

24  punched in front of other people.  He had a lot of theories

25  about what the other correctional officers did or aren't doing

1  or are doing to him.  And then you had Mr. Ward get up there

2  and clarify to you what the circumstances were, which was what

3  the parties have stipulated to, that he was locking down the

4  entire yard.  He had given a direct order to Mr. Gaston to lock

5  down, and that Mr. Gaston defied that order and responded with

6  insults and profanity.

7       Then, you heard Mr. Ward testify about the fact that he

8  perceived that Mr. Gaston squared up to fight him, and that in

9  response to that, to defend himself and to control the

10  situation, he struck Inmate Gaston one time, and that after

11  that, he was cuffed and he was taken away.  Even if you wanted

12  to indulge the plaintiff's theory here that my client was

13  malicious and sadistic and had it out for Mr. Gaston and just

14  wanted to fight him, do you really think if all the inmates --

15  all the officers were in on this, and this is an ADOC policy,

16  and that Mr. Ward just wanted to punch him and have at it, he

17  would have punched him one time?  No, that makes no sense.

18       If we're doing "the one", if we're going to have a fight

19  and do all of these things, then there would have been an

20  actual fight.  This wasn't a fight.  This was an unruly inmate

21  defying a direct order to lock down, thinking he can square up

22  with a correctional officer, and a correctional officer,

23  controlling the situation, punching him one time, and handling

24  the situation.

25       Now, the other point that the plaintiff's counsel keeps

 1   leaning in on is what Mr. Ward could have and should have done.

 2   Two points to that:  Number one, that's not what you've been

 3   charged to consider.  You've not been asked to put yourself in

 4   Mr. Ward's shoes and to think about what it feels like working

 5   in a dangerous correctional facility and evaluate whether or

 6   not he accurately perceived that there was a threat in front of

 7   him.

 8        You heard Mr. Ward testify he has been working at

 9   Limestone Correctional Facility for almost ten years.  He

10   continues to work there to this day.  He takes his job

11   seriously.  He cares about rehabbing and working with the

12   inmates.  And you heard him say that, given this circumstance,

13   he thought that the situation had gotten out of control and

14   that he needed to use one punch to control the situation.

15        That is what you need to consider in whether or not there

16   was a use of excessive force.  Was that one punch, used to

17   control the situation, a use of excessive force by Officer

18   Ward, not could he, should he have done anything else.  He took

19   that action.  Was that excessive?  We think the evidence says

20   no.

21        Also, significant in their whole point about what he could

22   have and should have done, Officer Ward testified that he could

23   have used mace, but that he intentionally chose not to.  And he

24   testified saying he didn't choose to use mace because, A, it

25   could have sprayed everybody else, so that would have been an

 1    issue.  And, B, having been maced before, he would have much

 2    rather been punched in the face than maced.  So it would seem

 3    to me, again, if Mr. Ward wanted to harm Inmate Gaston, if this

 4    was a situation where he was just abusing his authority and

 5    trying to take advantage of the situation, he would have used

 6    the resources he does have at his disposal to do something that

 7    he thinks would actually hurt Inmate Gaston, which is mace him.

 8    He chose not to.  He punched him one time, one time only, and

 9    then he was cuffed, and he was taken away.

10         That's why we're here today.  There's no other bigger

11    theory.  There's not been evidence, other than insinuations,

12    that maybe there could have, should have, was something else

13    that was going on.  But that's not sufficient to show that

14    there was excessive force.  You have heard nothing from

15    Mr. Ward suggesting that he was malicious or sadistic in trying

16    to hit -- when he struck Inmate Gaston one time, nothing.

17         You may disagree with his decision to handle the situation

18    that way, but again, that's not the question when it comes to

19    excessive force.  It is given the need that was present, and

20    that's been established.  That was on the white board that's

21    not next to me right now.  But the first point is, was there a

22    need?  Yes, there was a need.

23         It's stipulated to the fact that Inmate Gaston did not

24    obey a direct order to lock down.  It's stipulated to that

25    fact.  We would submit that there's been evidence presented,

1 through Dustin Ward, that that is a significant need to control
2 the situation, that when you have 22 to 2400 inmates, and
3 you've got 22 correctional officers, when a correctional
4 officer says, we're locking down, we're locking down.  It's not
5 a debate.  It's not up for discussion.  We're not thinking
6 about it.  It's not a maybe.  You need to lock down.

7      And he said he was asking them to lock down, not just
8 because he felt like it, but because he needed to do an
9 institutional count.  We need to make sure all the inmates are
10 there, and we need to make sure everybody is safe and taken
11 care of.  And it's undisputed that Inmate Gaston said, No, I'm
12 not going to do that.  And then he responded with insults and
13 profanity.  There's clearly a need, and the evidence showed
14 that there was a need.

15      The second point -- we've already discussed this at length
16 -- the need and the amount of force used.  There was a need.  I
17 think that we have proven that.  The amount of force used was
18 one punch.  That's it.  One punch by Mr. Ward to control the
19 situation, and then Mr. Gaston was taken away.

20      He's alleged that he was bumped and bruised and scraped
21 from being brought down and taken, and now, he's emotionally
22 distressed.  None of that has anything to do with Officer Ward.
23 The testimony is and it's another stipulated fact that he was
24 arrested and then taken off.  That's it.

25      The third point, minimal physical injuries.  You saw the

1 pictures, and you've heard the testimony.  What came as a
2 result of the one punch that Mr. Ward used was a cut on his lip
3 and a bump on his forehead.  That's it.  That's what the
4 pictures show.  That's all we've been -- we've heard has
5 happened here.  There are no stitches for the busted lip.
6 There's an aspirin for the bump on his head.  That's it.  That
7 is definitionally, when you see the jury instructions when you
8 go back to the room, a minimal physical injury.  It defines
9 minimal physical injuries as bumps or a bruise and cut.  That
10 is what happened to Inmate Gaston.

11      So even if you are not inclined to believe my client and
12 the case that we've put on and the arguments I've just made,
13 there's nothing more than a minimal physical injury here, and
14 Mr. Gaston is not entitled to anything more than $1.  And
15 finally, before -- and I'd just like to draw two more points.

16      One is the credibility of the testimony that was given.
17 You heard from Inmate Gaston, and then you heard from Officer
18 Ward.  You are allowed, and you are instructed by Judge
19 Danella, to consider the truthfulness of both of the people who
20 have testified, and you are allowed to consider the fact that
21 Mr. Gaston is a felon and that he is currently serving
22 20 years.  You are allowed to consider that in the context of
23 his trustworthiness and whether or not you want to believe what
24 he says about what has happened.

25      You've heard from Mr. Ward, and you've heard that he is a

1   correctional officer, has been for ten years and continues to

2   be.  He's an expecting father.  He's worked hard.  He cares

3   about what he does.  And you heard him testify about what he

4   did.  It is up to you to make the common sense decision as to

5   who you want to trust and believe and whose testimony you're

6   going to give the most weight to.

7       And I would also like to draw your attention to three

8   inconsistencies that came out during their testimonies.  And it

9   came out from Inmate Gaston and not from my client.  The first

10  is there's a direct order to lock down.  The complaint was

11  filed by Inmate Gaston, in which he says, and you saw it on

12  your screens, he defied a direct order to lock down.  And he

13  responded with insults and profanity.

14      He filed a complaint against my client alleging those two

15  things.  And now, he sat here and told you all, No, actually,

16  there was no order to lock down.  It was ordered to lock down

17  after this incident with Mr. Ward.  And I did not respond with

18  insults and profanity.  It was the opposite.  Mr. Ward used

19  insults and profanity against me, after he tackled me and then

20  locked down the yard, and then he cussed at me.  It was the

21  opposite of what was in the complaint.

22      And the third point that there was an inconsistency about

23  is how many times Mr. Ward struck Mr. Gaston.  In his

24  complaint, where he is suing my client, he says he was struck

25  one time.  That's it.  Now, there's two punches, and now, he's

1  been wrestled to the ground.  And there's a whole lot of

2  issues.  But when he first filed this complaint, right after

3  the incident, when he was very upset about it, when he wanted

4  to fight for his constitutional rights, he only put in there

5  that he was struck one time.

6      So on three very significant issues, in his own case, when

7  this was all recent, had just happened four weeks ago, those

8  were the allegations Inmate Gaston made.  And now, two years

9  later, he sat up here and told you guys a very different

10  version of events.  So you should consider that when you're

11  evaluating the testimony and giving it weight.

12      And finally, the damages that are being requested.  I

13  would submit to you there's not sufficient evidence to find

14  that any excessive force was used by Officer Ward in that

15  situation.  But should you think that excessive force was used,

16  the only appropriate damages here is the $1 nominal damages

17  that Judge Danella instructed you that you were allowed to

18  afford Inmate Gaston for the situation.

19      Should you find that Mr. Ward acted improperly and

20  violated his constitutional right, you may award Inmate Gaston

21  $1.  And that is the most he is entitled to here today.  He has

22  not proven any compensatory damages beyond the minor injuries

23  we just discussed.  And if it's only the minor injuries,

24  legally, he is only entitled to $1.

25      Beyond that, I think we can all agree that Part C to the

1  nominal damages says that you can award $1 when you think there
2  was both a justified and an unjustified use of force.  I think
3  that we all agree that, if you defy a direct order from a
4  correctional officer at a maximum security prison to do an
5  institutional count, that some type of force, some type of
6  response was warranted.

7       The plaintiffs concede that.  They just disagree with the
8  amount of force that our guy used to control the situation and
9  to get done what needed to be done.  That means you can fall
10 under C.  You can say, Well, you know what, I didn't think that
11 was okay.  Legally, I think it's appropriate to find that there
12 was excessive force.  You may award Inmate Gaston $1.  That's
13 it.

14      Compensatory of $10,000 have not been supported
15 whatsoever.  I'm not exactly sure how the plaintiffs got there,
16 but there's nothing to justify that.  There's no stitches;
17 there's no follow-up care; there's no counseling; there's no
18 nothing, anything else, other than Mr. Gaston saying all of a
19 sudden he doesn't feel safe when he's traveling between
20 correctional facilities.  That's it.  That is what he's asking
21 you to value at $10,000.

22      And then on top of that, they're asking for $65,000 in
23 punitive damages.  You heard Mr. Ward testify he makes $60,000
24 a year.  They're asking more in punitives than he makes in a
25 year, just period, on top of that $10,000.  So it's $75,000.

1   So you have a young man, who is soon to become a father,

2   working a thankless job that many people don't want to do

3   because it's dangerous.  It's hard.  You're working very long

4   hours, as you heard him testify to.  And they're asking you for

5   him to -- to award Inmate Gaston $75,000, more than he can even

6   make in a year, because they disagree with his use of force in

7   this circumstance.  That is completely unreasonable.

8        And I would submit to you, beyond the fact that the

9   evidence does not support any such a finding, that should you

10  be inclined to award any damages, it shouldn't be near the

11  scope of what they're asking you for.  So when you go back to

12  the jury room, I would just please ask you to think about, it

13  was one punch.  That's why we're here today.  One punch.  Not

14  how do you feel about it, not what would you have done.  One

15  punch that was used by Officer Ward against Inmate Gaston, and

16  that's all.  That's all.  One punch.

17       How would you value that?  Was that excessive force?  We

18  would say, absolutely not.  And nothing that you've been

19  submitted to you today has shown that that was excessive force.

20  Thank you.

21       THE COURT:  Thank you.  Mr. Banks.  Brief rebuttal.

22       MR. BANKS:  Yes, Your Honor.  When someone understands

23  that they have power over us, it only becomes dangerous when

24  they refuse to accept the responsibility that comes with that

25  power.  We've heard opposing counsel talk a lot about this case

1   is about one punch.  One punch.  Ladies and gentlemen, it's not

2   about one punch.  It is what led to that one punch and whether

3   or not this defendant had any conceivable right to use that

4   force to control Mr. Gaston.

5        How do we know that's not the case?  Because this

6   defendant took the stand and told us he knows and he thinks

7   it's not appropriate for ADOC employees to fight inmates.  And

8   when I caught him in an inconsistency on his direct testimony,

9   he said, No, no, self-defense and a fight are the same thing.

10        We know that's not the case because if this was

11   self-defense, if this was remotely anything close to what this

12   defendant was supposed to do, he would have different lawyers.

13   Somebody from the ADOC would be here saying he did his job.

14   That is not the case.

15        You heard Judge Danella issue an instruction saying that

16   the force required had to have some legal justification.  This

17   defendant said a fight with an inmate is nothing an ADOC

18   employee should be doing, no justification.  He tried saying

19   because Gaston wanted "the one", he was defending himself.  But

20   again, he took off his radio, and he took off his mace that he

21   told us was important to do his job to protect and secure

22   himself, other officers, and inmates just like Mr. Gaston.

23        Instead, he decided to gain control with the punch, not a

24   takedown.  In fact, when I asked him about a takedown, he did

25   what we see a lot on TV, and we don't really think happens in

1 real life.  He said he assisted Mr. Gaston to the ground with
2 the help of another officer.  A whole bunch of fancy talk to
3 get around the point.  That's like saying his fist assisted
4 Mr. Gaston's lip getting swole, cut, and getting a knot on his
5 head.  That's like saying his conduct assisted Mr. Gaston in
6 getting threats from other officers who were there to protect
7 and secure him at other facilities for asserting a
8 constitutional right.

9     A constitutional right that opposing counsel got up here
10 and opened and said does not matter today.  When buildings just
11 like this, and courtrooms just like this one, are built on
12 constitutional rights.  When this country was built on
13 constitutional rights.  But somehow, a claim brought under the
14 constitution, under the Eighth Amendment and the Bill Of
15 Rights, is not about the constitution.

16     The issue here is not that this defendant chose not to use
17 his mace.  The issue here is that this defendant took off his
18 mace and took off his radio, and now, decides to say everything
19 he was doing in that moment was for safety and protection.  An
20 officer who said he'd rather get punched than to get maced, but
21 said Mr. Gaston's so big, I decided to punch him.  How does
22 that make sense?

23     If he was so concerned about Mr. Gaston fighting him, and
24 so concerned about what Mr. Gaston could do to him, why would
25 he not use a thing that he knows is more effective and that the

1   ADOC issued him to use in situations just like this one?  Well,

2   there was wind.  There was another officer there.  There were

3   other inmates.  He already told us the yard was empty.  There

4   were a couple of stragglers, but now, wants to tell us all of

5   that, just like he told us he cares about inmates.  He cares

6   about them as a person and not what their backgrounds are.

7       So of course he would get up here and decide to tell us

8   and deny that he didn't say any slur at Mr. Gaston because that

9   doesn't fit.  Mr. Gaston has taken the stand, and he's told us

10  exactly why he's here, exactly what got him to that position.

11  There hasn't been any fluff to that.  This defendant, whole lot

12  of fluff regarding a whole bunch of nothing.

13      This defendant had a position of authority.  He chose to

14  ignore the responsibility that comes with that position and the

15  authority that is vested in it.  And because of that,

16  Mr. Gaston's constitutional rights were violated.  Return the

17  only verdict that the evidence supports and that justice

18  demands, and that's a verdict for Mr. Gaston against this

19  defendant.

20      THE COURT:  Thank you.  Ladies and gentlemen of the

21  jury, I remind you, once again, that the arguments of counsel

22  are not evidence in this case.  The court allows counsel to

23  make closing arguments or summations to help you recall the

24  evidence and to help you tie the evidence together.  You should

25  not substitute what the lawyers say about the evidence for your

1  own recollection.  You must decide the case based solely on

2  your view of the facts, as you find them to be from the

3  evidence, in applying the law to those facts as I have

4  instructed you.

5       In this case, you have been permitted to take notes during

6  the course of the trial, and most of you, if not all of you,

7  have taken advantage of that opportunity and have made notes

8  from time to time.  You will have your notes available to you

9  during your deliberations, but you should make use of them only

10  as an aid to your memory.  In other words, you should not give

11  your notes any precedence over your independent recollection of

12  the evidence or the lack of evidence, and neither should you be

13  unduly influenced by the notes of other jurors.

14       I emphasize that notes are not entitled to any greater

15  weight than the memory or impression of each juror as to what

16  the testimony may have been.  When you get to the jury room,

17  choose one of your members to act as foreperson.  The

18  foreperson will direct your deliberations and speak for you in

19  court.

20       The verdict form has been prepared for your convenience.

21  The form will address Mr. Gaston's claim against Mr. Ward.  The

22  form will ask you to answer a series of yes or no questions.

23  If the result of those answers is a finding in favor of

24  Mr. Gaston, the verdict form will ask you to assign the amount

25  of compensatory damages, if any, Mr. Gaston should recover from

1  Mr. Ward.

2      The verdict form will also ask you to decide if Mr. Gaston

3  is entitled to recover punitive damages from Mr. Ward as a

4  result of that claim.  If you conclude that Mr. Gaston should

5  recover punitive damages, the verdict form will ask you to

6  assign the amount of punitive damages Mr. Gaston should recover

7  from Mr. Ward.

8      Take the verdict form with you to the jury room.  When

9  you've all agreed on the verdict, your foreperson must fill in

10  the form, sign it, and date it.  Then, you'll return it to the

11  courtroom.  If you wish to communicate with me at any time,

12  please, write down your message or question, and give it to a

13  court staff member.  He or she will bring it to me, and I'll

14  respond as promptly as possible, either in writing or by

15  talking to you in the courtroom.

16      Please, understand that I may have to talk to the lawyers

17  and the parties before I respond to your question or message,

18  so you should be patient as you await my response.  But I

19  caution you not to tell me how many jurors have voted one way

20  or the other at that time.  That type of information should

21  remain in the jury room and should not be shared with anyone,

22  including me, in your note or question.

23      When you have reached your decision, knock on the jury

24  room door, tell a member of the court staff that you have the

25  verdict.  Starting now, you will decide when you want to take

1  your breaks and when you want to stop for the day, just let a

2  member of the court staff know.  But you can only discuss the

3  case when all of you are together in the jury room.

4       I'll remind you again, do not discuss this case or

5  anything about it with anyone outside of the jury room.  Do not

6  post anything about this case or your jury service on any blog

7  or social networking page.  Do not send e-mail messages about

8  the case to anyone.  Do not call, text, or e-mail each other.

9  Do not conduct any research about any aspect of this case.

10  That means do not consult a dictionary, do not use Google or

11  Wikipedia, do not ask questions of anyone other than each other

12  or me.

13       Remember, as I told you earlier, the only information you

14  should use to decide this case is the evidence presented and

15  the law explained in this courtroom.  At this time, please

16  return to the jury room.  You may select your foreperson, but

17  do not begin your deliberations until you have the exhibits and

18  verdict form.

19            (Jury out at 4:02 p.m.)

20       THE COURT:  The jury is out.  A few housekeeping

21  matters.  Any objections from either side to the court's jury

22  instructions, closing, or final?

23       MR. BANKS:  No, Your Honor.

24       MS. BAUER:  Yes, Your Honor.  We have an objection to

25  the closing statements or arguments made by plaintiff's

1  counsel.

2      THE COURT:  Just jury instructions for now.

3      MS. BAUER:  I'm sorry.  I thought you said closing.

4  No, Your Honor.

5      THE COURT:  Thank you.  Ms. Bauer, I'll stay with you.

6  Any objection to -- I'll just put them together -- plaintiff's

7  initial closing argument or rebuttal closing argument?

8      MS. BAUER:  Yes, Your Honor.  To the initial closing

9  argument, we object.  Plaintiff's counsel, I think, was trying

10  to reference a stipulation and inform the jury that we had

11  stipulated to the first special interrogatory response, that we

12  had stipulated to a yes.  That is not the case, nor was that

13  ever a stipulation that the defendant made.  As to the rebuttal

14  argument --

15      THE COURT:  Let's stop there.

16      MS. BAUER:  Okay.  Sorry.

17      THE COURT:  Argument from plaintiff?

18      MR. BANKS:  Your Honor, we'll fess up to that.  That

19  was a complete blunder, and that was mainly on confusion of the

20  final special interrogatory that was submitted to the jury.

21      THE COURT:  I think it's clear from the verdict form.

22  I think you cleaned it up in closing.  Argument is not

23  evidence.  What would you propose for a remedy?  I can give

24  another curative on that if you want it.  I think it's been

25  covered.  If you want to propose something, I'll consider it.

1   I don't think it's grounds for a mistrial.

2           MS. BAUER:  Okay.  Then, no, Your Honor.  Then, that's

3   fine.

4           THE COURT:  And then on the rebuttal.

5           MS. BAUER:  Several objections, Your Honor.  The first

6   is that the reference to Mr. Ward having no counsel from ADOC,

7   beyond the fact that that was not an issue presented to the

8   jury, that really can only inflame them and confuse them, and

9   now suggest that there's something wrong.  The judge's order

10  was clear -- your order was clear regarding the fact that we're

11  not getting into the disciplinary record of Mr. Ward and any of

12  the ADOC proceedings afterwards.

13      It is, for us, all clear that part of the reason that

14  Mr. Ward didn't need to have counsel is because of the

15  proceedings that happened afterwards.  But your order clearly

16  excluded that from being at issue here in this case.  And so,

17  by referencing it, it was, for us, a clear attempt to try to

18  now find a back way into suggesting that Mr. Ward has done

19  something wrong in a manner that was not consistent with the

20  evidence that was presented to the jury and the evidence that

21  you clearly excluded.

22      And in that same vein, during the rebuttal, there was

23  reference to now -- the statements that Mr. Ward is now making.

24  There was no evidence submitted that he had previously made a

25  statement to the contrary, other than the improper references

1    to the disciplinary report that Your Honor had excluded.  And
2    so, to the extent to which that was excluded during the trial,
3    you sustained an objection, you did not allow that to be put
4    in.  But then during closing, to refer back to it, again.
5    There was no other statement that my client has made that can
6    carry that.

7        So I understand that was just one time he said now.  But
8    in light of the fact that we're referring back now to the ADOC
9    proceedings afterwards, when it's clearly been excluded, it
10   made the entire jury respond and look up and look at us and
11   figure out -- I mean, they all looked confused and looked
12   straight over at us.  I think that's a significant objection.

13       THE COURT:  Help me with that one again.  I think I'm
14   confused now.  It was an inconsistent statement?

15       MS. BAUER:  Yes.  That in conjunction with not having
16   any counsel from the ADOC.

17       THE COURT:  And what was the now change?

18       MS. BAUER:  That he is saying that -- Mr. Ward is now
19   testifying that this happened, this happened, that he wasn't
20   going to use his mace, that he was going to do this, that, and
21   the other.  For lack of a better way, he's saying "now" like he
22   had previously said something else.  And there's no evidence
23   that anything was ever said previously, other than the
24   disciplinary report that the plaintiffs did refer to improperly
25   during the trial.  Sorry.  I should have just said it that

1  succinctly.

2       THE COURT:  I think, I don't -- there was some

3  illusions to disciplinary actions after.  I don't think it ever

4  got too far into it.  The now is hard for me to grasp, but let

5  me hear from Mr. Banks.

6       MR. BANKS:  Your Honor, the now -- apologies in the

7  event that that was the heard effect.  My intention, saying

8  "now", was during the course of today's trial.  That was not

9  any effort to reference prior proceedings.  I was very clear on

10  the court's ruling during the cross-examination of Officer

11  Ward.  That was merely an indication of, literally, today and

12  not any reference back to any testimony that did not come up

13  during today's trial.

14       THE COURT:  That one, I overrule the objection.  I

15  don't -- I hear the concern.  I don't see it as problematic.

16  And again, argument is not evidence.  I'll say the

17  representation, I think, was improper.  I don't know if you

18  want to explain or if you have any argument on that.

19       MR. BANKS:  I mean, Your Honor, that was based on the

20  court's introduction, during voir dire, as to the firms

21  representing both parties.

22       THE COURT:  I agree.  It's factually correct that he's

23  not represented by ADOC.  But it is an improper inference, I

24  think, and I don't think that it necessarily comes in as

25  covered by the MIL on discipline.  I hear you that -- frankly,

1   I didn't even know that. I assume that's correct, but I didn't

2   know that. That's no where in the case record. And so we'd

3   agree, there wasn't an evidentiary basis to make that argument.

4   I do think it was an improper argument. I take your point that

5   it is factually correct and was covered in voir dire.

6         MR. BANKS: Yes, Your Honor.

7         THE COURT: And again, Ms. Bauer, I sustain that

8   objection in the air. I don't know if you want a curative

9   instruction or if you want to move for a mistrial.

10        MS. BAUER: May I confer with Mr. Freese briefly?

11        THE COURT: You may.

12        MS. BAUER: I think, if it would be possible to give a

13   curative instruction, it may be worth it. It seemed to invoke

14   a response in almost all the jurors, and they all looked

15   straight over at us. So I do think to the extent that -- just

16   that there's no inference to be made. I'm not exactly sure how

17   it would structured.

18        THE COURT: Well, why don't you work something up and

19   show it to the other side and --

20        MS. BAUER: Okay.

21        THE COURT: -- if you can't agree on it, then I'll

22   rule, and we can come -- bring the jury back in, and I can

23   instruct them.

24        MS. BAUER: Okay. Thank you.

25        THE COURT: In the meantime, Ms. Buhler, do they have

1 the exhibits and the verdict form?

2 COURTROOM DEPUTY: They do not yet. I wanted to make

3 sure that I had everything correct before I took it to them.

4 THE COURT: And do they have the -- let's go off the

5 record.

6 (Off the record.)

7 THE COURT: Let's go back on the record. Before we go

8 any farther, any objections to defendant's closing argument?

9 MR. BANKS: No, Your Honor.

10 THE COURT: And for you, Ms. Bauer, do you want us to

11 wait on the -- the jury, at this point, does not have the

12 exhibits, does not have the verdict form, does not have the

13 jury instructions. They have been instructed not to deliberate

14 until they have that, and we can hold that while we hash this

15 out or --

16 MS. BAUER: Yes, Your Honor. I think we can quickly

17 come up with something.

18 THE COURT: Okay. We'll go back off the record until

19 you have that ready. Thank you.

20 (Off the record.)

21 THE COURT: Let's go back on the record. Ms. Bauer.

22 MS. BAUER: After conferring with my co-counsel,

23 defendants would not like to submit a curative instruction to

24 be given to the jury.

25 THE COURT: Thank you.

1          MS. BAUER:  Thank you.

2          THE COURT:  Mr. Banks, anything else?

3          MR. BANKS:  No, Your Honor.

4          THE COURT:  All right.  Ms. Buhler, if you, please,

5   would bring the jury the jury instructions, the verdict form,

6   and the exhibits.  We're off the record.

7               (Recess at 4:18 p.m. to 4:21 p.m.)

8          THE COURT:  Group, let's go back on the record for

9   just one minute.  The jury now has the exhibits, the verdict

10  form, and the jury instructions.  And I just want to thank

11  counsel.  I see Mr. Freese is not in here.  You can convey as

12  much.  I just want to thank you all for your service in this

13  case.  I think you all did an excellent job.  And now we will

14  wait.  We're off the record.

15              (Recess at 4:21 p.m. to 5:04 p.m.)

16         THE COURT:  Back on the record.  The parties are here.

17  Counsel is here.  The jury is not here.  We have a note from

18  the jury, define excessive force, definition, color of law.  My

19  understanding is that the parties have seen that and had a

20  minute to think about it.  My reaction, and then we can talk

21  about how to handle it, is that both of these are covered in

22  the jury instructions.

23      I'm looking at Pages 7 and 8.  Color of law is the fourth

24  element.  And it's stipulated to that Mr. Ward acted under

25  color of law.  The parties have agreed that Mr. Ward acted

1 under color of law, so you should accept that as a proven fact.

2 And I suppose, on Page 6, one of the stipulations,

3 Defendant Ward was acting under color of law when the March 12,

4 2021 incident occurred.

5 And on excessive force, this is Page 8. For the second

6 element, you must decide whether the force used in this case

7 was excessive, based on whether the force was applied in a good

8 faith effort to maintain or restore discipline, through the end

9 of that paragraph. Let's start simple. Do you all see where I

10 am?

11 MR. BANKS: Yes, Your Honor.

12 MS. BAUER: Yes, Your Honor.

13 THE COURT: So I propose -- excuse me -- to either

14 direct them to those pieces of the jury instructions, or if one

15 or both sides wants, we can have them back in, and I can read

16 those pieces again. I see no need to give a new instruction on

17 either of those.

18 MS. BAUER: No, Your Honor.

19 MR. BANKS: I think the parties are okay to just

20 direct the jury to the portions the court just noted.

21 THE COURT: Okay. And that can take the form of a

22 note back that says, See X, Y, Z. We can give them these pages

23 again, so they don't have to go looking for it. We can give

24 them these pages highlighted.

25 MR. BANKS: I think highlight to overt any further

1   confusion or question on these, Your Honor.

2          THE COURT:  All right.  Let's do this.  Ms. Buhler,

3   could you print me Pages 6, 7, and 8?  And if we need to go off

4   the record and take a minute, we can do that.  But I just could

5   highlight it, and then have the parties take a look.

6          COURTROOM DEPUTY:  Sure.  Let me go grab those real

7   quick.

8          THE COURT:  Thank you.  Ms. Buhler, don't be mad at

9   me, the page break is on there.

10          COURTROOM DEPUTY:  How about I just print it off?

11          THE COURT:  Can you just give me Page 5, please?

12          COURTROOM DEPUTY:  Page 5, yeah.

13          THE COURT:  Ms. Buhler, will you please share this

14   with the parties?

15          COURTROOM DEPUTY:  Yes.

16          MR. FREESE:  That's good with us, Your Honor.

17          MR. BANKS:  Plaintiff is okay, Your Honor.

18          THE COURT:  All right.  Ms. Buhler, will you please

19   make a copy, and then give it to the jury?

20          COURTROOM DEPUTY:  Yes.

21          THE COURT:  Thank you.  Anything else?

22          MS. BAUER:  No, Your Honor.

23          MR. BANKS:  No, Your Honor.

24          THE COURT:  Back off the record.

25                    (Off the record.)

1        THE COURT:  Back on the record for one minute, the

2   jury, now, has the highlighted copy of the selected jury

3   instructions in response to the note, the questions that the

4   jury said -- excuse me -- the jury had sent out.  We'll go back

5   off the record.

6                    (Recess at 5:14 p.m. to 5:32 p.m.)

7        THE COURT:  On the record.  The parties are here.  The

8   lawyers are here.  The jury is still in the jury room.  I'm

9   told we have a verdict, and I would ask Ms. Buhler to please go

10  get the jury.

11                   (Jury in at 5:34 p.m.)

12       THE COURT:  The jury is in.  Do we have a verdict?

13       FOREPERSON:  We do.

14       THE COURT:  Would you please hand it to Ms. Buhler?

15  I'll ask Ms. Buhler to read the verdict.

16       COURTROOM DEPUTY:  Okay.  The United States District

17  Court, Northern District of Alabama, Northeastern Division.

18  Roderick Gaston, plaintiff, versus Dustin T. Ward, defendant,

19  Case Number 5:21-cv-549-NAD.

20       Verdict form:  We, the jury, find unanimously -- did not

21  select -- okay -- for Defendant Ward and against Plaintiff

22  Gaston.

23       Special interrogatories:  Do you find from a preponderance

24  of the evidence, one, that Mr. Gaston has proved that Mr. Ward

25  intentionally violated Mr. Gaston's constitutional right to be

1 free from the use of excessive force while incarcerated?

2 Answer yes or no. The answer is no. Signed Russell Delay,

3 foreperson, April 12th, 2023.

4        THE COURT: Thank you. Would either party like the

5 jury to be polled?

6        MR. BANKS: No, Your Honor.

7        MS. BAUER: No, Your Honor.

8        THE COURT: Thank you. Members of the jury, thank

9 you. I think that's a responsible verdict based on the

10 evidence. This will conclude your term of service. The

11 lawyers may not -- excuse me -- the lawyers may want to talk to

12 you afterward, but you're not required to talk to them. If you

13 want to wait in the jury room, I'll come to visit with any of

14 you that want to chat, but you're not required to chat with me

15 either. At this time, you're free to go. Thank you.

16                    (Jury out at 5:37 p.m.)

17        THE COURT: The jury is out. Thank you again,

18 counsel. Thank you, again, to the parties. I think this was a

19 clean trial. Anything else before we adjourn for the day?

20        MR. BANKS: No, Your Honor.

21        MS. BAUER: No, Your Honor.

22        THE COURT: Thank you. We're adjourned.

23        (Proceedings were adjourned at 5:38 p.m.)

24

25

1                    C E R T I F I C A T E

2              I certify that the foregoing is a correct

3    transcript  from the record of proceedings in the

4    above-entitled matter.

5                              Dated: April 25, 2023

6

7

8

9    _Lauren Shirley_

10   Lauren Shirley, RPR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25